**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CHRIS VAN HOLLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | Civil Action No. 1:11-cv-00766 (ABJ) |
| | ) | |
| Defendant, | ) | MEMORANDUM |
| | ) | |
| HISPANIC LEADERSHIP FUND, | ) | |
| | ) | |
| Intervenor Defendant, | ) | |
| | ) | |
| CENTER FOR INDIVIDUAL FREEDOM, | ) | |
| | ) | |
| Intervenor Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

On August 1, 2011, the Court issued a Minute Order granting the motions of the Hispanic

Leadership Fund and the Center For Individual Freedom to intervene as Defendants in this

matter, and ordering each intervenor to submit a pleading that avoids duplication of arguments

already made by Defendant Federal Election Commission.

**I.      Plaintiff Representative Chris Van Hollen Lacks Standing To Challenge 11 C.F.R. §**
**104.20(c)(9)**

Defendant Federal Election Commission does not address the issue of Plaintiff's standing

to bring this lawsuit.  Plaintiff's brief assertion of standing, however, fails to demonstrate that

such standing exists.  As the Supreme Court instructs:

> The minimum constitutional requirements for standing were explained in *Lujan* v.
> *Defenders of Wildlife*, 504 U.S. 555 (1992).
>
> "First, the plaintiff must have suffered an 'injury in fact' -- an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) 'actual or imminent,
> not "conjectural" or "hypothetical."'  Second, there must be a causal connection between
> the injury and the conduct complained of -- the injury has to be 'fairly . . . trace[able] to
> the challenged action of the defendant, and not . . . th[e] result [of] the independent action
> of some third party not before the court.'  Third, it must be 'likely,' as opposed to merely
> 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id*., at 560-561
> (citations and footnote omitted).
>
> In requiring a particular injury, the Court meant "that the injury must affect the plaintiff
> in a personal and individual way." *Id*., at 560, n. 1.

*Ariz. Christian Sch. Tuition Org*. v. *Winn*, 131 S. Ct. 1436 , 1445 (2011).

Plaintiff's assertion of injury is premised on the holdings in *FEC* v. *Akins*, 524 U.S. 11

(1998) and *Shays* v. *FEC*, 340 F.Supp. 2d 39 (D.D.C. 2004).  However, neither decision supports

Plaintiff's standing in this matter.

## A.     Informational Injury

Plaintiff claims standing under *FEC* v. *Akins* "because he is not receiving disclosure of

information mandated by BCRA."  *See* Plaintiff's Motion For Summary Judgment at 16;

Declaration of Representative Chris Van Hollen In Support Of Motion For Summary Judgment,

¶ 5.  The Supreme Court's holding in *Akins* was premised on the FEC's refusal to take a certain

enforcement action in response to a filed complaint, and to the extent that *Akins* created any

broad information-based standing right, it did so within the context of 2 U.S.C. § 437g, and not

within the context of the FEC's rulemaking authority.  *See Citizens For Responsibility and*

*Ethics In Washington* v. *FEC*, Civil Action No. 10-1350 (D.D.C. filed Aug. 1, 2011) (J. Boasberg) ("The Supreme Court in <u>Akins</u> recognized 'informational injury' as a basis for standing to challenge the FEC's dismissal of a complaint under § 437g(a)(8)(A).").

The Supreme Court's decision in *Akins* included discussion of both a statutory right to bring suit and traditional prudential standing doctrine.  The respondents in that case had filed an administrative complaint with the FEC pursuant to 2 U.S.C. § 437g(a)(1)[1] against the American Israel Public Affair Committee (AIPAC), alleging that AIPAC qualified as a "political committee" under the Federal Election Campaign Act (FECA), and was therefore subject to FECA's registration and reporting requirements.  The FEC dismissed the respondents' complaint.  The respondents then brought suit pursuant to 2 U.S.C. § 437g(a)(8), which provides that  "[a]ny party aggrieved by an order of the Commission dismissing a complaint filed by such party under paragraph (1) . . . may file a petition with the United States District Court for the District of Columbia."  While the Supreme Court's decision intermingled discussion of this statutory provision with traditional "injury in fact" considerations, it is clear that the Court's decision regarding standing was influenced by the statutory language:  "*Given the language of the statute* and the nature of the injury, we conclude that Congress, intending to protect voters such as respondents from suffering the kind of injury here at issue, intended to authorize this kind of suit."  *FEC* v. *Akins*, 524 U.S. at 20 (emphasis added).

Plaintiff's purported informational injury is also based on a presumptuous legal conclusion, namely that "Plaintiff is not receiving the full, accurate, and timely disclosures *required under BCRA*."  See Plaintiff's Motion For Summary Judgment at 17 (emphasis added).

---

[1] 2 U.S.C. § 437g(a)(1) provides, in part: "Any person who believes a violation of this Act or of chapter 95 or chapter 96 of title 26 has occurred, may file a complaint with the Commission."

The question of whether these disclosures are "required under BCRA," however, is the

substantive legal issue at the center of this lawsuit.

Both Plaintiff's Motion For Summary Judgment and the Supreme Court in *Akins*

reference *Public Citizen* v. *U.S. Dept. of Justice*, 491 U.S. 440 (1989).  The Court in *Public*

*Citizen* likened the request for information in that case to a denial of information under the

Freedom of Information Act:

> Appellant WLF has specifically requested, and been refused, the names of candidates
> under consideration by the ABA Committee, reports and minutes of the Committee's
> meetings, and advance notice of future meetings.  As when an agency denies requests for
> information under the Freedom of Information Act, refusal to permit appellants to
> scrutinize the ABA Committee's activities to the extent FACA allows constitutes a
> sufficiently distinct injury to provide standing to sue.  Our decisions interpreting the
> Freedom of Information  Act have never suggested that those requesting information
> under it need show any more than that they sought and were denied specific agency
> records. . . . .There is no reason for a different rule here.

*Public Citizen* v. *U.S. Dept. of Justice*, 491 U.S. at 449.  No such agency denial of a specific

request for information exists here.

In fact, Plaintiff does not claim to be deprived of any information that affects him "in a

personal and individual way."  *See Ariz. Christian Sch. Tuition Org*. v. *Winn*, 131 S. Ct. at 1445.

Rather, Plaintiff broadly asserts a right to the entire universe of "contributor" information that

potentially could be disclosed on electioneering communication reports that are filed with the

FEC, were the Court were to interpret the relevant statutory language as broadly as possible and

then order the FEC to do the same.  To the extent that Plaintiff claims an injury in this regard,

"the impact on" the Plaintiff by the FEC's current regulation "is plainly undifferentiated and

'common to all members of the public.'"  *U.S.* v. *Richardson*, 418 U.S. 166, 176-177 (1974)

*quoting Ex parte Levitt*, 302 U.S. 633, 634 (1937).

Plaintiff's alleged injury is also not "concrete."  Plaintiff does not allege that the challenged regulations could be enforced against him or that any of his potential actions are "chilled" by the threat of enforcement of the challenged regulation.  Nor does Plaintiff allege that anyone has actually distributed an electioneering communication in his congressional district, and subsequently filed a disclosure report lacking the additional element of disclosure that Plaintiff seeks from the Court.  Plaintiff merely declares that "I *will* also be the subject of 'electioneering communications' that are financed by donors whose names would have otherwise been disclosed" and that he will then not be able to "draw attention" to these donors in personal terms, as opposed to simply responding to their substantive arguments.  Declaration of Representative Chris Van Hollen In Support Of Motion For Summary Judgment, ¶ 4 (emphasis added).  This is entirely speculative and does not demonstrate the occurrence, or the imminent occurrence, of any actual injury, if the purported lack of this information can even be regarded as an "injury" to a recognized interest.  FEC records indicate that Plaintiff has never been identified in a reported electioneering communication.  *See* FEC Database of Electioneering Communication Reports *available at* http://www.fec.gov/finance/disclosure/ec_table.shtml; *see also* Center For Responsive Politics aggregation of Outside Spending By Candidate *available at* http://www.opensecrets.org/outsidespending/summ.php?disp=C.

Finally, the fact that "[t]his lawsuit appears to be a judicial effort to achieve what could not be done legislatively," *see* Defendant Federal Election Commission's Motion For Summary Judgment at 38, coupled with the extraordinarily broad and non-particularized informational injury asserted by Plaintiff, very strongly suggests that "the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance." *See FEC* v. *Akins*, 524 U.S. at 23.

**B.**     **Competitor Standing**

Plaintiff also fails to demonstrate injury under the "competitor standing" theory accepted

by the Court in *Shays* v. *FEC*, 414 F.3d 76 (D.D.C. 2005).  Plaintiff claims to suffer legal harm

because the FEC's regulation "illegally structures a competitive environment," see Plaintiff's

Motion For Summary Judgment at 17, but offers nothing other than a rote explanation of how

this is so while failing to acknowledge that this phrase, as used in *Shays* v. *FEC*, had a specific

meaning that is not applicable in this case.

Plaintiff claims that "[t]he challenged regulation infringes Plaintiff's interest in

participating in elections untainted by BCRA-banned practices because it allows corporations

and labor organizations to hide the sources of funds they use to pay for 'electioneering

communications.'"  *See* Plaintiff's Motion For Summary Judgment at 17 *citing* Van Hollen Decl.

¶ 4.  As set forth in the succeeding section of this brief, BCRA, as it was initially conceived and

passed into law, did not permit any corporate- or labor union-funded electioneering

communications (or independent expenditures).  Accordingly, BCRA cannot be understood to

have contemplated the issue of contributor/donor disclosure in connection with corporate- and

labor union-funded electioneering communications (or independent expenditures).  Thus, it

cannot be claimed that the FEC's current electioneering communication donor disclosure

regulation causes elections to be "tainted" by a "BCRA-banned practice."

The theory underlying standing in *Shays* v. *FEC* was that the FEC regulations at issue in

that litigation permitted that which BCRA prohibited, namely, the spending of "soft money" in

connection with Federal elections.  The Court accepted the Plaintiffs' asserted particularized

injury:

> Particularizing this claim of injury, the Congressmen then identify consequences for their
> own campaigns flowing from FEC subversion of each key category of BCRA

restrictions.  For example, as to BCRA's 'soft-money provisions,' Shays and Meehan
state, 'If [FEC] regulations do not faithfully implement the soft-money ban, I face the
strong risk that unregulated soft money contributions will again be used in an attempt to
influence federal elections in which I am a candidate.' (Shays Decl. P5; Meehan Decl.
P5.)  As to the 'sham issue ad provisions,' they assert, 'If those regulations do not
faithfully implement [BCRA], I will be open to attack, during critical time periods just
before the primary and general elections, in broadcast advertising campaigns mounted by
groups seeking to evade the contribution limits, source prohibitions, and disclosure
requirements imposed by Congress.'  (Shays Decl. P7; Meehan Decl. P7.)

*Shays* v. *FEC*, 414 F.3d at 84.

Of course, as a result of *WRTL* and *Citizens United*, the Plaintiff in this case cannot claim

the *Shays* v. *FEC*-recognized interest in being protected from advertising funded with "soft

money,' as corporations and labor unions are now free to sponsor electioneering communications

and independent expenditures and pay for those advertisements using so-called "soft money"

from their general treasury funds.  Much of the election spending that the *Shays* Plaintiffs self-

interestedly disparaged as "tainted" and "corrupt" "special-interest money," has since been

afforded constitutional protection by the Supreme Court.  In the process, the Supreme Court

rendered the incumbency-protection-based theory of "competitor standing" found in *Shays* v.

*FEC* irrelevant because the laws and FEC regulations that allegedly allowed for the "illegal

structuring of a competitive environment" that forced incumbent politicians to "face *intensified*

competition" from "additional campaign spending" have been held unconstitutional.

In other words, standing existed in *Shays* v. *FEC* because the Plaintiffs might

conceivably have faced additional election spending that was illegal under BCRA.  No such

claim can be made here – all of the spending at issue is an unquestionably permissible exercise

of First Amendment rights.  The additional element of disclosure that Plaintiff seeks, or the

absence of such disclosure, does not impact the "competitive environment" similar to the

hypothetical scenarios described by the Court in *Shays* v. *FEC*.  In fact, because the regulation at

Case 1:11-cv-00766-ABJ   Document 31   Filed 08/22/11   Page 8 of 18

issue in this matter does not allow any parties "to engage in activities that otherwise would be

barred," it is very likely that the FEC's regulation has no cognizable impact whatsoever on the

Plaintiff's "competitive environment." *See Shays* v. *FEC*, 414 F.3d at 87 *quoting Shays* v. *FEC*,

337 F.Supp.2d 28, 42-43 (D.D.C. 2004).

## II.    Alternatively the Court Should Grant Defendant Federal Election Commission's Motion for Summary Judgement

Except as otherwise set forth below, Intervenor Hispanic Leadership Fund adopts and

incorporates herein the arguments made by Defendant Federal Election Commission in its

Opposition and Motion For Summary Judgment.

### A.    As Adopted, BCRA Prohibited All Corporate- And Labor-Funded Electioneering Communications

Plaintiff's Memorandum of Points and Authorities states that BCRA allowed so-called

"*MCFL* corporations"[2] to make electioneering communications, which, according to Plaintiff,

indicates that Congress contemplated and provided for certain corporate-funded electioneering

communications in BCRA.  *See* Plaintiff's Memorandum of Points and Authorities, at 7 n.4.

Defendant Federal Election Commission similarly asserts that "BCRA prohibited corporations

from making electioneering communications unless they met the strict criteria of '*MCFL*

corporations,' . . .."  Defendant Federal Election Commission's Memorandum of Points and

Authorities, at 6.  *See also id.* at 18 ("BCRA prohibited all unions and *virtually all* corporations

from making any electioneering communications") (emphasis added).

We disagree with this assessment.  Both the Supreme Court and the special three-judge

District Court panel that first considered *McConnell* v. *FEC* understood that lawmakers, when

---

[2] An "*MCFL* corporation" is an incorporated, non-profit advocacy organization that satisfies certain criteria set forth in *FEC* v. *Massachusetts Citizens For Life, Inc.*, 479 U.S. 238 (1986).  Prior to *Citizens United* v. *FEC*, these organizations were deemed to be entitled to an "as applied" exemption from the Federal Election Campaign Act's prohibition on corporate independent expenditures at 2 U.S.C. § 441b.

they adopted the Wellstone Amendment, intended to prohibit *all* corporate- and labor-funded

electioneering communications. The Supreme Court explained in *McConnell* v. *Federal Election*

*Commission* that "[t]he parties and the judges on the District Court have assumed that amended

FECA § 316(c)(6) completely canceled the exemption for nonprofit corporations set forth in §

316(c)(2)." *McConnell* v. *Federal Election Commission*, 540 U.S. 93, 210 n.90.  The Supreme

Court referred to the lower court's consideration of the case, citing Judge Leon's opinion and

quoting a portion of the following passage:

> As defendants acknowledge, Section 204 completely cancels out the exemption for all
> nonprofit corporations provided by Section 203. *See* Gov't Opening Br. at 164, n.115.
> Plaintiffs contend, and Judge Henderson agrees, that Section 204 is unconstitutional
> because, in essence, it contravenes the Supreme Court's decision in *MCFL*.

*McConnell* v. *FEC*, 251 F. Supp. 2d 176, 804 (D.D.C. 2003) (Leon, J.).

The Supreme Court agreed that BCRA itself did not include a *MCFL* exemption: "That

FECA § 316(c)(6) does not, on its face, exempt MCFL organizations from its prohibition is not a

sufficient reason to invalidate the entire section." *Id*. at 211.  The Supreme Court then *construed*

the electioneering communications provisions to include the *MCFL* exception to avoid the

constitutional question raised.  The FEC similarly read a *MCFL* exception into the electioneering

communication prohibition when it adopted regulations.  That the Supreme Court and the FEC

incorporated the *MCFL* exception into the electioneering communication provision, however,

does not mean that Congress actually intended for BCRA to include such an exception.

When Senator Wellstone presented his amendment on the Senate floor, he explicitly

stated that it did not include the *MCFL* exception:

> The main argument that I think colleagues will hear advanced against the
> constitutionality of this amendment is based upon a 1986 Supreme Court case called the
> Federal Election Commission v. Massachusetts Citizens for Life.  In that case, a 5-4
> decision, the Court found a flier produced by the group that urged voters to vote "pro-

life" and mentioned candidates could be paid for using the group's regular treasury funds. But I think the five reasons why the Court would find this amendment, which is different constitutionally is: First, it is important to note tonight at the onset that this amendment – and indeed the Snowe-Jeffords motion already in the bill – only covers broadcast communications.  It does not cover print communications such as the one issue in the Massachusetts Citizens for Life.  Indeed, the group argued that the flier should  have been protected as a news editorial.  Snowe-Jeffords specifically exempts editorial communications.  Second, the Court based its decision in part on the logic that the regulation of election-related communications was overly burden [sic] to small grassroots organizations.  Under our amendment – and under Snowe-Jeffords the group would have to raise $10,000 on broadcast ads that mention a candidate 60 days before the election before their provision would kick in. . . . Finally, and most importantly of all about this Court decision, the Court actually argued that the election communications of nonprofit corporations, such as the one covered in this amendment, could be regulated once it reached a certain level. . . . Since this decision, these groups have operated outside the law with impunity.

147 Cong. Rec. S2845, S2848 (Mar. 26, 2001)

The Wellstone Amendment was specifically and explicitly intended to overcome the

Supreme Court's decision in *Massachusetts Citizens For Life, Inc*., to the extent that a *MCFL*

organization might otherwise produce and distribute an electioneering communication.  BCRA,

as it was originally adopted, did not provide for any corporation – even an *MCFL* organization –

to make or disclose electioneering communications.  Plaintiff's obfuscations regarding the "back

up" Snowe-Jeffords provision, and his speculation about the Congressional intent behind a

provision of BCRA that has never been, and was never intended to be, operative law, do not

change this fact.  *See* Plaintiff's Memorandum of Points and Authorities at 23-25.

Thus, for the reasons set forth herein, and in further support of the reasons set forth in

Defendant Federal Election Commission's Memorandum of Points and Authorities In Support

Of Its Motion For Summary Judgment, we agree that Congress did not speak to the issue raised

by Plaintiff and that "the Court must proceed to step two of the *Chevron* analysis."

**B.** ***Center For Individual Freedom, Inc*. v. *Tennant* Indicates That The FEC's Regulation Is Constitutionally Required**

In *Center For Individual Freedom, Inc*. v. *Tennant*, Civil Action No. 1:08-cv-00190, S.D.W.Va. July 18, 2011, the Court indicated that an electioneering communication disclosure requirement does not survive "exacting scrutiny" unless it contains limitations similar to those present in the FEC's regulation.  Specifically, the Court construed West Virginia's electioneering communication donor disclosure requirement "to reach only contributions that are either (1) received by the organization or corporation in response to a solicitation specifically requesting funds to pay for an electioneering communication or (2) specifically designated for electioneering communications by the contributor." *Center For Individual Freedom, Inc*. v. *Tennant* at \*91.  Otherwise, the required disclosures "compel a flood of information . . . that is not necessarily relevant to the purpose the regulation purportedly services: to provide the electorate with information as to who is speaking."  Plaintiff's preferred reading of BCRA would similarly "add so much information that it ultimately fails to further the government interest it was enacted to serve." *Id*. at \*90.

The *Tennant* Court also observed that "requiring the disclosure of corporate or organizational contributors' personal information can be quite burdensome on those entities and may discourage general treasury contributors from associating with and giving to the entity as a consequence." *Center For Individual Freedom, Inc*. v. *Tennant* at \*90.  The same is certainly true here, and there is no valid governmental interest in intentionally imposing burdens on speech either for the sake of discouraging that speech or out of simple curiosity in what might be disclosed. *See  FEC* v. *Machinists Non-Partisan Political League*, 655 F.2d 380, 388 (D.C. Cir. 1981) ("Plainly, mere 'official curiosity' will not suffice as the basis for FEC investigations….").

**C.Plaintiff Asks The Court To Set Aside FEC Regulations That Save The Constitutionality of BCRA's Electioneering Communication Disclosure Provisions**

As the decision in *Center For Individual Freedom, Inc*. v. *Tennant* demonstrates, the electioneering communication donor disclosure requirements set forth at 2 U.S.C. § 434(f)(2)(F) are subject to constitutional challenge.  However, those requirements can be read, interpreted, and implemented in a manner that avoids the constitutional problems identified in *Center For Individual Freedom, Inc*. v. *Tennant*.  The FEC's regulations accomplish this necessary task.

The Supreme Court explained, "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available."  *NLRB* v. *Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979).  Furthermore, "[a]s was stated in *Hooper* v. *California*, 155 U.S. 648, 657 (1895), 'the elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'"  *Edward J. DeBartolo Corp*. v. *Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (U.S. 1988).  "The principle enunciated in *Hooper* v. *California, supra*, and subsequent cases, is a categorical one: 'as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.'  *Blodgett* v. *Holden*, 275 U.S. 142, 148 (1927) (opinion of Holmes, J.)."  *Rust* v. *Sullivan*, 500 U.S. 173, 190 (1991).

In its Explanation and Justification of the regulation at issue in this litigation, the FEC explained:

> In the Commission's judgment, requiring disclosure of funds received only from those persons who donated specifically for the purpose of furthering ECs appropriately provides the public with information about those persons who actually support the message conveyed by the ECs without imposing on corporations and labor organizations the significant burden of disclosing the identities of the vast numbers of customers, investors, or members, who have provided funds for purposes entirely unrelated to the making of ECs.

Final Rule on Electioneering Communications, 72 Fed. Reg. 72,899, 72,911 (Dec. 26, 2007).

While Plaintiff criticizes this explanation as resting on "arbitrary and unreasonable assumptions," these judgments are, in fact, precisely the ones that the District Court in *Center For Individual Freedom, Inc.* v. *Tennant* found must be made in order to ensure that the statute "bear[s] a sufficient relationship to the interest of providing the electorate with meaningful information as to who is speaking in electioneering communications." *Center For Individual Freedom, Inc.* v. *Tennant* at \*91. Furthermore, while Plaintiff argues that the FEC's findings regarding the potential burdens imposed on corporations and labor unions were "irrational," the District Court in *Center For Individual Freedom, Inc.* v. *Tennant* found those burdens to be self-evident. *See Center For Individual Freedom, Inc.* v. *Tennant* at \*90 ("It is apparent to the Court that requiring the disclosure of corporate or organizational contributors' personal information can be quite burdensome on those entities and may discourage general treasury contributors from associating with and giving to the entity as a consequence.").

In this matter, the FEC's regulation reflects an interpretation of the statutory provision that avoids the constitutional issues – namely, severe overbreadth (*i.e.*, an irrelevant "flood of information") that undermines the legitimate governmental interests involved – raised in *Center For Individual Freedom, Inc.* v. *Tennant.* In 2005, the D.C. Circuit wrote, "it is perfectly permissible for the Postal Service to change its enforcement policies or regulations in order to eliminate the basis for a constitutional challenge." *Initiative & Referendum Inst.* v. *United States Postal Serv.*, 417 F.3d 1299, 1317 (D.C. Cir. 2005). This is yet one more reason why the FEC's regulation should be upheld.

**D.Plaintiff Asks The Court To Order The FEC To Implement Portions of Legislation That Was Not Enacted and Draft Regulations That Were Rejected For Inclusion in a Notice of Proposed Rulemaking**

In filing this lawsuit, Plaintiff seeks an order from this Court effectively requiring the

FEC to implement portions of the defeated Democracy is Strengthened by Casting Light on

Spending in Elections Act (*i.e.*, the DISCLOSE Act), which Plaintiff sponsored in the U.S.

House of Representatives.  As introduced by Plaintiff on April 26, 2010, H.R. 5175 required

organizations submitting electioneering communications reports to disclose, among other things:

> The identification of each person who made unrestricted donor payments to the
> organization during the covered organization reporting period – (I) in an aggregate
> amount equal to or exceeding $1,000 during such period, if any of the disbursements
> made by the organization for any of the electioneering communications which are
> covered by the statement were not made from the organization's Campaign-Related
> Activity Account under section 326….

H.R. 5175, 111th Cong. § 211(b)(1)(B) (2010).  It is no coincidence that the interpretation of 2

U.S.C. § 434(f)(2)(F) that Plaintiff urges the Court to adopt exactly mirrors the proposed

provision set forth above.  This provision however was part of a bill that was defeated twice in

the U.S. Senate and did not become law.  *See* 156 Cong. Rec. S6266, S6285 (July 27, 2010)

(rejection of cloture motion, 57-41); 156 Cong. Rec. S7367, S7388 (Sept. 23, 2010) (rejection of

cloture motion, 59-39).  Plaintiff asks the Court to declare that this defeated legislative proposal

has actually been the law all along.

Congress, including Plaintiff, was unquestionably aware of the FEC's regulation at 11

C.F.R. § 104.20(c)(9) when it considered Plaintiff's proposed legislation (the "DISCLOSE Act")

in 2010.  That bill included a provision, quoted above, that would have forced the FEC to amend

or repeal the challenged regulation.  When the House of Representatives' and Senate's versions

of the DISCLOSE Act were released on April 29, 2010, Plaintiff distributed a document entitled

"The Van Hollen 'DISCLOSE ACT,'" a summary of the legislation, along with a press release.

This summary document included the following explanation of the bill's impact on requirements

pertaining to the disclosure of electioneering communication donors:

> The legislation would require corporations, labor unions, and section 501(c)(4), or (6) organizations – as well as section 527 organizations – to report all donors who have given $1,000 or more if expenditures are made on electioneering communications or $600 or more if expenditures are made for independent expenditures, during the past 12 month period if the organization makes aggregate independent expenditures or electioneering communications of $10,000 or more.

*See* "The Van Hollen "DISCLOSE ACT,'" *available at*

http://vanhollen.house.gov/UploadedFiles/DISCLOSE_Summary_042910.pdf.

The Senate sponsors distributed a nearly identical statement:

> The legislation would require corporations, labor unions, and section 501(c)(4), (5), or (6) organizations—as well as section 527 organizations—to report all donors who have given $1,000 or more to the organization during a 12-month period if the organization makes independent expenditures or electioneering communications in excess of $10,000.

*See* Press Release of Senators Schumer, Feingold, Wyden, Bayh, and Franken, "Senate

Democrats Unveil Legislation To Limit Fallout From Supreme Court Ruling That Allows

Unlimited Special-Interest Spending on Elections – Announce Plan For Senate Passage By July

4" (April 29, 2010) *available at* http://schumer.senate.gov/record.cfm?id=324343.

   Both the U.S. House of Representatives and the Senate considered specific legislation

that addressed the FEC's regulation that is now the target of this litigation.  The Senate, however,

rejected the Schumer/Feingold/Wyden/Bayh/Franken version of the DISCLOSE Act, and the

effort died.  As the Supreme Court explained, "[r]esolution of the pros and cons of whether a

statute should sweep broadly or narrowly is for Congress."  *U.S.* v. *Rodgers*, 466 U.S. 475, 484

(1984).  In 2010, Congress considered the substantive policy question that lurks just below the

surface of Plaintiff's Administrative Procedure Act arguments.  In rejecting Plaintiff's proposed

legislation, however, Congress opted to maintain the status quo, which includes the regulation at

issue in this litigation.

During the Defendant FEC's ongoing regulatory proceedings to revise its regulations in

light of *Citizens United*, certain Commissioners proposed or supported regulations that in many

respects mirrored certain provisions of the defeated DISCLOSE Act, including its requirements

for electioneering communication donor disclosure.  For example, the first draft Notice of

Proposed Rulemaking (Agenda Document No. 11-02) considered by the FEC on January 20,

2011, included the following proposal:

> Alternative B, in contrast, requires any corporation or labor organization that makes an
> electioneering communication with funds from an account other than a segregated bank
> account to report information (names and address) about all sources of funding to the
> organization over a certain amount, rather than only funding "for the purpose of
> furthering electioneering communications."  Thus, Alternative B would require those
> making electioneering communications to choose either to make electioneering
> communications from a segregated bank account, with reporting of that account's
> funding, or to report all funds received by the corporation or labor organization generally.

Draft Notice of Proposed Rulemaking on Independent Expenditures and Electioneering

Communications by Corporations and Labor Organizations (Draft A) at *73, Agenda Doc. No.

11-02 *available at* http://sers.nictusa.com/fosers/.  This proposal failed to gain approval by a vote

of 3-3.  *See* Certification of  Vote on Agenda Doc. No. 11-02 (Jan. 20, 2011) *available at*

http://sers.nictusa.com/fosers/.

The FEC voted on additional proposals on June 15, 2011.  One of those proposals, still

cast as "Alternative B," similarly suggested deleting current 11 C.F.R. § 104.20(c)(9), and

provided:

> [I]f the disbursements [for electioneering communications] are not made from a
> segregated account, the person reports all contributors of $1,000 or more to the person
> making the electioneering communication.

Draft Notice of Proposed Rulemaking on Independent Expenditures and Electioneering

Communications by Corporations and Labor Organizations at *72, Agenda Doc. No. 11-33

*available at* http://sers.nictusa.com/fosers/.  This proposal also failed, this time on a 2-4 vote.

*See* Certification of  Vote on Agenda Doc. No. 11-33 (June 15, 2011) *available at*

http://sers.nictusa.com/fosers/.

Thus, after failing two cloture votes in the  Senate, and two more votes at the FEC,

Plaintiff now makes a last-resort appeal to the Judicial Branch for an order that would implement

a policy change that very recently failed to be adopted by the other two branches of government.

**III.    Conclusion**

In light of the foregoing, Defendant-Intervenor Hispanic Leadership Fund respectfully

requests that this court enter an order dismissing this case as a result of Plaintiff's lack of

standing to bring this proceeding.  In the alternative, should this Motion to Dismiss not be

granted, Defendant Intervenor Hispanic Leadership Fund requests that this Court enter an order

granting Defendant Federal Election Commission's motion for summary judgment for the

reasons contained herein and in the filings of Defendant Federal Election Commission.

Dated: August 22, 2011

Respectfully submitted,

**Holtzman Vogel PLLC**

By:    /s/  Jason Torchinsky

Jason Torchinsky (Bar No. 976033)
jtorchinsky@holtzmanlaw.net
Scott S. Ward (Bar No. 477030)

17

sward@holtzmanlaw.net
Michael Bayes (Bar No. 501845)
mbayes@holtzman.law.net
Karen Blackistone
kblackistone@holtzmanlaw.net
HOLTZMAN VOGEL PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Tel: (540) 341-8808
Fax: (540) 341-8809

*Counsel for Hispanic Leadership Fund*