**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHRIS VAN HOLLEN,

                        Plaintiff,

       v.

FEDERAL ELECTION COMMISSION,

                   Defendant.

Civil Action No. 1:11-cv-00766 (ABJ)

**REPLY TO DEFENDANT FEC'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO
<u>DEFENDANT FEC'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................1

I.    UNDER SETTLED PRINCIPLES OF ADMINISTRATIVE LAW, THE FEC CANNOT NOW
      INVOKE THE ARGUMENT THAT BCRA'S TERM "CONTRIBUTOR" IS AMBIGUOUS,
      BECAUSE THE FEC DID NOT RELY ON THAT PROPOSITION WHEN IT
      PROMULGATED THE CHALLENGED REGULATION ...................................................1

II.   EVEN ASSUMING THE FEC CAN NOW RELY ON ITS AMBIGUITY ARGUMENT, THE
      FEC ERRS IN CONTENDING THAT THE COURT CANNOT AND SHOULD NOT
      RESOLVE PLAINTIFF'S CHALLENGE TO THE REGULATION IN QUESTION AT
      CHEVRON STEP ONE ..............................................................................................2

      A.     A Disposition Pursuant To Chevron Step One Is Appropriate And
             Required Because BCRA Speaks Clearly To The Precise Question At
             Issue ........................................................................................................2

      B.     The Term "Contributor" Is Not Ambiguous, And The Challenged
             Regulation Is Inconsistent With Its Plain Meaning ................................7

III.  EVEN ASSUMING THE FEC CAN NOW RELY ON ITS AMBIGUITY ARGUMENT, THE
      CHALLENGED REGULATION ALSO FAILS AT CHEVRON STEP TWO AND IS
      ARBITRARY AND CAPRICIOUS ..............................................................................10

      A.     A Regulation That Implements Only Half Of BCRA's Requirements Is
             Not Reasonable ......................................................................................10

      B.     The FEC's Burden Rationale Is Arbitrary And Capricious ...................11

      C.     Subsequent Legislative Inaction Has No Bearing On Whether The
             Challenged Regulation Is Reasonable ...................................................15

IV.   VACATUR IS APPROPRIATE WHERE, AS HERE, THE CHALLENGED REGULATION IS
      CONTRARY TO LAW...............................................................................................17

CONCLUSION...............................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*Aaron v. SEC,*
    446 U.S. 680 (1980) ........................................................................................16

*Allied-Signal v. United States Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ......................................................................17

*Anacostia Riverkeeper, Inc. v. Jackson,*
    713 F. Supp. 2d 50 (D.D.C. 2010) ................................................................17

*Barnhart v. Walton,*
    535 U.S. 212 (2002) ........................................................................................3

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983) ......................................................................................16

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ........................................................................................2

*\*Chevron U.S.A. Inc. v. Natural Resources Defense Council,*
    467 U.S. 837 (1984) ............................................................................. *passim*

*Citizens United v. FEC,*
    130 S. Ct. 876 (2010) ....................................................................................11

*Cobell v. Norton,*
    428 F.3d 1070 (D.C. Cir. 2005) ....................................................................16

*Engine Mfrs. Ass'n v. EPA,*
    88 F.3d 1075 (D.C. Cir. 1996) ........................................................................3

*Esch v. Yeutter,*
    876 F.2d 976 (D.C. Cir. 1989) ......................................................................11

*FEC v. Massachusetts Citizens for Life,*
    479 U.S. 238 (1986) ........................................................................................5

*FEC v. Wisconsin Right to Life, Inc.,*
    551 U.S. 449 (2007) ........................................................................................1

*Illinois Public Telecommunications Ass'n v. FCC,*
    123 F.3d 693, 693 (D.C. Cir. 1997) ........................................................11, 17

*IMS, P.C. v. Alvarez,*
   129 F.3d 618 (D.C. Cir. 1997) ......................................................................11

*Massachusetts v. EPA,*
   549 U.S. 497 (2007)............................................................................4, 16

*McConnell v. FEC,*
   540 U.S. 93 (2003).............................................................................5, 11

*Missouri Pub. Serv. Comm'n v. FERC,*
   337 F.3d 1066 (D.C. Cir. 2003) ......................................................................13

*Morales v. Trans World Airlines, Inc.,*
   504 U.S. 374 (1992)...............................................................................9

*National Ass'n of Clean Air Agencies v. EPA,*
   489 F.3d 1221 (D.C. Cir. 2007) ......................................................................7

*National Gypsum Co. v. EPA,*
   968 F.2d 40 (D.C. Cir.  1992) ......................................................................13

*\*Natural Resources Defense Council v. EPA,*
   489 F.3d 1250 (D.C. Cir. 2007) ................................................................11, 17

*\*Pennsylvania Dep't of Corrections v. Yeskey,*
   524 U.S. 206 (1998)...............................................................................3

*Robinson v. Shell Oil Co.,*
   519 U.S. 337 (1997)...............................................................................7

*\*SEC v. Chenery Corp.,*
   318 U.S. 80 (1943).................................................................................2

*Shays v. FEC,*
   337 F. Supp. 2d 28 (D.D.C. 2004) ..................................................................18

*\*Shays v. FEC ("Shays I"),*
   414 F.3d 76 (D.C. Cir. 2005) .....................................................7, 8, 9, 10, 18

*Shays v. FEC,*
   508 F. Supp. 2d 10 (D.D.C. 2007) ..................................................................18

*\*Shays v. FEC ("Shays III"),*
   528 F.3d 914 (D.C. Cir. 2008) ..............................................................11, 15, 18

*United States v. Judicial Watch*,
  266 F. Supp. 2d 1 (D.D.C. 2002) ...................................................................13

*United States v. Price*,
  361 U.S. 304 (1960) ......................................................................................16

*Williams Gas Processing - Gulf Coast Co., L.P. v. FERC*,
  373 F.3d 1335 (D.C. Cir. 2004) .....................................................................2

## STATUTES

*2 U.S.C. § 431(8) ...........................................................................................9

*2 U.S.C. § 431(11) .....................................................................................5, 7

*2 U.S.C. § 434(f)(1) ....................................................................................5, 7

*2 U.S.C. § 434(f)(2)(E) .................................................................................12

*2 U.S.C. § 434(f)(2)(F) ........................................................................... *passim*

2 U.S.C. § 434(f)(3) .........................................................................................8

2 U.S.C. § 441b(c)(2) .......................................................................................6

2 U.S.C. § 441b(c)(6) .......................................................................................6

*2 U.S.C. § 454 ................................................................................................6

## REGULATIONS

FEC, Final Rule and Explanation and Justification on Electioneering Communications,
11 C.F.R. Part 104, 114, 72 Fed. Reg. 72899 (Dec. 26, 2007) ("E & J").......................1, 5, 12, 13

11 C.F.R. § 104.20(c)(8) ..............................................................................8, 13, 15, 18

11 C.F.R. § 104.20(c)(9) ...............................................................................8, 11, 19

FEC, Notice of Proposed Rulemaking, 68 Fed. Reg. 404 (Jan. 3, 2003) ........................................9

**ARGUMENT**

I.    **UNDER SETTLED PRINCIPLES OF ADMINISTRATIVE LAW, THE FEC CANNOT NOW INVOKE THE ARGUMENT THAT BCRA'S TERM "CONTRIBUTOR" IS AMBIGUOUS, BECAUSE THE FEC DID NOT RELY ON THAT PROPOSITION WHEN IT PROMULGATED THE CHALLENGED REGULATION**

The FEC apparently did not discover that the term "all contributors" was assertedly ambiguous until it had to defend this case.  The FEC did not rely on or discuss the supposed ambiguity in the statutory language in the Explanation and Justification it published when it promulgated the rule in question.  *See* FEC, Final Rule and Explanation and Justification on Electioneering Communications, 11 C.F.R. Part 104, 114, 72 Fed. Reg. 72899 (Dec. 26, 2007) ("E & J").  The FEC considered whether 2 U.S.C. § 434(f)(2)(F) survived *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL*"), and concluded, correctly, that it did.  *See* 72 Fed. Reg. 72901.  But the question whether that statutory provision could be enforced at all is a very different question from what its terms—in particular, the words "all contributors"—mean and whether there is ambiguity in those words.

The E & J is devoid of any analysis of the text of the statute.  The FEC did not say that either the word "all" or the word "contributor" was ambiguous.  The rationale the FEC proffered for promulgating the "purpose" test was not premised on the statutory language, or any asserted ambiguity about what those words meant.  Rather, the FEC's rationale was that it saw merit in reaching what it (wrongly) considered to be a middle course as a policy matter, in order to alleviate perceived administrative burdens on corporations and labor organizations.  *See* FEC Br. 28-32 [Dkt. No. 24].

That the FEC did not invoke statutory ambiguity as a decisional ground in the rulemaking proceeding has two consequences here:

- 1 -

*First*, under well settled principles of administrative law, that argument in defense of the challenged regulation is now unavailable to the FEC.  Because the E & J failed to identify any ambiguity in the statute—and in particular, in the words "all contributors"—the FEC cannot defend the challenged regulation on that basis in this litigation.  *Williams Gas Processing - Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) ("It is axiomatic that [a court] may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review …; 'post hoc rationalizations by agency counsel will not suffice.'" (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)).

*Second*, the absence of any reliance in the E & J on the asserted ambiguity of the key statutory terms substantively impeaches the argument the FEC's litigation counsel advance today in defense of the challenged regulation.  It exposes the FEC's ambiguity contention for what it is—a tactical rearguard defense of a regulatory policy judgment that flouts a clear statutory mandate.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

**II.   EVEN ASSUMING THE FEC CAN NOW RELY ON ITS AMBIGUITY ARGUMENT, THE FEC ERRS IN CONTENDING THAT THE COURT CANNOT AND SHOULD NOT RESOLVE PLAINTIFF'S CHALLENGE TO THE REGULATION IN QUESTION AT *CHEVRON* STEP ONE**

**A.   A Disposition Pursuant To *Chevron* Step One Is Appropriate And Required Because BCRA Speaks Clearly To The Precise Question At Issue**

The FEC argues that the Court cannot adjudicate the regulation's validity at *Chevron* Step One because, the FEC says, Congress did not "speak to the issue" presented.  To support this mistaken argument, the FEC posits that Congress in enacting BCRA had not "envisioned" the post-*WRTL* environment in which more corporations could make "electioneering

communications" than before.  *See* FEC Br. 18-21, 27-29, 35, 36.  This circumstance, the FEC

says, "was never contemplated by Congress."  FEC Br. 18; *see also id.* at 20-21.

   This argument fails for two reasons.  First, the relevant consideration for the Court is not

whether Congress foresaw the future but whether the words Congress used are themselves

ambiguous.  Second, there are ample grounds to conclude that Congress did enact 2 U.S.C.

§ 434(f)(2)(F) with the understanding that it might become applicable to a wide range of

corporations.

   1. *The relevant inquiry at Chevron Step One is whether the statute is*
     *ambiguous, not whether Congress envisioned all of the circumstances in*
     *which the statute might apply*

   The first step in determining whether Congress has spoken directly to the precise

question at issue—that is, whether the case is appropriate for disposition under *Chevron* Step

One—is to examine the statutory language.  If the statutory language is clear—as it is here, *see*

Pl's Br. 18-21 [Dkt. No. 20]—then Congress has spoken to the issue within the meaning of

*Chevron*, and the Court's inquiry is at an end.  *See Barnhart v. Walton*, 535 U.S. 212, 217-218

(2002) ("[I]f the statute speaks clearly to the precise question at issue, we must give effect to the

unambiguously expressed intent of Congress." (internal quotation marks omitted)); *Engine Mfrs.*

*Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996) ("[F]or the EPA to avoid a literal

interpretation at *Chevron* step one, it must show either that, as a matter of historical fact,

Congress did not mean what it appears to have said, or that, as a matter of logic and statutory

structure, it almost surely could not have meant it.").

   Whether there is statutory ambiguity does not turn on whether Congress actually

"envisioned" the application of the statute before the Court (FEC Br. 28, 29, 35, 36).  In

*Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998), the Supreme Court rejected

the same argument the FEC makes here, holding that, even if "Congress did not 'envision that

the ADA would be applied to state prisoners,'" that fact would be "irrelevant" "in the context of an unambiguous statutory text." *Id.* at 212 (internal brackets in first quotation omitted); *cf. Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (rejecting agency's argument that it lacked authority to regulate greenhouse gases because Congress "might not have appreciated the possibility that burning fossil fuels could lead to global warming"). The FEC cites no authority in support of its argument. *See* FEC Br. 18-23.

Moreover, the issue the FEC now says Congress did not foresee and speak to directly is the issue of *whether* corporations are subject to the reporting requirements at all, not what they must report if they are. And the FEC has correctly resolved any supposed ambiguity regarding the former question by concluding that corporations that engage in "electioneering communications" *are* subject to the reporting requirements applicable to any person who makes an "electioneering communication." With that question resolved, there is no further gap for the FEC to fill because there is no doubt that Congress directly spoke to the issue of what it is that persons subject to the reporting requirement must report: they must report (among other things) "all contributors." The FEC points to no ambiguity in the manner in which Congress addressed that question. And any doubts the FEC claims to have about whether it correctly resolved the question of the reporting requirements' applicability cannot serve as a basis for altering the nature of those requirements once it has found them applicable.

Thus, there is no merit to the FEC's argument that *Chevron* Step One analysis is inappropriate here because Congress did not "foresee[]" (FEC Br. 19) the circumstances in which the agency promulgated the challenged regulation. As we next show, the premise of the FEC's erroneous legal contention—that Congress has not foreseen these circumstances—lacks merit as well.

2.   *Congress, in any event, understood that BCRA's disclosure provisions would apply to a broad array of corporations*

As the FEC acknowledged in its E & J, Congress demonstrably understood that § 434(f)(2)(F) and its "all contributors" language could apply to corporations.  *See* FEC Br. 9 ("The Commission rejected the contention that BCRA did not contemplate any reporting by corporations and labor organizations, even though BCRA did not generally permit corporations and labor organizations to finance electioneering communications." (citing 72 Fed. Reg. 72901)). The FEC correctly reached this conclusion because BCRA "requires every 'person' that finances electioneering communications to file disclosure reports" that include "all contributors."  *Id.* (citing 2 U.S.C. § 431(11)).  The definition of "person," as referenced in the E & J, is not limited to particular types of corporations or labor organizations.  *See* 2 U.S.C. §§ 431(11) (defining "person"); 434(f)(1) (reporting requirements for every "person" who makes "electioneering communications").

The FEC argues now that Congress "envisioned" the application of its reporting statute to only one particular type of corporation—namely, non-profit corporations meeting criteria set out in *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*")—because BCRA prohibited other types of corporations from making "electioneering communications."  *See* FEC Br. 6, 18, 21.  The FEC's concession that Congress understood and intended that *MCFL* corporations could make "electioneering communications" (FEC Br. 6 (citing *McConnell v. FEC*, 540 U.S. 93, 209-212 (2003)) undermines its argument here.  Those *MCFL* corporations, like other non-profit entities, could have "members" who might pay dues without announcing or otherwise manifesting an explicit "purpose" to further "electioneering communications."  Before *WRTL*, such *MCFL* corporations were required to disclose "all contributors" in accordance with

§ 434(f)(2)(F).  The challenged regulation, however, exempts all corporations, including *MCFL*

corporations, from compliance with the "all contributors" provision of § 434(f)(2)(F).

Moreover, Congress did "contemplate" that certain non-*MCFL* corporations would be

able to make "electioneering communications" under 2 U.S.C. § 441b(c)(2) (part of the "Snowe-

Jeffords Amendment") if a court were to invalidate 2 U.S.C. § 441b(c)(6) (the "Wellstone

Amendment"), thereby triggering BCRA's severability provision ("[i]f any provision of

[BCRA], or the application thereof to any person or circumstance, is held invalid, the validity of

the remainder of the Act and the application of such provision to other persons and

circumstances shall not be affected thereby."  2 U.S.C. § 454).  *See* Pl's Br. 24-25.  Contrary to

the FEC's suggestion, the Snowe-Jeffords Amendment was no mere "proposal," *see* FEC Br. 24-

25 & n.9.  Congress enacted Snowe-Jeffords as part of BCRA—it appears in Title 2 of the

United States Code.  Thus, there is no basis for the FEC's contention that Snowe-Jeffords is

irrelevant to determining whether Congress, in enacting BCRA, contemplated that § 434(f)(2)(F)

might in certain circumstances apply to a broader array of corporations (even assuming,

*arguendo*, that the inquiry is itself relevant to a *Chevron* Step One analysis).  BCRA's sponsors

in Congress reminded the FEC of this provision and Congress's intent in their comments on the

proposed rulemaking.  *See* Dkt. No. 17-3 at VH0371 (*Comments from Sen. McCain et al. re:*

*Notice 2007-16:  Electioneering Communications*, (Oct. 1, 2007) (reasoning that BCRA's

disclosure provision, Section 201, is "completely independent of the prohibition in Section 203"

and that "the severability clause in Section 401 [2 U.S.C. § 454] was meant to underscore

congressional intent that even if Section 203 were declared unconstitutional, other sections of the

bill, including Section 201, should survive.")).

**B.      The Term "Contributor" Is Not Ambiguous, And The Challenged
         Regulation Is Inconsistent With Its Plain Meaning**

The FEC—whose views receive no deference in the *Chevron* Step One analysis, *see, e.g.,*

*National Association of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007)—has

failed to rebut Plaintiff's argument that the terms "contributor" and "contributed" (2 U.S.C.

§ 434(f)(2)(F)) are not ambiguous.  A "contributor" is one who gives money without expectation

of service or property or legal right in return.  Pl's Br. 20.  The FEC does not meet this

conclusion head on, *see* FEC Br. 19-23.  Rather, the FEC defends its position by arguing that it

promulgated the challenged regulation because, after *WRTL*, it was "presented" with "a range of

novel issues" concerning who had "contributed" to a corporation or labor organization "because

of the complex finances of these organizations."  FEC Br. 22.  As can be seen, the challenged

regulation is not premised on the FEC's close parsing of an assertedly ambiguous statutory text,

but on a purportedly pragmatic policy judgment.

The FEC's reliance on policy judgments is misplaced in light of the clear statutory text.

Whether the term "contributor" permits a construction that excludes persons who give money to

a corporation or labor organization but who have not announced or otherwise adequately

manifested a purpose to further "electioneering communications" must be analyzed using "the

traditional tools of statutory construction."  *Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005)

("*Shays I*"); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or

ambiguity of statutory language is determined by reference to the language itself, the specific

context in which that language is used, and the broader context of the statute as a whole.").

There can be no dispute that BCRA requires every "person" who makes an "electioneering

communication" to disclose "all contributors," 2 U.S.C. § 434(f)(1), (f)(2)(F), and that Congress

defined the term "person" to include corporations and labor organizations, *id.* § 431(11).  And

nothing in the language, context, or purpose of BCRA supports an interpretation of the term "contributor" that excludes certain donations to persons making "electioneering communications."  Nor has the FEC attempted to explain why the term "contributor" means a person with a purpose to further "electioneering communications" when that person donates to a corporation or labor organization, but not when that person donates to an individual, unincorporated association, partnership, or other group of persons.  *Compare* 11 C.F.R. § 104.20(c)(9) (purpose requirement), *with id.* § 104.20(c)(8) (no purpose requirement).

The reasoning of the Court of Appeals in *Shays v. FEC*, holding at *Chevron* Step One that the FEC's definition of "electioneering communication" was contrary to law, is instructive here. In that case, the Court struck down an FEC regulation that purported to add a qualification to an unqualified statutory term.  Specifically, the Court considered whether the FEC's interpretation of the term "made" violated the plain language of the statute, *i.e.*, 2 U.S.C. § 434(f)(3).  *See* 414 F.3d at 107-08.  The statutory definition of "electioneering communication" covered "'any broadcast, cable, or satellite communication' that … 'is *made* within' 60 days before a general election or 30 days before a primary ….'"  *Shays I*, 414 F.3d at 107 (quoting 2 U.S.C. § 434(f)(3), emphasis added).  The FEC's regulation defined "'made' to mean 'publicly distributed,'" and defined "'publicly distributed' to mean 'aired, broadcast, cablecast or otherwise disseminated *for a fee*.'"  *Id.* (emphasis in *Shays*).  Focusing on the text of the statute, the Court concluded that the ordinary meaning of the term "made"—an undefined term—did not include a "for a fee" qualification.  *See Shays I*, 414 F.3d at 108.

As in *Shays*, the FEC here has promulgated a regulation that adds an additional requirement that the plain meaning, context, and purpose of the authorizing statute rule out— here, a "purpose" requirement.  *See* Pl's Br. 18-23.  Moreover, as in *Shays*, the FEC makes

virtually no argument that the challenged regulation, and in particular its "purpose" requirement, is required by the statute, focusing instead on purported burdens on corporations.  *Compare Shays I*, 414 F.3d at 109 ("Rather than focusing on these textual problems, the FEC's briefs emphasize the 'risk' that without its limiting construction, BCRA's electioneering communication restrictions could chill [speech]."), *with* FEC Br. 21-22 (reasoning that without its limiting construction, BCRA's disclosure requirements might implicate "customers, investors, or comparable sources of revenue that might have little or no connection to political activity").

Departing from the Commission's own previous view, the FEC now argues that the term "contributor" should be regarded as ambiguous because it resembles the term "contribution" which is found and defined in a different statute, the Federal Election Campaign Act ("FECA"), *see* FEC Br. 20.  That argument lacks merit, and the FEC itself has previously rejected it.  BCRA provides that "contributor" is not a term that encompasses only a person who makes a "contribution" as FECA defines that term.  2 U.S.C. § 431(8).  As the FEC itself concedes, the term "contribution" includes any payment made "for the purpose of influencing any election for Federal office," whereas an "electioneering communication" includes ads *not* made for the purpose of influencing an election.  FEC Br. 20; *see also* Pl's Br. 21.  The term "contributor," therefore, must have been intended to cover persons who contributed money *without* a purpose to influence elections.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general"); *accord* FEC Br. 20.  The FEC previously reached precisely this conclusion, *see* FEC, Notice of Proposed Rulemaking, 68 Fed. Reg. 404, 413 (Jan. 3, 2003), and affirms it here, *see* FEC Br. 20.  Its contradictory assertion that the definition of "contribution" lends ambiguity to "contributor" cannot be squared with its own recognition that the two terms are quite distinct.

### III.  EVEN ASSUMING THE FEC CAN NOW RELY ON ITS AMBIGUITY ARGUMENT, THE CHALLENGED REGULATION ALSO FAILS AT *CHEVRON* STEP TWO AND IS ARBITRARY AND CAPRICIOUS

Because the disclosure requirements are not "ambiguous," the Court need not reach *Chevron* Step Two and the overlapping arbitrary and capricious standard under the APA.  If the Court reaches *Chevron* Step Two, however, it should conclude that the FEC's regulation is unreasonable and that its explanation and justification for it is arbitrary and capricious.  While the FEC is generally entitled to deference in *Chevron* Step Two where the statutory provision at issue is, unlike here, ambiguous, the FEC must still demonstrate that its interpretation of the statute is "reasonable."  *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984); *Shays I*, 414 F.3d at 97.  It has failed to do so here by a wide margin.

### A.  A Regulation That Implements Only Half Of BCRA's Requirements Is Not Reasonable

The Commission suggests that the Court should defer to its regulation as reasonable because it charts a middle course between the two proposed policy alternatives the FEC said it would consider in its Notice of Proposed Rule-Making ("NPRM"), leaving intact part of the BCRA disclosure requirements.  The Commission lamely says that its regulation should be upheld because it requires "disclosure of critical information about who is making disbursements for electioneering communications, how much those persons are spending, and who is providing the funds to be used for the communications."  FEC Br. 32.  But § 434(f)(2)(F) prescribes disclosure of the "*all contributors*" to the persons making "electioneering communications," not just of the persons making "electioneering communications" and those contributors who have seen fit to manifest their "purpose."

The FEC's argument highlights a core problem with the challenged regulation—by requiring disclosure only of those who spend money on "electioneering communications"

without requiring that those spenders disclose "all contributors," it allows the spenders to run "election-related advertisements 'while hiding behind dubious and misleading names.'" *Citizens United v. FEC*, 130 S. Ct. 876, 914 (2010) (quoting *McConnell*, 540 U.S. at 197)).  The challenged regulation has thus re-created the very problem that the Court in *McConnell* said BCRA intended to solve.  *See* 540 U.S. at 196-97; FEC Answer ¶ 30 (admitting that "filings with the FEC by persons making electioneering communications disclosed the sources of less than 10% of the $79.9 million in electioneering communications made in 2010, that the ten persons spending the most on electioneering communications during that period disclosed the sources of approximately 5% of the funds used for their electioneering communications …."); *id.* ¶ 31 (admitting that certain non-profit corporations disclosed none of their contributors).[1]

### B.      The FEC's Burden Rationale Is Arbitrary And Capricious

In promulgating 11 C.F.R. § 104.20(c)(9), the FEC not only failed to consider (or more likely, ignored the likelihood) that it was creating a loophole that would undermine the effectiveness of BCRA, the FEC also irrationally concluded that complying with § 434(f)(2)(F) would impose undue administrative burden on corporations and labor organizations.  That conclusion is unsupported by persuasive evidence and is not entitled to judicial deference.

---

[1]   As set forth above, the FEC's answer in this case admits that disclosure of contributors to corporations making "electioneering communications" has dropped drastically after promulgation of the challenged regulation.  At the same time, the FEC argues that the Court may not in its *Chevron* Step Two analysis consider the very information the FEC has admitted in this case because that information is outside the administrative record.  The cases do, however, give the court some leeway to consider such information to determine whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision.  *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989); *see also IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997).  As noted in Plaintiff's opening brief (Pl's Br. 14-15), it is appropriate for the Court to consider the actual effect of the challenged regulation as part of its consideration whether the Commission failed to consider whether the regulation would create a loophole and thereby undermine BCRA, a critical failure, given that "savvy campaign operators" will exploit any loophole in these laws "to the hilt."  *Shays v. FEC*, 528 F.3d 914, 927-28 (D.C. Cir. 2008) ("*Shays III*").  Even if the court decides it cannot consider the FEC's admissions in connection with its *Chevron* Step Two analysis, however, it may and should consider them as relevant to the vacatur issue discussed in Part IV, *infra*.  *See Illinois Public Telecommunications Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997) (comparing vacatur decision to decision "whether to grant a preliminary injunction"); *cf. Natural Resources Defense Council v. EPA*, 489 F.3d 1250, 1263 (D.C. Cir. 2007) (Randolph, J., concurring) (arguing that courts should vacate and then entertain a motion for a stay in order to hear "evidence needed to assess the consequences" of the order).

*First*, corporations and labor organizations that make "electioneering communications" could avoid the "burden" the FEC identified by taking the simple step of establishing a segregated account pursuant to § 434(f)(2)(E), and using funds contributed to that account to pay for "electioneering communications."  Defendant's sole response is that a segregated account is insufficient to relieve the "potential burden" on corporations that wish to fund their "electioneering communications" with donations from other corporations.  This rationale is unpersuasive.  The FEC made no factual findings to support any such conclusion; there is no evidence in the administrative record to support any such conclusion; and the FEC did not rely on that conclusion in its E & J.  No corporation or labor organization that submitted comments claimed it expected to receive substantial donations from persons other than individuals to fund its "electioneering communications" and therefore could not avail itself of the segregated account option.

*Second*, the FEC's statement that corporations and labor organizations cannot "identify those persons who provided funds totaling $1,000 or more" without an "inordinate amount of effort" (72 Fed. Reg. 72911) is irrational and unsupported by evidence in the administrative record.  As a preliminary matter, the FEC premises its burden concern by positing the untenable proposition that the word "contributor" could or does include persons who make investments, loans, and purchases.  The FEC's E & J did not provide any basis – by, for example, reference to dictionary definitions of the word "contributor" – to support such an, at best, counter-intuitive assumption (it assumes, but does not actually say that "contributor" means a person who make any payment whatsoever, 72 Fed. Reg. 72910-11).

Absent that bizarre assumption, there is not much left to the FEC's burden argument: corporations and labor organizations would be required to report the same information that

individuals, partnerships, and unincorporated organizations report under 11 C.F.R.

§ 104.20(c)(8):  namely, the identity of those who make gratuitous gifts to them.  The FEC has

not ever posited that the "all contributors" requirement of 2 U.S.C. § 434(f)(2)(F) imposes undue

burdens on individuals, partnerships, and unincorporated organizations.

But even if one suspends disbelief and accepts the notion that 2 U.S.C. § 434(f)(2)(F)'s

reference to "contributors" sweeps in any transferor of funds, the FEC's calls for deference to its

"burden" determination ring hollow because the E & J simply does not support its conclusion

with any information, data, or estimates concerning the assertedly "inordinate" cost of

compliance.  Nor does it provide any concrete examples of the supposed burden.  *See Missouri*

*Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1070 (D.C. Cir. 2003) (holding agency action was

arbitrary and capricious where agency failed to "fully explain the assumptions it relied on to

resolve unknowns and the public policies behind those assumptions" (citation omitted));

*National Gypsum Co. v. EPA*, 968 F.2d 40, 47 (D.C. Cir. 1992) (vacating agency decision as

arbitrary and capricious because it failed to offer a "reasoned explanation for its assumption").

In the E & J and in its brief, the FEC relies heavily on conclusory, vague remarks of self-

interested commenters.  *See* 72 Fed. Reg. 72911; FEC Br. 11 (citing Gold, AFL-CIO, VH0660;

Sullivan, SEIU, VH0924).  Not one of the 25 comments the FEC received, however, was

submitted by a for-profit corporation that has business revenue, customers, and investors.  *See*

Dkt. No. 17-2, 17-3, 17-4.  The only corporations that submitted comments were § 501(c)

organizations which either do not have business revenue, customers, or investors, or must

already distinguish donations from unrelated business taxable income and other revenue sources

on their tax returns in order to maintain their tax-exempt status.  *See United States v. Judicial*

*Watch*, 266 F. Supp. 2d 1, 19 (D.D.C. 2002) ("[T]ax laws and regulations require tax-exempt

organizations to report annually to the IRS 'the total of all contributions and gifts received by it during the year,' … and to list 'the names and addresses of all persons who contributed, bequeathed, or devised $ 5,000 or more … during the taxable year.'" (quoting 26 U.S.C. § 6033(b)(5) & Treas. Reg. § 1.6033-2(a)(2)(ii)(f), respectively)), *aff'd*, 371 F.3d 824 (D.C. Cir. 2004).

Only two of the corporations and labor organizations that submitted comments—Citizens United and Alliance for Justice—claimed that distinguishing between donations and other revenues would be difficult and/or burdensome.  These commenters did not specify the supposed burden nor provide evidence concerning the cost or effort thought to be required:

- Citizens United submitted comments claiming that reporting the name and address of each $1,000 donor would "likely prove difficult, if not impossible."  It continued:  "The difficulties of compliance would be most acute where revenues are generated through sales, investment capital or a combination thereof, which is generally the case with a commercial business."  Dkt. No. 17-2 [VH0312-VH0313].

- Alliance for Justice commented that "Nonprofit corporations making electioneering communications under the *WRTL II* exception may receive funds into their general treasuries from a wide variety of sources:  membership dues; admission fees, subscriptions, sales of educational materials and other revenue from their exempt activities; interest, dividends and other income from investments; and income from unrelated business activities."  Dkt. No. 17-4 [VH0445].

Three of the corporations and labor organizations that submitted comments noted other potential "administrative burdens" but none of the three explained what the burden of identifying contributors would entail:

- American Association of Advertising Agencies, American Advertising Federation, and the Association of National Advertisers:  "an advertiser would have to set up a compliance system that tracks the cost of its ads at the commencement of each blackout period, compute each $10,000 increment of such ads, and then make the requisite filings at the FEC."  Dkt. No. 17-2 [VH0240].

- National Association of Realtors:  referring generally to "the administrative burdens associated with reporting"  Dkt. No. 17-3 [VH0378].

- AFL-CIO, AFSCME, NEA, SEIU:  "It would be … burdensome for the Commission to require unions to disclose the names and addresses of members whose dues happen to have accumulated to $1,000 since the beginning of the preceding calendar year."  Dkt. No. 17-4 [VH0461].

And at the rulemaking hearing, only one of the witnesses representing corporations or labor organizations mentioned potential burdens, again failing to explain why identifying contributors would be burdensome:

- Lawrence Gold, AFL-CIO:  "[T]here would be a tremendous burden on unions in particular.  The obligation to report income at the $1,000 level would be remarkable in comparison to a regulatory requirement by the Labor Department under a long-standing law, the Labor Management Report and Disclosure Act, which requires unions to disclose all receipts at the $5,000 threshold."  Dkt. No. 17-5 [VH0646].

To the extent that these generalizations provide any support at all, the comments are insufficient to require judicial deference to the FEC's finding that, absent imposition of a "purpose" requirement not found in the text of the statute, compliance with the regulation would be unduly burdensome for non-*MCFL* corporations or labor organizations.  After all, individuals, partnerships, or unincorporated associations who make "electioneering communications" are expected to do so without relying on a "purpose" test, *see* 11 C.F.R. § 104.20(c)(8), and those spenders, like corporations, frequently receive payments that are not donations, *e.g.*, loans, paychecks, dividends, interest payments, tax refunds, and so forth.  *See, e.g.*, *Shays v. FEC*, 528 F.3d 914, 928-29 (D.C. Cir. 2008) ("*Shays III*") (affirming ruling that FEC's revised regulation was arbitrary and capricious where the Commission implemented changes based on complaints that "the regulation was unnecessarily cumbersome" without supporting "its decision with reasoning and evidence").

### C.    Subsequent Legislative Inaction Has No Bearing On Whether The Challenged Regulation Is Reasonable

Defendant argues that because Congress did not enact the DISCLOSE Act in 2010, the Court should infer that Congress tacitly approves of § 104.20(c)(9).  However, the Supreme

Court has held that congressional inaction is entitled to little, if any, weight. *See Massachusetts v. EPA*, 549 U.S. 497, 529-30 (2007) ("That subsequent Congresses have eschewed enacting binding emissions limitations to combat global warming tells us nothing about what Congress meant when it amended § 202(a)(1) in 1970 and 1977" (citing *United States v. Price*, 361 U.S. 304, 313 (1960) (holding that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"); *Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005) ("[P]ost-enactment legislative history is not only oxymoronic but inherently entitled to little weight"))).

The Commission relies on *Bob Jones University v. United States*, 461 U.S. 574 (1983), in which the IRS interpretation of § 501(c)(3) of the Tax Code was at issue. This reliance is surprising given that *Bob Jones* was an exceptional case readily distinguishable from this one. The Court in *Bob Jones* noted, "Ordinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation," *id*. at 600 (citing *Aaron v. SEC*, 446 U.S. 680, 694 n.11 (1980)), but went on to find that the facts of *Bob Jones* made it anything but the "ordinary case." Congress's "non-action" regarding § 501(c)(3) was "significant" because over 12 years, 13 bills had been introduced specifically to overturn the particular IRS interpretation at issue, none of which emerged from any committee.

Here, unlike in *Bob Jones*, the DISCLOSE Act was not a targeted Congressional effort to overrule a specific regulation. Rather, the Act was a broad and comprehensive response to the *Citizens United* decision that proposed disclosure provisions with broader coverage than the current statute and that had a number of nondisclosure provisions. Thus, this is not the rare case where a court may properly draw inferences from Congressional inaction.

## IV.   VACATUR IS APPROPRIATE WHERE, AS HERE, THE CHALLENGED REGULATION IS CONTRARY TO LAW

Remand without vacatur to "permit the Commission to more fully explain the existing regulation" (FEC Br. 44) would be futile where, as here, the agency's regulation is inconsistent with the unambiguous terms of a statute. *See Natural Resources Defense Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007)  (vacating rule; remand without vacatur inappropriate where rule could not survive court's decision); *Illinois Public Telecommunications Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997) (vacating rule; "When this court remands a rule to an agency for further consideration with little or no prospect of the rule's being readopted upon the basis of a more adequate explanation of the agency's reasoning, the practice of the court is ordinarily to vacate the rule."); *Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp. 2d 50, 52 (D.D.C. 2010) (vacating rule; remand without vacatur inappropriate where agency would "be unable to justify the challenged [rule] in a manner that is consistent with the statute." (internal quotation marks omitted)).

The FEC contends that *Allied-Signal v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993), supports remand without vacatur. *See* FEC Br. 43-44.  But the Court in *Allied-Signal* did not hold that the regulation before it was inconsistent with the statute. Rather, the Court held that the agency had failed to give sufficient reasons for its rule. *See Allied-Signal*, 988 F.2d at 150 (deciding whether to vacate an "*inadequately supported rule*" (emphasis added)); *id.* at 151 ("[T]here is at least a serious possibility that the Commission will be able to substantiate its decision on remand.").

The FEC claims that vacating its regulation would leave corporations and labor organizations without adequate guidance. *See* FEC Br. 44.  This is spurious.  As the FEC admits, a corporation can set up a segregated account.  But even if one assumes that this option is

insufficient, there is no reason to assume that corporations and labor organizations cannot make "electioneering communications" in accordance with § 434(f)(2)(F). *See supra* pp. 12, 14.  If the challenged regulation is invalidated, corporations need only abide by the plain text of the statute, and the existing standard applicable to individuals, partnerships, and other unincorporated entities under 11 C.F.R. § 104.20(c)(8) demonstrates that they can do so.

Finally, the FEC contends that the Court should not retain jurisdiction to enforce its judgment because "there is no reason to doubt that, in the event of remand, the Commission would proceed in a timely way."  FEC Br. 45.  Regrettably, experience teaches the opposite.

Following enactment of BCRA in 2002, the FEC issued implementing regulations.  In October 2002, Representatives Christopher Shays and Martin Meehan, the chief House sponsors of BCRA, filed suit against the FEC challenging the regulations, including the FEC's "coordination" rules.  In September 2004, the district court invalidated fifteen FEC regulations, including the coordination regulation.  *Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005).

Two years later, in 2006, the FEC issued a revised coordination regulation, and Representatives Shays and Meehan challenged it and five other regulations promulgated.  In September 2007, the district court struck down five of the new regulations, including the coordination regulation.  *Shays v. FEC*, 508 F. Supp. 2d 10 (D.D.C. 2007).  The Court of Appeals upheld the district court's decision to invalidate four of the regulations, including the coordination regulation, reinstated one of the regulations, and struck down the one regulation that the district court left standing.  *Shays III*, 528 F.3d 914 (D.C. Cir. 2008).  In all, it took six years, two lawsuits, and four winning court decisions to overturn the coordination regulation adopted to implement BCRA.

For these reasons, the FEC is not entitled to any presumption that it will proceed in a timely manner with respect to "electioneering communications" absent continued judicial oversight.

## CONCLUSION

For the reasons stated, we respectfully urge the Court to grant Plaintiff's motion for summary judgment and deny the FEC's cross motion; declare that the challenged regulation, 11 C.F.R. § 104.20(c)(9), is contrary to law and arbitrary and capricious; vacate the challenged regulation; and direct the FEC to promulgate promptly a revised regulation consistent with this Court's ruling and declaratory judgment with reasonable expediency.  We also respectfully urge the Court to retain jurisdiction until the Court's judgment is satisfied.


Dated this 30th day of August, 2011.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td>/s/ Roger M. Witten</td></tr>
<tr><td>Fred Wertheimer (Bar No. 154211)<br>DEMOCRACY 21<br>2000 Massachusetts Ave, N.W.<br>Washington, D.C. 20036<br>(202) 355-9610</td><td>Roger M. Witten (Bar No. 163261)<br>Brian A. Sutherland<br>Fiona J. Kaye<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>399 Park Avenue<br>New York, NY 10022<br>(212) 230-8800</td></tr>
<tr><td>Donald J. Simon (Bar No. 256388)<br>SONOSKY CHAMBERS SACHSE<br>  ENDRESON & PERRY, LLP<br>1425 K Street, N.W.<br>Suite 600<br>Washington, D.C. 20005<br>(202) 682-0240</td><td>Trevor Potter (Bar No. 413778)<br>J. Gerald Hebert (Bar No. 447676)<br>Paul S. Ryan (Bar No. 502514)<br>Tara Malloy (Bar No. 988280)<br>CAMPAIGN LEGAL CENTER<br>215 E Street N.E.<br>Washington, D.C. 20002<br>(202) 736-2200</td></tr>
<tr><td></td><td>*Attorneys for Plaintiff Chris Van Hollen*</td></tr>
</table>