**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
CHRIS VAN HOLLEN, Jr.,                   )
                                        )
              Plaintiff,                 )
                                        )
      v.                                 )        Civil Action No. 11-0766 (ABJ)
                                        )
FEDERAL ELECTION COMMISSION,             )
                                        )
              Defendant.                 )
_____)

**MEMORANDUM OPINION**

Plaintiff Chris Van Hollen, Jr., brings this lawsuit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenging a regulation promulgated by defendant Federal Election Commission ("FEC") defining the disclosure requirements for corporations and labor unions that fund electioneering communications. Plaintiff contends that the regulation, 11 C.F.R. § 104.20(c)(9), which was promulgated in the wake of the Supreme Court's decision in *FEC v. Wisconsin Right to Life, Inc.* ("*WRTL*"), 551 U.S. 449 (2007), is contrary to the disclosure regime set forth in the Bipartisan Campaign Reform Act ("BCRA"), 2 U.S.C. § 434, specifically, subsections (f)(2)(E) and (F). Therefore, he submits that the regulation should be declared invalid on the grounds that the agency exceeded its statutory authority. 5 U.S.C. § 706(2)(C). Plaintiff also claims that the regulation is otherwise arbitrary, capricious, and contrary to law under the APA. *Id.* § 706(2)(A).

This case presents what appears to be the novel question of whether an agency may promulgate regulations that narrow a statutory provision for the stated purpose of curing a perceived ambiguity or change in the statute's reach that was created by new legal precedent.

Both sides direct the Court to the two step analysis set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and neither party has presented the Court with authority that directly addresses the question of what administrative law principles apply when the Supreme Court has altered the landscape. But there is some case law that states that if the language of a statute is clear, it must govern even unforeseen circumstances, and that the agency has no power to amend it on its own. And, a close reading of *Chevron* itself reveals that the fundamental APA inquiry is whether Congress – either explicitly or implicitly – delegated authority to the agency to clarify a particular provision through regulation, not whether a provision has become unwieldy or even unwise for some other reason. Since the Court concludes that the language of the statutory provision in question is not ambiguous, the FEC's attempt to tailor it to new circumstances cannot stand, even if its approach may have been reasonable. When the agency determined in this instance that the statute should be revised in light of legal developments, it undertook a legislative, policymaking function that was beyond the scope of its authority and that fails at the first step of the *Chevron* test.

Accordingly, the Court will grant plaintiff's motion for summary judgment [Dkt. # 20] and will deny defendant's cross motion for summary judgment [Dkt. # 25]. The Court will also deny intervenor-defendant Hispanic Leadership Fund's motion to dismiss [Dkt. # 30] and intervenor-defendant Center for Individual Freedom's cross motion for summary judgment [Dkt. # 36].

## I.   BACKGROUND

Plaintiff Chris Van Hollen is a member of the U.S. House of Representatives from the 8th Congressional District of the State of Maryland. Compl. ¶ 9. Plaintiff, who was first elected in 2002, has expressed an intention to seek re-election in November 2012 and communications

related to that election will be subject to the regulation at issue in this case.  *Id.*  Defendant is a federal agency created pursuant to the Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. § 437c, and it is charged with administering and enforcing federal campaign finance laws such as the FECA and BCRA.  Def.'s Mem. in Support of Its Mot. for Summ. J. and Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem.") at 2.

## A.  Relevant Statutory and Regulatory Background

Congress enacted the BCRA as an amendment to FECA in 2002, and under the terms of the statute, persons who make disbursements to fund "electioneering communications" are subject to certain reporting obligations.   The BCRA defines an electioneering communication as "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office," is made within 30 days of a primary or 60 days of a general election, and is geographically targeted to the relevant electorate.  2 U.S.C. § 434(f)(3)(A).

Under the BCRA, every "person" who makes  disbursements for the direct cost of producing and airing electioneering communications in an aggregate amount that exceeds $10,000 per year must file a report with the Commission.  *Id.* § 434(f)(1), (2).  The report must contain, among other things, the "identification of the person making the disbursement, of any person sharing or exercising direction or control over the activities of such person, and of the custodian of the books and accounts of the person making the disbursement."  *Id.*  More significantly for purposes of this case, the BCRA also requires the "person" to disclose the following:

> (E)     If the disbursements were paid out of a segregated bank account which consists of funds contributed . . . directly to this account for electioneering communications, the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to that account . . . .; or

(F)     If the disbursements were paid out of funds not described in subparagraph (E), the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.

*Id*. § 434(f)(2).

There is no dispute among the parties that the definition of the word "person" in the statute specifically includes organizations such as corporations and labor organizations.  2 U.S.C. § 431(11).  As originally enacted, though, section 203 of the BCRA prohibited most corporations and labor organizations from making electioneering communications with corporate or union general treasury funds.  2 U.S.C. § 441b, *invalidated by Citizens United v. FEC*, 588 U.S. ---, 130 S. Ct. 876, 913–16 (2010). [1]

**B.  FEC Promulgates Regulations Implementing the BCRA**

Following the enactment of the BCRA, the FEC promulgated regulations implementing the disclosure provisions.  67 Fed. Reg. 65,190 (Oct. 23, 2002); 68 Fed. Reg. 404 (Jan. 3, 2003). The regulation tracked the same two options for reporting the sources of the funds used to make electioneering communications, but the agency substituted the words "donor" and "donated" for "contributor" and "contributed."  It called for the following disclosures:

---

[1]     An exception to the prohibition on corporation and union expenditures that precedes the enactment of the BCRA came as a result of the Supreme Court's decision in *FEC v. Massachusetts Citizens for Life, Inc. ("MCFL")*, 479 U.S. 238 (1986).  There, the Court held that it was unconstitutional to bar incorporated advocacy organizations possessing certain characteristics from using general treasury funds to make independent expenditures.  In order to qualify as an "*MCFL* organization," a nonprofit corporation must meet three criteria: the corporation (1) must have been "formed for the express purpose of promoting political ideas, and cannot engage in business activities[;]" (2) must have "no shareholders or others affiliated" so that members have "no economic disincentive for disassociating with it if they disagree with its political activity[;]" (3) was "not established by a business corporation," and has a policy of refusing contributions from such entities."  *Id*. at 264.  The parties are agreed that MDFL corporations are covered by section 434(f)(1) and (2).

(7)     If the disbursements were paid exclusively from a segregated bank account . . . , the name and address of each donor who donated an amount aggregating $1,000 or more to the segregated bank account, aggregating since the first day of the preceding calendar year; or

(8)     If the disbursements were not paid exclusively from a segregated bank account described in paragraph (c)(7) of this section, the name and address of each donor who donated an amount aggregating $1,000 or more to the person making the disbursement, aggregating since the first day of the preceding calendar year.

11 C.F.R. § 104.20(c) (effective until Dec. 26, 2007); 68 Fed. Reg. 404, 419 (Jan. 3, 2003).  As the FEC explains, "[b]ecause BCRA prohibited corporations from making electioneering communications unless they met the strict criteria of "MCFL corporations," the new regulation applied to very few corporations (and no unions)."  Def.'s Mem. at 6, citing *MCFL*, 479 U.S. at 263–64; *McConnell v. FEC*, 540 U.S. 93, 209–12 (2003), overruled in part by *Citizens United*, 130 S. Ct. 876; *see* note 1, *supra*.

## C.  Supreme Court Precedent Regarding Electioneering Communications

In 2003, the Supreme Court rejected the first facial challenge to section 203 of the BCRA in *McConnell v. FEC*, and it upheld the prohibition on the use of general treasury funds by corporations and labor organizations to pay for electioneering communications.  540 U.S. at 93. In *WRTL*, though, the Court held that the prohibition embodied in section 203 was unconstitutional as applied to expenditures by corporations and unions for advertisements that did not constitute "express advocacy" or the "functional equivalent of express advocacy."  551 U.S. at 470–76. The Court explained that a communication is the "functional equivalent of express advocacy" only if it "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.  *Id*. at 470.   Thus, following *WRTL*, corporations and labor organizations were permitted to make expenditures for electioneering

communications that did not constitute express advocacy or its functional equivalent ("*WRTL* ads"). *Id*. at 476–82.

Subsequently, in 2010, the Supreme Court finished the job and completely invalidated the prohibition on the use of corporate and union treasury funds to finance electioneering communications in *Citizens United,* 130 S. Ct. 876 at 913. At the same time, though, the Court upheld section 201 of the BCRA – the disclosure provision – because "the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id*. at 915.

### D.  FEC Regulations Implementing *WRTL*

Soon after the *WRTL* decision, the FEC issued a Notice of Proposed Rulemaking ("NPRM") "to implement the Supreme Court's decision in *WRTL*." 72 Fed. Reg. 50261 (Aug. 31, 2007). The FEC requested public comment "generally regarding the effect of the [*WRTL*] decision on the Commission's rules governing corporate and labor organization funding of electioneering communications, the definition of 'electioneering communication,' and the rules governing reporting of electioneering communications." 72 Fed. Reg. at 50262.

The NPRM set forth two alternatives for implementing *WRTL*. Alternative 1 proposed to allow corporations and unions to finance certain electioneering communications with general treasury funds but would not have exempted *WRTL* ads from the definition of election communications altogether. 72 Fed. Reg. 50261, 50262. In connection with this alternative, the FEC posed the following question: "[s]hould the Commission limit the 'donation' reporting requirement to funds that are donated for the express purpose of making electioneering communications?" *Id*. at 50271. Alternative 2 proposed to entirely exempt the ads from the definition of electioneering communication in 11 C.F.R. § 100.29 and, as a result, eliminate both

the disclosure requirements and financing restrictions for *WRTL* ads.  *Id*.  The FEC held hearings

on the proposed rule in October 2010.

### E.  The FEC Promulgates a New Regulation

On December 26, 2007, the FEC promulgated the new regulation, 11 C.F.R. § 104.20,

which is at issue in this suit.  The regulation provides for disclosure:

> If the disbursements were made by a corporation or labor organization pursuant to
> 11 C.F.R. § 114.15, the name and address of each person who made a donation
> aggregating $1,000 or more to the corporation or labor organization, aggregating
> since the first day of the preceding calendar year, *which was made for the purpose
> of furthering electioneering communications.*

11 C.F.R. § 104.20(c)(9) (emphasis added).  In connection with its decision, the FEC published

an "Explanation and Justification for Final Rules on Electioneering Communications" ("E&J"),

72 Fed. Reg. 72899 (Dec. 26, 2007).  The E&J explained that one rationale behind the rule was

that corporations and labor organizations may have funding sources other than donations, and

that those persons may not support the corporation's electioneering communications:

> A corporation's general treasury funds are often largely compromised of funds
> received from investors such as shareholders who have acquired stock in the
> corporation and customers who have purchased the corporation's products or
> services, or in the case of a non-profit corporation, donations from persons who
> support the corporation's mission.  These investors, customers, and donors do not
> necessarily support the corporation's electioneering communications.  Likewise,
> the general treasury funds of labor organizations and incorporated membership
> organizations are composed of member dues obtained from individuals and other
> members who may not necessarily support the organization's electioneering
> communications.

*Id*. at 72911.  The FEC's second rationale for the rule was that compliance with the disclosure

requirements would impose a heavy burden on corporations and labor organizations:

> Witnesses at the Commission's hearing testified that the effort necessary to
> identify those persons who provided funds totaling $1,000 or more to a
> corporation or labor organization would be very costly and require an inordinate
> amount of effort.  Indeed, one witness noted that labor organizations would have
> to disclose more persons to the Commission under the [electioneering

communications] rules than they would disclose to the Department of Labor under the Labor Management Report and Disclosure Act.

*Id*.  Based on these considerations, the FEC determined that:

> [T]he policy underlying the disclosure provisions of BCRA is properly met by requiring corporations and labor organizations to disclose and report only those persons who made donations for the purpose of funding [electioneering communications].  Thus, new section 104.20(c)(9) does not require corporations and labor organizations making electioneering communications permissible under 11 CFR 114.15 to report the identities of everyone who provides them with funds for any reason.  Instead, new section 104.20(c)(9) requires a labor organization or a corporation to disclose the identities only of those persons who made a donation aggregating $1,000 or more specifically for the purpose of furthering [electioneering communications] pursuant to 11 CFR 114.15, during the reporting period . . . .

> In the Commission's judgment, requiring disclosure of funds received only from those persons who donated specifically for the purpose of furthering [electioneering communications] appropriately provides the public with information about those persons who actually support the message conveyed by the [electioneering communications] without imposing on corporations and labor organizations the significant burden of disclosing the identities of the vast number of customers, investors, or members who have provided funds for purposes entirely unrelated to the making of ECs.

*Id*.

The complaint alleges that as result of the promulgation of 11 C.F.R. § 104.20(c)(9), "corporations have exploited the enormous loophole it created."  Compl. ¶ 29.  According to the plaintiff Van Hollen: "[i]n 2010, persons making electioneering communications disclosed the sources of less than 10 percent of their $79.9 million in electioneering communication spending. The ten persons that reported spending the most on electioneering communications (all of them corporations) disclosed the sources of a mere five percent of the money spent.  Of these ten corporations, only three disclosed any information about their funders."  *Id*. ¶ 30, citing 2010 Outside Spending by Groups, Center for Responsive Politics, available at

http://www.opensecrets.org/outsidespending/summ.php?cycle=2010&disp=O&type=Echrt=D

(last checked March 30, 2012) (internal quotation marks omitted).

### F.  The Lawsuit Before this Court

Plaintiff filed this lawsuit on April 21, 2011.  [Dkt. # 1].  The complaint alleges that the regulation promulgated by the FEC, 11 C.F.R. § 104.20(c)(9), violates the APA, 5 U.S.C. § 706(2)(A) and(C), because the agency exceeded its statutory authority and because it is arbitrary, capricious, an abuse of discretion, and contrary to the disclosure scheme set forth in the BCRA.  Compl. ¶¶ 33–36.  Plaintiff asks the Court to declare the regulation invalid and remand it to the FEC for further action consistent with that determination.  *Id*. ¶ 37.  Plaintiff and defendant filed cross-motions for summary judgment [Dkt. # 20 and # 25.]

The Hispanic Leadership Fund ("HLF") and the Center for Individual Freedom ("CFIF") moved to intervene [Dkt. # 14 and # 15] under Fed. R. Civ. P. 24(a)(2) and (b).  Plaintiff opposed the motions to intervene [Dkt. # 21], whereas defendant took no position [Dkt. # 18].  On August 1, 2011, the Court granted the motions to intervene under Fed. R. Civ. P. 24(1) as of right.  Defendant-Intervenor HLF filed a motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1), arguing that plaintiff lacks standing to bring this suit.  [Dkt. # 30].  Defendant-Intervenor CFIC filed a pleading that served as both its opposition to plaintiff's motion for summary judgment and its cross-motion for summary judgment.  [Dkt. # 36].

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).   To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).   The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).   A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).   In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## III. ANALYSIS

This case presents no genuine issues of material fact, and so it may be properly decided on summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 323.   The question presented is whether the disclosure requirement for corporations and labor unions embodied in 11 C.F.R. § 104.20(c)(9) is contrary to a clear statement of Congressional intent found in the BCRA, 2 U.S.C. § 434(f)(2)(E) and (F), or whether Congress did not speak to this precise issue and instead delegated authority to the FEC to promulgate regulations to fill in a

gap or ambiguity in the statute.  If the agency had the authority to act, the Court would also be required to consider whether the agency's interpretation was reasonable.

### A.        Plaintiff Has Standing to Challenge the Regulation

As a threshold matter, the Court addresses defendant- intervenor Hispanic Leadership Fund's ("HLF") argument that plaintiff lacks standing to challenge 11 C.F.R. § 104.20(c)(9). HLF contends that plaintiff has neither informational standing under *FEC v. Akins*, 524 U.S. 11 (1998) and *Shays v. FEC ("Shays III")*, 528 F.3d 914, 923 (D.C. Cir. 2008), nor competitor standing under *Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ("*Shays I*").  HLF's  Mem. in Support of Mot. to Dismiss ("HLF's Mem.") [Dkt. # 31] at 2–8.  The Court notes that defendant FEC does not attack the complaint on these grounds; indeed, it agreed at oral argument that plaintiff had standing under *Akins* and *Shays III*.   Motions Hearing Transcript ("Tr.") at 57 (Jan. 11, 2011).

Turning first to the argument regarding informational standing, in *Shays III*, the D.C. Circuit found that a member of Congress "plainly ha[d] standing" to challenge the FEC's definition of "coordinated communications" because he had been denied information about who was funding presidential candidates' campaigns.  528 F.3d at 923, citing *Akins*, 524 U.S. at 16. The court stated that "the information would help [Shays] (and others to whom [he] would communicate it) to evaluate candidates for public office . . . , and to evaluate the role that [outside groups'] financial assistance might play in a specific election."  *Id*. (alterations in original).  In reaching that decision, the court relied on the Supreme Court's holding in *Akins*, where a group of voters challenged the FEC's determination that the American Israel Public Affairs Committee ("AIPAC") did not qualify as a "political committee," which meant that it did not have to disclose its members, contributors and expenditures.  524 U.S. at 16.  The Supreme

Court held that the voters had standing because they had suffered an injury in fact, namely an inability to obtain information on AIPAC's donors, contributions, and expenditures, that they believed the statute required AIPAC to make public.  *Id.* at 21.

> Here, plaintiff has represented:

> FECA and BCRA require disclosure of donors who provide funding to persons making "electioneering communications."   If the FEC regulations do not faithfully implement these disclosure provisions, I will be deprived of information to which I am entitled under FECA and BCRA.

Van Hollen Decl. ¶ 5.  The Court concludes that based on this statement, plaintiff has made the necessary showing to support informational standing under *Shays III* and *Akins*, as the FEC agrees.  Because the Court finds that plaintiff has informational standing, it does not reach HLF's second argument that plaintiff also lacks competitor standing to challenge the regulation.

### B.        Plaintiff's Challenge to the Rule Under the Administrative Procedure Act

#### 1.      The *Chevron* procedure.

The Court has jurisdiction to review the FEC's action under the Administrative Procedure Act.  Where, as here, the plaintiff challenges an agency action that interprets a statute the agency administers, the Court is required to analyze an agency's interpretation of the statute by following the two-step procedure set forth in *Chevron*, 467 U.S. 837.

First, the Court must determine "whether Congress has directly spoken to the precise question at issue."  *Id.* at 842.  "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.  In determining whether Congress has spoken directly to the question at issue, the Court must consider whether "the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill[.]"  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005).  Courts "use 'traditional tools of

statutory construction' to determine whether Congress has unambiguously expressed its intent,"
*Serono Labs., Inc., v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998), including examination of
the statute's text, structure, purpose, and legislative history.  *Bell Atlantic Tel. Co. v. FCC*, 131
F.3d 1044, 1047 (D.C. Cir. 1997).

 If the Court concludes that the statute is either silent or ambiguous with respect to the
issue in question, the second step of the Court's review process is to determine whether the
interpretation proffered by the agency is "based on a permissible construction of the statute."
*Chevron*, 467 U.S. at 843.  Once a reviewing court reaches the second step, it must accord
"considerable weight" to an executive agency's construction of a statutory scheme it has been
"entrusted to administer."  *Id.* at 844.  Indeed, "under *Chevron*, courts are bound to uphold an
agency interpretation as long as it is reasonable – regardless of whether there may be other
reasonable or, even more reasonable, views."  *Serono*, 158 F.3d at 1321.  The Supreme Court
explained:

> If Congress has explicitly left a gap for the agency to fill, there is an express
> delegation of authority to the agency to elucidate a specific provision of the
> statute by regulation. Such legislative regulations are given controlling weight
> unless they are arbitrary, capricious or manifestly contrary to the statute.
> Sometimes the legislative delegation to an agency on a particular question is
> implicit rather than explicit. In such a case, a court may not substitute its own
> construction of a statutory provision for a reasonable interpretation made by the
> administrator of an agency.

*Chevron,* 467 U.S. at 843–44.  In either event, then, the fundamental inquiry at the first level of
the *Chevron* analysis is to ascertain whether *Congress* has authorized the agency to make rules to
fill in a gap.

   **2.  *Chevron* step one.**

 According to defendant, the rule it promulgated is appropriate, in part, because *the
Supreme Court* took action that rendered the statute ambiguous.  Def.'s Mem. at 21–23;  Tr. at

31–33.  The FEC initiated the rulemaking in 2007 in direct response to the decision in *FEC v. Wisconsin Right to Life*, which struck down the BCRA prohibition on the use of corporate and labor organization funds for at least certain types of electioneering communications.  72 Fed. Reg. 50261-01.[2]  There is no question that the agency was animated by concerns that the disclosure provision might be too burdensome or too broad as a matter of policy when applied to all corporations and labor unions, as opposed to just the *MCFL* corporations it covered before.  In other words, the agency did not purport to be responding to a direct delegation of rulemaking authority or addressing an ambiguity inherent in the statutory scheme:   it specifically undertook to modify existing law to fit the changed circumstances.

In its Notice of Proposed Rulemaking, the FEC noted that corporations or unions could select the option available under 2 U.S.C. §434(f)(2)(E) "that persons making electioneering communications may create a segregated bank account for funding electioneering communications in order to limit reporting to the donors for that account."  72 Fed. Reg. 50261, 50271.  But then it asked:

> If the corporation or labor organization does not pay for the electioneering communication from [a segregated bank account], would the corporation or labor organization be required to report "the name and address of each donor who donated an amount aggregating $1000 or more" to the corporation or labor organization during the relevant reporting period as required by 2 U.S.C. §434(f)(2)(F) and 11 CFR 104.20(c)(8)?  If so, how would a corporation or labor organization determine which receipts qualify as "donations?" Should the Commission limit the "donation" reporting requirement to funds that are donated for the express purpose of making electioneering contributions?

*Id.*

---

2      Defendant points to comments submitted in 2007 during the FEC's rulemaking process regarding the *WRTL* decision, which observe that "*WRTL* was a fundamental change that Congress could not have foreseen."  Def.'s Mem. at 19 & n.7 (providing examples of comments made at the FEC's hearing on the revised rule).

When the agency characterized its own exercise as a making a decision on whether a corporation or labor organization should be bound to report "as required by" the statute, or whether the Commission should "limit" that requirement instead, it succinctly answered the first question presented by *Chevron*:  Congress has already spoken.[3]

      a.   <u>The Text of the Statute</u>

It is undeniable that in determining whether Congress has directly spoken to the issue, the Court must first consider the plain meaning of the statutory text itself.  *S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 23 (D.C. Cir. 1999).  *Chevron* step one requires the Court to apply traditional canons of statutory interpretation to the law in question to determine if its meaning is clear.  *ArQule, Inc. v. Kappos*, 793 F. Supp. 2d 214, 220 (D.D.C. 2011), citing *Eagle Broadcasting Group, Ltd. v. FCC*, 563 F.3d 543, 552 (D.C. Cir. 2009).  As the Supreme Court has explained:

> [C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others.  We have stated time and time again that courts must presume that a legislature says in a statute what it

---

3    Indeed, the FEC's own summary of the E&J seems to largely concede the point. According to the FEC's brief:

- The Commission "rejected the contention that the BCRA did not contemplate reporting by corporations and unions;"
- The Commission noted that the statute requires "persons" as defined by section 431, *i.e.*, including corporations and labor unions), to file reports;
- The Commission rejected the argument that it was necessary to eliminate the reporting requirement to protect privacy concerns; and
- The Commission decided that corporations and labor unions were bound by the reporting requirements.
- But, the Commission promulgated what it described as a "new" regulation "to ensure that disclosure would be narrowly tailored."

Def.'s Mem. at 9-11, citing 72 Fed. Reg. 72,899-901.

means and means in a statute what it says there.  When the words of a statute are unambiguous, then this first canon is also the last:  judicial inquiry is complete.

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (internal quotation marks and citation omitted).

Here, there is no question that the BCRA provides that every "person" who funds "electioneering communications" must disclose "all contributors," 2 U.S.C. § 434(f)(1), (f)(2)(F), and that Congress explicitly defined "person" to include corporations and labor organizations. *Id*. § 431(11).  The provision plainly requires "every person" to identify "all" contributors who contributed over $1,000 during the reporting period, and there are no terms limiting that requirement to call only for the names of those who transmitted funds accompanied by an express statement that the contribution was intended for the purpose of funding electioneering contributions.  So, there is no indication that Congress charged the FEC with clarifying anything, either explicitly or implicitly, and the text favors the plaintiff at *Chevron* step one.

      b.  <u>The fact that Congress did not contemplate the current reach of the BCRA does not render the statute ambiguous for *Chevron* purposes.</u>

The FEC reminds the Court, though, that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).  *See also Bell Atlantic Tel. Co.*, 131 F.3d at 1047 (determination of whether a statutory provision is ambiguous involves a consideration of the entire statute, including its text, structure, purpose and legislative history).  It takes the position that Congress could not possibly have addressed the precise question at issue here because under the BCRA as enacted, corporations and labor organizations were prohibited from funding electioneering communications altogether.  2 U.S.C. § 441b(b)(2).  So, defendant reasons, the

conflict between that provision and the provision detailing what persons who *could* make such disbursements were required to disclose renders the disclosure provision ambiguous as to the originally barred entities.   Def.'s Mem. at 18–27.   Put another way, the FEC argues that Congress could not have specifically intended the broad disclosure rules to apply to corporations and labor unions as written if it carved them out of the BCRA entirely at the same time.

While this is the agency's most compelling argument, in the end the Court concludes that it is not a proper consideration at the *Chevron* step one stage when the statutory language is clear and unambiguous.   The Supreme Court was quite unequivocal in *Chevron* when it declared: "[i]f the intent of Congress is clear, that is the end of the matter."   467 U.S. at 842–43.   And, the Supreme Court has gone on to explain that unambiguous statutory text is not rendered ambiguous simply because the statute has been called upon to govern unforeseen circumstances: "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; it demonstrates breadth."   *Penn. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (internal quotation marks omitted).   In *Yeskey*, the Supreme Court held that the Americans with Disabilities Act applied to state prisoners, notwithstanding defendant's argument that Congress did not envision that prisons would qualify as public entities under the Act, because "in the context of unambiguous statutory text[,] that is irrelevant."   524 U.S. 206 at 212.[4]

---

4       *See also Massachusetts v. EPA*, 549 U.S. 497 (2007). In that case, the EPA denied a petition for rulemaking asking it to regulate certain greenhouse gas emissions on the grounds that the statute did not expressly authorize it do so.   *Id*. at 511.   The Court rejected the EPA's argument that it lacked authority to regulate carbon dioxide emissions from motor vehicles under the Clean Air Act, 42 U.S.C. § 7521(a)(1), simply because Congress did not expressly grant it the authority to do so.   *Id*. at 532.   The Court found that Congress intentionally defined "air pollutant" broadly in the statute so that that the agency could respond to "changing circumstances and scientific developments" that would otherwise "render the Clean Air Act obsolete."   *Id*.   It cited its decision in *Yeskey* for the proposition that "broad language . . . reflects

Defendant argues that *Yeskey* is not applicable here because it did not address a situation in which a court decision significantly altered the scope of a statute by "legalizing what Congress had specifically made unlawful." Def.'s Reply at 8. But those different circumstances do not negate the applicability of the key principle involved: that this Court is bound to give effect to the broad language that Congress decided to employ. And the FEC cites no authority for the proposition that a legal decision striking down one provision of a statute provides a gateway for an agency to move in and tinker with another that the courts have left untouched. Indeed, the notion that *Chevron* would not approve rulemaking under those circumstances is particularly compelling here since Congress was careful to make the statute explicitly severable, expressing an intention that the disclosure provisions would stand as written – applying to all "persons," defined to include corporations and labor unions – even if the ban on corporate disbursements was struck down. *See* Pub. L. 107-155 § 401 ("If any provision of this Act or amendment made by this Act, or the application of a provision or amendment to any person or circumstance, is held to be unconstitutional, the remainder of this Act and amendments made by this Act, and the application of the provisions and amendment to any person or circumstance, shall not be affected by this holding.") And, as the FEC acknowledges, the disclosure rules did apply as written to at least *some* corporations. *See MCFL*, 479 U.S. at 238.

So, the problem the FEC decided it needed to address – the fact that some, or even many, contributors to organizations might be providing those funds for purposes other than electioneering communications and might even disagree with those communications – was already inherent in the statutory regime. *MCFL* corporations could have a number of purposes,

---

an intentional effort to confer the flexibility necessary to forestall [a statute's] obsolescence." While the case may not be on all fours with the instant situation as defendant suggests, it reinforces the teaching in *Yeskey*.

including education and advocacy, yet the rule requiring the identification of "all" contributors applied to them.  And Congress also plainly intended that the rule would apply to partnerships and other unincorporated business organizations, even if they, like some corporations, derived income or operating revenue from selling goods or services or collecting dues, or they received contributions from donors intending to support activities other than electioneering, or who were indifferent, or even opposed, to the ads the organization chose to fund.  Indeed, as the Supreme Court observed when it rejected a First Amendment challenge to the disclosure provisions, *all* speakers, even individuals, might fund their political speech with money amassed from the economic marketplace, even from people who disagree with them.  *Citizens United*, 130 S. Ct. at 905.  Yet Congress made a clear policy choice not to limit the disclosure requirement applicable to any "person" to whom a contribution is made based on the contributors' individual motivation.  Perhaps the legislature recognized that the motivation for a contribution is not always easily discerned or expressly stated, or that such a rule could result in the wholesale evasion of disclosure requirements if contributors were encouraged to simply transfer money but keep their thoughts to themselves.  In any event, under *Chevron,* it was not up to the FEC to revisit that legislative determination.

The law in this Circuit points to the same conclusion.  In *Mova Pharmaceutical Corp. v. Shalala*, the Court of Appeals addressed a situation where the plain language of the statute technically applied to the situation, but the agency promulgated a regulation that was inconsistent with the text because it was concerned that application of the literal text would produce an absurd result.  140 F.3d 1060 (D.C. Cir. 1998).  The court recognized that although statutes should be construed to avoid absurd results, agencies do not "obtain a license to rewrite the statute" when the agency feels that application of "seemingly clear statutory language"

would lead to an anomalous outcome.  *Id*. at 1068.  The court reasoned that "[w]hen the agency concludes that a literal reading of a statute would thwart the purposes of Congress, it may deviate no further from the statute than is needed to protect congressional intent."  *Id*.  The ruling is instructive in this case even though the FEC was not specifically worried about an absurd result; indeed, the principle might apply more strongly to this situation where the agency was attempting to "limit" a broad rule's application.[5]

> c.  A consideration of the statute's purpose and legislative history supports the
>     conclusion that it is not ambiguous.

Circuit precedent indicates that developing an understanding of the purpose of the statutory provision under review is another aspect of the statutory construction to be undertaken at the *Chevron* step one stage.  *City of Cleveland v. U.S. Nuclear Regulatory Comm'n*, 68 F.3d 1361, 1366 n.4 (D.C. Cir. 1995) ("[W]e may consider a provision's legislative history in the first step of *Chevron* analysis to determine whether Congress' intent is clear from the plain language of the statute.")  And here, it cannot be gainsaid that the purpose of the regulation was to increase disclosure.

In enacting the disclosure requirements, it is clear that Congress intended to "shine[] sunlight on the undisclosed expenditures for sham issue advertisements."   147 Cong. Rec.

---

5       Although this is more properly a *Chevron* step two concern, the Court notes that the separate bank account option Congress provided in the BCRA might be a viable way to solve the agency's concerns about the burden the  disclosure rule would impose on the newly regulated entities. Defendant points out that the separate bank account can only be utilized to receive contributions made to regulated "persons" by individuals, so it does not necessarily capture all contributions to those "persons" subject to the disclosure regime after *WRTL*. Tr. at 48–49.  But it was the potential burden imposed by the need to identify individual contributors under 2 U.S.C. §434(f)(2)(F),  *i.e.*, individual customers, investors, and dues paying members – that was cited at the rulemaking stage as the reason for the "limiting" the requirement.  There is little indication that anyone complained that it would be too burdensome to name all of their institutional contributors.  So, it appears to the Court that the separate bank account option already included in the statute would largely solve the problem the FEC set out to address.

S3022-05, S3034 (Mar. 28, 2001) (statement by Sen. Jeffords).  Reflecting on the need for more

comprehensive disclosure requirements, Senator Dianne Feinstein commented:  "The attacks

come and no one knows who is actually paying for them.  I believe this is unethical.  I believe it

is unjust.  I believe it is unreasonable and it must end."  147 Cong. Rec. S3233-06, S3238 (April

2, 2001).  Similarly, in upholding the BCRA's disclosure provisions in *Citizens United*, the

Supreme Court observed that "the public has an interest in knowing who is speaking about a

candidate shortly before an election."  130 S. Ct. at 915.  The Court also noted that in its

previous decision in *Buckley v. Valeo*, 424 U.S. 1 (1976), it had found that the statute's

disclosure requirements were motivated by the fact that there was evidence in the record that

independent groups were running advertisements "'while hiding behind dubious and misleading

names'" and that disclosures "would help citizens 'make informed choices in the political

marketplace.'"  *Id*. at 914, citing and quoting *Buckley*, 540 U.S. at 197 (internal citation omitted).

In light of this clearly articulated legislative purpose, there is no question that the

regulation promulgated by the FEC directly contravenes the Congressional goal of increasing

transparency and disclosure in electioneering communications.  Defendant argues that Congress'

general preference for disclosure in the BCRA does not mean that the Congress specifically

intended to mandate the electioneering communication disclosures that plaintiff believes are

necessary since corporations and unions were originally prohibited from making any

electioneering disbursements.  Def.'s Mem. at 26.  But the general legislative purpose here is

clearly expressed and it favors plaintiff's interpretation of the statute: that Congress intended to

shine light on whoever was behind the communications bombarding voters immediately prior to

elections.

d. <u>The general rulemaking provision did not authorize defendant to promulgate rules to respond to changes occasioned by Supreme Court precedent</u>.

It is true that Congress authorized defendant "to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of this Act."  2 U.S.C. § 437d(a)(8).  But devising procedures to "carry out" or "implement" statutory provisions is not the same thing "limiting" them as the agency did here.  So, there is nothing in this statutory text expressly delegating authority to the agency to *narrow* the disclosure rules, and defendant has failed to point to anything in the statute that would support a finding that Congress implicitly delegated the authority to alter them either.

e. <u>There was no other ambiguity in the plain language of the disclosure provision</u>.

The rulemaking was specifically undertaken to address the changes wrought by *WRTL* to the types of "persons" to whom the disclosure rules apply and, for the reasons set forth above, the Court concludes that this change in circumstances does not constitute an ambiguity or gap under *Chevron* step one.  But in its briefing here, FEC now contends that the text was actually ambiguous all along, and that this inherent ambiguity – which did not prompt the rulemaking exercise – is sufficient to require the Court to move on to the *Chevron* two stage of reviewing the regulation for reasonableness. [6]

---

[6]   The Court notes that this argument is not one of the stated justifications that defendant gave for the promulgation of 11 C.F.R. § 104.20(c)(9), but it is one of the reasons it advances now for why the Court should resolve the question in this case under *Chevron* step two instead of step one.  Plaintiff argues that the FEC cannot now invoke the argument that the BCRA's term "contributor" is ambiguous because the FEC did not rely on that proposition when it promulgated the regulation.  Pl.'s Opp. at 1–2, citing *Williams Gas Processing – Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) ("It is axiomatic that [a court] may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review . . . post hoc rationalizations by agency counsel will not suffice." (internal citation and quotation marks omitted).  Because the Court finds that the statutory language is unambiguous under *Chevron* step one, it does not reach this question.

The BCRA requires that every "person" who disburses funds for the direct costs of electioneering communications must disclose the names of "all contributors who contributed an aggregate amount of $1,000 or more" to the segregated bank account from which the disbursements were made, or, if no such account was used, to the "person" itself.  2 U.S.C. § 434(f)(2)(E) ("if the disbursements were paid out of a segregated bank account . . . the names and addresses of *all contributors* who contributed . . . ") and *id.* at § 434(f)(2)(F) ("if the disbursements were paid out of funds not [from a segregated bank account], the names and addresses of *all contributors* . . .") (emphasis added).  According to the Oxford English Dictionary, the plain meaning of the word "all" is "the entire number of; the individual components of, without exception."  Oxford English Dictionary, 2d edition (1989) (online version 2012).  Defendant does not contest that the meaning of the word "all" is unambiguous.

Rather, defendant focuses on the words "contributor" and "contributed," arguing that these terms are "susceptible of multiple meanings in different contexts."  Def.'s Opp. [Dkt. #24] at 19.  Defendant points out that while neither of the words is defined in the BCRA, these terms share a common root with the word "contribution" which is defined under FECA as a transfer of something of value made "for the purpose of influencing any election for Federal office."  *Id.* at 20, citing 2 U.S.C. § 431(8)(A).  Because of the definition provided in FECA and the fact that the BCRA uses similar terms but leaves them undefined, defendant contends that the terms "contributor" and "contributed" have been ambiguous since the BCRA was enacted – well before the Supreme Court's *WRTL* decision – and that the FEC attempted to resolve this ambiguity in its rulemaking procedures that took place in 2003.  In the 2003 rulemaking that led to the Commission's original electioneering communications disclosure regulation, the

Commission noted that, although Congress defined the term "contribution" long ago in FECA, neither "contributor" nor "contributed" was defined in the BCRA and as a result:

> [I]t did not seem appropriate to interpret "contributor" in this context precisely as one who has made a "contribution" as defined by FECA because the definition of "electioneering communication" could include speech *not* made for the purpose of influencing an election:  The mere reference to a clearly identified candidate in a targeted broadcast communication suffices to bring an ad within the statutory definition.

Def.'s Mem. at 20.  In other words, the FEC is not claiming that the FECA definition is applicable here; it submits that the absence of a definition in the BCRA created a gap to be filled. [7]

But even if there was such an ambiguity inherent in the statute, the FEC took action in 2003 to address it.   According to defendant's papers, to clarify the issue, the FEC chose not to repeat the terms "contributor" and "contributed" when promulgating the original regulation in 2003.  *Id*.  Instead, it required disclosure of the "name and address of each *donor* who *donated* an amount aggregating $1,000 or more to the person making the disbursement[.]"   11 C.F.R. § 104.20 (c)(8) (emphasis added).  *Id*.; *see also* Tr. 38–39 ("Even in the 2003 rulemaking for the rule that existed when *Wisconsin* was decided, the Commission had identified that it was not clear in that context that – what 'contributors who contributed' meant, and that's why we adopted – that's why the Commission adopted the language 'donation' and 'donated.')

So why was more needed after *WRTL*? Defendant contends that the ambiguity in the statute became even more pronounced after the Supreme Court's decision in *WRTL* because no one had ever pondered the question of what constituted "all contributors who contributed" to a

---

7       Contrary to defendant FEC's position, defendant-intervenor CFIF argues that this case can be decided under *Chevron* step one because it contends that the definition of "contribute" from FECA should be imported to the BCRA.   CFIF Mem. at 6–8. But both plaintiff and defendant agree that would be underinclusive and unworkable.

corporation or a union due to the BCRA's prohibition on electioneering disbursements by those entities. Def.'s Mem. at 20–21. Because, according to defendant, the *WRTL* decision changed the rules of the game so significantly in 2007, the agency "for the first time had to address the vast majority of corporate organizations and unions[,] which, unlike *MCFL* corporations, may have customers, investors, or comparable sources of revenue that might have little or no connection to political activity." *Id.* at 21.[8]

Plaintiff responds that there is no question that Congress enacted the BCRA with the understanding that it might become applicable to a wide range of corporations. Pl.'s Opp. [Dkt. #35] at 5–6.[9] He maintains that the FEC's own acknowledgement that Congress understood and intended that some corporations could make electioneering communications, Def.'s Mem. at 6, citing *McConnell*, 540 U.S. at 209–212, undermines its contention that Congress could not have envisioned that the disclosure requirements would someday apply to other types of corporations.

---

8       The Court is not particularly persuaded by this argument. If "all contributors who contributed" was ambiguous from the start, the FEC had a rulemaking to address it. And its substitution of the words "donor" and "donation," with their clear connotation of providing something for nothing, *see* http://www.merriam-webster.com/dictionary/donation (defining "donation" as "the making of a gift, especially to a charity or public institution" or "a free contribution"), seems to ameliorate the concerns supposedly raised by the expansion of the statute's reach to include corporations and unions. Is it really difficult to determine if dues paid in return for the benefits of membership are "donations," or if investors who pay for shares of stock and customers who pay for goods and services are a corporation's "donors?" The problem here is that the challenged regulation was prompted, at least in part, by the agency's stated concern that it would be too burdensome for corporations or unions to identify all "persons who provided funds." 72 Fed. Reg. 72911. But the existing regulation was not so broad – it called for the identification of "donors," not all who provided funds for any purpose. Thus, the agency had already narrowed the universe in a way that did not add an intent requirement or contravene the intent of the statute, and nothing about *WRTL* made the existing regulation ineffective.

9       Intervenor HLF disputes statements made by both plaintiff and defendant that the BCRA recognized that at least some corporations, namely *MCFL*-corporations, would be permitted to engage in certain corporate-funded electioneering communications under the original enactment of the BCRA. HLF Mem. at 8–10. Because the Court's decision under *Chevron* step one rests on the unambiguous language of the BCRA, it declines to resolve this issue.

Pl.'s Opp. at 5.   As plaintiff points out, "[t]hose *MCFL* corporations, like other non-profit entities, could have 'members' who might pay dues without announcing or otherwise manifesting an explicit 'purpose' to further 'electioneering communications.'"  *Id.*[10]

Bearing all of these considerations in mind, the Court must look first to the actual language of the statute.  *CSX Transp., Inc. v. Alabama Dep't of Revenue*, --- U.S. ---, 131 S. Ct. 1101, 1007 (2011).   There is no question that that BCRA clearly states that "the names and addresses of *all contributors who contributed*" must be disclosed.  2 U.S.C. § 434(f)(2)(E), (F) (emphasis added).   The Oxford English Dictionary defines "contributor" as "one that contributes or gives to a common fund; one that bears a part in effecting a result."   Oxford English Dictionary, 2d edition (1989) (online version 2012).   The verb "contribute" is defined, in relevant part, as "to give or pay jointly with others; to furnish a common fund or charge."  *Id.* Similarly, the Merriam-Webster dictionary defines "contributor," in relevant part, as "to give or supply in common with others [;] . . . to give a part to a common fund or store[.]"   Merriam-Webster   Dictionary   online   at   1,   3,   available   at:   http://www.merriam-webster.com/dictionary/contributor.

Each of these definitions suggests that as the term is commonly used, an individual's status as a "contributor" is not dependent on his or her purpose in transferring the funds.   In other words, the plain meaning of "contribute" does not include a purpose or intent element, and the

---

10      Plaintiff also points to the Snowe-Jeffords Amendment, 2 U.S.C. § 441b(c)(2), as evidence that Congress did contemplate that certain non-*MCFL* corporations would be able to make electioneering communications under the BCRA.  Pl.'s Opp. at 6.  Defendant contends that the plaintiff is relying on a portion of the Snowe-Jeffords amendment that is inoperative and "sheds no light on what electioneering communication disclosure Congress would have required had it known how the Supreme Court would alter the scope of BCRA in *WRTL*."  Def.'s Mem. at 23–26.  But at oral argument, the parties indicated that the Snowe-Jeffords amendment is largely irrelevant to the question the Court must resolve in this case.  Tr. at 18 ("[Plaintiff's Counsel]:  I think the ink spilled over Snowe-Jeffords and Wellstone is in inverse proportion to its importance to the resolution of this case.")

FEC's attempt to add one is an alteration, and not a clarification.[11]   As plaintiff contends, contributor "means a person who gives money without expectation of service or property or legal right in return . . . . [And] a person who gives money to a non-profit corporation but has no opinion about how the non-profit uses the money is still a 'contributor.'  Likewise, a person who gives money to a non-profit but does not know whether the non-profit makes 'electioneering communications' is still a contributor."  Pl.'s Mem. in Support of Its Mot. for Summ. J. ("Pl.'s Mem.") [Dkt. #20] at 20.[12]   So, when the FEC asked in its rulemaking if it should "limit" the

---

[11]    CFIF contends that these definitions actually support the addition of a purpose requirement because of language such as "common fund" and "in common with others," CFIF Mem. at 8, but the Court reads these definitions to mean simply that the money was deposited in a common pot.  The recipient of the donation is what the contributors all have in common, not the reason behind the donation.

And defendant-intervenor HLF complains that this lawsuit is an attempt to accomplish judicially what plaintiff was unable to do legislatively.  It notes that plaintiff sponsored a bill in the U.S. House of Representatives known as the "Democracy is Strengthened by Casting Light on Spending in Elections Act" (the "DISCLOSE Act").  H.R. 5175, 111th Congress § 211(b)(1)(B), which was defeated in the Senate.  HLF Mem. at 15 (summarizing relevant legislative history).  HLF argues that "it is no coincidence that the interpretation of 2 U.S.C. § 434(f)(2)(F) that Plaintiff urges the Court to adopt exactly mirrors [plaintiff's legislative proposal.]"  *Id.*  But the Court cannot glean much meaning from legislative inaction as it may reflect the Senate's disagreement with the plaintiff's proposal or a view that it simply wasn't necessary.  *See, e.g., Chevron*, 467 U.S. at 865 ("Perhaps [Congress] consciously desired the [agency] to strike the balance at this level . . . ; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question[.]").  Therefore, plaintiff's motivation in filing this lawsuit is immaterial to the Court's determination of whether that the language of the BCRA is clear and unambiguous.

[12]    At oral argument, counsel for plaintiff offered a hypothetical that underscores the point that the plain meaning of "contributor" does not include an intent requirement:

[PLAINTIFF'S COUNSEL]:  Let's say I was a contributor to the Do-Re-Mi Music Festival.  Maybe I did that because I love music.  Whether or not I love music, I'm a contributor.  Maybe I hate music but I like to see my name printed on the program.  I have a purely selfish motive.  I'm still a contributor.  Or maybe I gave because somebody I know was putting the arm on me to give to his favorite charity, and I hate music but I gave anyway.  I'm still a contributor.  Or maybe I gave because I thought if I give to his charity, he'll give to my charity.  I'm still a contributor.

disclosure rules, it directly contravened the requirement set forth plainly by Congress that "all contributors who contributed" be disclosed.   Congress's use of repetitive, but not obscure, language in the provision did not justify the agency's assertion of authority here. [13]

### C.   The Intervenors' Constitutional Arguments Lack Merit

Defendant-intervenors HLF and CFIF advance several constitutional arguments related to the regulation, but these concerns are not properly before the Court on this motion, and in any event,  they are governed by the Supreme Court's decision in *Citizens United*, 130 S. Ct. at 914–16.

CFIF argues that plaintiff's reading of the regulation would burden "core speech," triggering "exacting scrutiny."  CFIF's Mem. in Support of Summ. J. [Dkt. # 33] ("CFIF Mem.") at 14–16.  CFIF contends that plaintiff has "the burden of showing that applying the statute to require broad disclosures from corporations and labor unions satisfies exacting scrutiny."  *Id.* at 13.  But CFIF fails to provide any authority that plaintiff must meet this "burden" in order to succeed on his challenge to the regulation under the APA.  Plaintiff did not allege in the complaint that the statute or regulation, as written, violates the Constitution, and defendant-

---

Tr. at 22–23.

[13]      Indeed, the Court wonders how defendant would ever be able to enforce the intent requirement embodied in the regulation.   How is the recipient supposed to know which contributors it must disclose and which ones it is not?  Would contributors be required to state their purpose when making a donation?  Also, plaintiff points out that many of the entities making electioneering communications "conveniently neglect to communicate about purpose [to their contributors.]  That's why this construction of the statute has blown a gaping loophole in the disclosure issue . . . ."  Tr. at 23.  Although these considerations do not bear on the Court's analysis of the plain language of the statute at the *Chevron* step one stage, they heighten concerns that the new regulation does not comport with the Congressional purpose and intent behind campaign finance legislation:  to expose the parties behind the communications to the light.

intervenors did not file their own claims, so their arguments regarding the constitutionality of the statute and regulation are not properly before the Court on these motions.

To the extent that defendant-intervenors are arguing that the Court's statutory construction must adopt the FEC's interpretation to "save the statute from constitutional invalidity," the FEC has no authority, as plaintiff points out, to "save" statutes by promulgating regulations that contravene the plain language of the statute. Pl.'s Opp. to Intervenors' Briefs [Dkt. # 39] at 9, citing *Weinberger v. Salfi*, 422 U.S. 749, 794 (1975) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.")[14]   And even if that were not the case, plaintiff is under no obligation to demonstrate that requiring an agency to follow the unambiguous language Congress used in a statute must meet "exacting scrutiny."[15]

Most important, any constitutional concerns that defendant-intervenors raised about the burdens the regulation would impose were addressed by the Supreme Court in *Citizens United*, 130 S. Ct. at 914–16.  The Court expressly upheld the disclosure requirements set forth in section 434(f) of the BCRA, noting that they serve an important public function because they "'provid[e] the electorate with information about the sources of election-related spending,'" quoting and

---

[14]    Furthermore, as plaintiff points out, even if the constitutional concerns were proper considerations, the intervenors may not defend the challenged regulation on grounds not invoked by the FEC.  Pl.'s Opp. to Intervenors' Briefs [Dkt. #39] at 7–8.  The Court notes that the FEC did not rely on constitutional considerations in the E&J it published when the regulation was promulgated.

[15]    Both intervenors point to a recent case from the Southern District of West Virginia as authority for the proposition that the regulation promulgated by the FEC is constitutionally required.  HLF Mem. at 11, citing *Center for Individual Freedom, Inc. v. Tennant*, --- F. Supp. 2d ---, No. 1:08-cv-00190, 2011 WL 2912735 (S.D. W. Va. July 18, 2011); *see also* CFIF Mem. at 16–17.  In that case, the court considered disclosure requirements under West Virginia state election law.  *Tennant* is not controlling authority, and moreover, because it arose under state law and regulations, it is not persuasive to the federal law issues presented in this case.

citing *Buckley*, 424 at 66, and "help citizens 'make informed choices in the political marketplace.'" *Id*. at 914, quoting and citing *McConnell*, 540 U.S. at 197.  The Court in *Citizens United* specifically understood that corporations and labor unions would fall within the category of "persons" to whom the disclosure rules would apply, yet it still approved the disclosure requirements with which defendant-intervenors take issue.  The only outer limit the Court seems to have imposed is whether disclosure would subject an organization's donors to threats or reprisals, 130 S. Ct. at 914, and nothing like that has been raised as an issue in this case.

**CONCLUSION**

In sum, the Court finds that Congress spoke plainly, that Congress did not delegate authority to the FEC to narrow the disclosure requirement through agency rulemaking, and that a change in the reach of the statute brought about by a Supreme Court ruling did not render plain language, which is broad enough to cover the new circumstances, to be ambiguous. The agency cannot unilaterally decide to take on a quintessentially legislative function; if sound policy suggests that the statute needs tailoring in the wake of *WRTL* or *Citizens United*, it is up to Congress to do it. Because the statutory text is unambiguous, the "judicial inquiry is complete," and the Court need not reach step two of the *Chevron* framework. *Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 53 (2005).

Accordingly, the Court will grant plaintiff's motion for summary judgment [Dkt. # 20] and will deny defendant's cross motion for summary judgment [Dkt. # 25]. The Court will also deny intervenor-defendant Hispanic Leadership Fund's motion to dismiss [Dkt. # 30] and intervenor-defendant Center for Individual Freedom's cross motion for summary judgment [Dkt. # 36]. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 30, 2012