# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRIS VAN HOLLEN, | ) |
| Plaintiff, | ) |
| v. | ) Civ. A. No. 1:11-cv-00766 (ABJ) |
| FEDERAL ELECTION COMMISSION, | ) |
| Defendant, | ) |
| and | ) |
| CENTER FOR INDIVIDUAL FREEDOM, | ) |
| Defendant, | ) |
| and | ) |
| HISPANIC LEADERSHIP FUND, | ) |
| Defendant. | ) |

## DEFENDANT CENTER FOR INDIVIDUAL FREEDOM'S
## SUPPLEMENTAL BRIEFING ON REMANDED ISSUES

Jan Witold Baran (D.C. Bar No. 233486)
Thomas W. Kirby (D.C. Bar No. 915231)
Caleb P. Burns (D.C. Bar No. 474923)
Andrew G. Woodson (D.C. Bar No. 494062)
WILEY REIN LLP
1776 K St., NW
Washington, D.C. 20006
202.719.7000

May 13, 2013                              *Counsel for Center for Individual Freedom*

As authorized by the Court in its minute order of March 18, 2013, the Center for Individual Freedom ("CFIF") submits this Supplemental Memorandum addressing the issues remaining in this case after remand by the Court of Appeals. Consistent with this Court's directive, CFIF will avoid repeating its previous briefing as well as the submissions of the Federal Election Commission ("FEC") and the Hispanic Leadership Fund. Of course, CFIF reserves all of those arguments in the event of any further appeal.

The Court of Appeals ruling pointedly rejected Van Hollen's argument that the challenged regulation, 11 C.F.R. § 104.20(c)(9) (the "Regulation"), contradicted or was narrower than the underlying statute. *CFIF v. Van Hollen*, 694 F.3d 108, 110 (D.C. Cir. 2012). Contrary to Van Hollen's arguments here, the Court of Appeals opinion held that the statutory language could "be construed to include a 'purpose' requirement," and this was "especially" so based on the relevant statutory language. *Id.* Thus, Van Hollen is clearly mistaken in arguing that the FEC contravened existing law in adopting exactly the sort of regulatory purpose requirement authorized by the statute.

As the FEC explained in promulgating the Regulation, the agency's use of a purpose requirement is wholly consistent with other provisions of federal campaign finance law. Hence, the Regulation easily survives the "highly deferential"[1] review authorized by Step 2 of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), and the "very deferential"[2] arbitrary and capricious test incorporated into the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Indeed, as this Court observed during the January 11, 2012, argument, "once you get to Chevron II[, a

---

[1] *Village of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 665 (D.C. Cir. 2011) (quoting *NRA v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000)).

[2] *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). *See also Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (the arbitrary and capricious standard is "[h]ighly deferential," "narrow," and "presumes the validity of agency action").

challenger's] burden is much higher because of the level of deference. So the Chevron I decision is close to being the outcome determinative decision, or it may very well be the outcome determinative decision." Tr. of Oral Arg. at 73:3-10. Having survived *Chevron* Step One, there should be little doubt that the Regulation is lawful.

With these general principles in mind, the following first few pages of CFIF's memorandum refute a pair of additional arguments advanced in Plaintiff Van Hollen's Supplemental Brief ("VH Supp. Br."). The remainder of CFIF's submission explains why the FEC's unchallenged explanation of the cross-reference to 11 C.F.R. § 114.15 fully resolves the ambiguity identified by the Court of Appeals and is necessary to preserve the constitutionality of the electioneering communication disclosure regime as a whole.

## I.     Van Hollen's Latest Arguments Directly Contradict Existing Precedent.

As discussed above, Van Hollen's first supplemental argument – that the Regulation "[f]louts BCRA's [l]anguage and [p]urpose" – rehashes a claim already foreclosed by the Court of Appeals opinion. VH Supp. Br. at 4 (emphasis omitted). Van Hollen argues (at 5) that the use of the word "for" in the general disclosure requirements of 2 U.S.C. § 434(f)(1), and the absence of this same word in the contributor-specific disclosure requirement, 2 U.S.C. § 434(f)(2)(F), is evidence that Congress did not want to limit the disclosure of funding sources for those making electioneering communications. Not only does this assertion contradict the explicit reasoning of the Court of Appeals opinion, *see CFIF*, 694 F.3d at 110 (citing § 434(f)(1) in explaining that § 434(f)(2)(F) may very well include a purpose requirement), but it ignores additional statutory language critical to understanding the scope of the disclosure provisions. The contributor-specific disclosure requirement of § 434(f)(2)(F) includes the phrase "contributors who contributed." The statute elsewhere defines the word "contribution" to include a "<u>for</u> the purpose of influencing" element. *See* 2 U.S.C. § 431(8)(A)(i) (emphasis

added).  It would have been statutory overkill for Congress to have inserted the word "for" a second time within the framework of § 434(f)(2)(F).

Remarkably, even after the Court of Appeals ruling, Van Hollen's Supplemental Brief continues to rely on recycled citations to the Congressional Record and unsubstantiated assertions about alleged congressional intent.  *See, e.g.*, VH Supp. Br. at 4, 6-7.  But references to legislative history run afoul of *CFIF*, which unequivocally held that Congress lacked "'any intention on the precise question at issue' in this case."  694 F.3d at 111.

Van Hollen's second supplemental argument about the propriety of considering post-rulemaking developments fares no better.  A recent ruling by the Court (Dkt. No. 92) underscores CFIF's previous demonstration that review must focus tightly on the record and circumstances before the FEC in 2007 when it promulgated the Regulation rather than on subsequent developments.  *See, e.g.*, Dkt. No. 33 at 5-6.  After the FEC declined to initiate a rulemaking, either *sua sponte* or in response to CFIF's recent petition, CFIF moved to amend its answer to permit consideration of whether post-promulgation developments required a further rulemaking.  *See* Dkt. No. 81.  Plaintiff Van Hollen objected to introducing that issue, *see* Dkt. No. 86, and the Court denied CFIF's motion, *see* Dkt. Nos. 91-92.  Plaintiff Van Hollen cannot have it both ways by asserting post-promulgation developments in his own briefs, but then objecting to further rulemaking that could have addressed these developments.  In any event, the law is clear that judicial review must be "limited to assessing the record that was actually before the agency."  *Ass'n of Private Sector Colls. and Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) (emphasis added).

## II. The FEC's Explanation of the Cross-Reference in 11 C.F.R. § 104.20(c)(9) Is Correct, Constitutionally Compelled, and Not Challenged by Any Party.

The FEC's Supplemental Memorandum makes clear (Dkt. No. 90 at 7-9 & nn.7 & 8) that the Regulation, as promulgated and consistently applied since its inception, was intended to govern all funding disclosures by corporations and labor organizations making lawful electioneering communications. Prior to the Supreme Court's decision in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL II*"), only so-called *MCFL* corporations were permitted to make electioneering communications and the applicable disclosure requirements applied only to them.[3] In response to *WRTL II*, the FEC promulgated the Regulation to apply the electioneering communication disclosure obligations to all corporations – not just *MCFL* corporations – engaged in electioneering communications authorized by *WRTL II*. The cross-reference to 11 C.F.R. § 114.15 in the Regulation simply identified the types of corporate electioneering communications then-permitted by *WRTL II*. Thus, when *Citizens United v. FEC*, 130 S. Ct. 876 (2010), expanded the lawful scope of permissible corporate speech, the FEC and the regulated community continued to understand and apply the Regulation comprehensively to all corporate speakers. *See, e.g.*, FEC Supp. Br. at 8-9 & nn. 7-8 (discussing the Freedom's Watch enforcement matter).

Significantly, although the parties to this proceeding have conflicting views on many matters, no party disputes that the Regulation applies comprehensively to all corporate speakers. Several lines of reasoning support that understanding:

---

[3] An "*MCFL* corporation" is a narrow type of incorporated organization that is the product of the Supreme Court's decision in *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986). Among other things, the organization must (1) be formed to promote political ideas and not to engage in business activities; (2) have no shareholders or others with claims to the assets; and (3) not be established by a corporation or labor union and have a policy against accepting contributions from the same. CFIF is not an *MCFL* corporation.

- Because the evident intent of the cross-reference was merely to identify the then-permissible types of electioneering communications, the Regulation may continue to apply to all corporate electioneering communications even though the wording is inapt. *See Americans for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (an "agency's interpretation of its own regulations must [generally] be given controlling weight") (internal quotation omitted); *CFIF*, 694 F.3d at 111 (soliciting the FEC's "expert judgment [on] the meaning and scope of 11 C.F.R. § 104.20(c)(9)"); *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 242 (1989) (where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters[,] the intention of the drafters" controls).[4]

- If the cross-reference reflects an unconstitutionally narrow understanding of corporate free speech rights, it may be severed and disregarded. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010) (expressing a general preference for severing constitutional flaws); *Dillon v. United States*, 130 S. Ct. 2683, 2688 (2010) (explaining that an earlier Supreme Court decision invalidated a number of cross-references "to remedy [a] constitutional problem").

- The Regulation supplies the general principle for how corporations making any lawful electioneering communications – not just those described by 11 C.F.R. § 114.15 – should disclose their sources of funding. *See, e.g.*, *Geneva Steel v. United States*, 914 F. Supp. 563, 594 (Ct. Int'l Trade 1996) (approving agency's use of regulation "by analogy" to provide a decisional principle where the regulation did not apply directly); *Union Nat'l Bank of Kan. v. Lamb*, 337 U.S. 39-41 (1949) (congressionally-approved rule of procedure used to supply a principle for interpreting a vague statute to which rule did not expressly apply).

The need for a broad application of the Regulation to all corporations after *Citizens United* is particularly compelling here because the underlying statute has several constitutional flaws that the Regulation mitigates. When Congress passed BCRA in 2002, federal law flatly

---

[4] In cases involving statutory rather than regulatory analysis, courts also have explained that they "are willing to correct errant cross-references," *Owner-Operator Independent Drivers Ass'n, Inc. v. United Van Lines, LLC*, 503 F. Supp. 2d 1200, 1203 n.3 (E.D. Mo. 2007), or "read [them] out" where literal application of the text would "produce a result demonstrably at odds with Congressional intent," *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 868 (4th Cir. 1994). *See also NRDC v. EPA*, 22 F.3d 1125, 1140 & n.19 (D.C. Cir. 1994) (revising cross-reference in statute); *Colonial Life & Acc. Ins. Co. v. American Family Life Assur. Co. of Columbus*, 846 F. Supp. 454, 463 n.14 (D.S.C. 1994) (a "court may disregard [a] mistaken reference or read it as corrected in order to give effect to the legislative intent."). Courts also will strike "surplusage" from statutes, *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 706 (D.C. Cir. 2008) (collecting authority), including "where the surplus words consist simply of a numerical cross-reference," *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). Since the "same rules of construction apply to administrative rules as to statutes," *Exelon Generation Co., LLC v. Local 15, Int'l Broth. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012), these principles inform the Court's analysis of 11 C.F.R. § 104.20(c)(9).

prohibited corporations and labor unions from making electioneering communications. *See* 2 U.S.C. § 441b (2002). At that time, Congress therefore did not evaluate – much less tailor – the disclosure burdens to entities that were expressly prohibited from making electioneering communications.

After the Supreme Court's decision in *WRTL II*, the FEC assumed responsibility for evaluating the burdens applicable to a new class of speakers. In proposing a post-*WRTL II* rulemaking in 2007, the FEC specifically sought comment on "concerns about . . . First Amendment rights." Notice of Proposed Rulemaking on Electioneering Commc'ns, 72 Fed. Reg. 50,261, 50,262 (Aug. 31, 2007). The agency received comments addressing the burdens and benefits of alternative disclosure requirements. These comments focused on burdens on "privacy interests" and "request[s] to remain anonymous," and the FEC explained that its regulations were "narrowly tailored" in a "constitutional way," using "carefully designed reporting requirements [that] do not create unreasonable burdens." Final Rule and Explanation and Justification on Electioneering Commc'ns, 72 Fed. Reg. 72,899, 72,901 (Dec. 26, 2007); *see also id.* at 72,911 (explaining that "to identify those persons who provided funds totaling $1,000 or more to a corporation or labor union would be very costly and require an inordinate amount of effort"). After *Citizens United*, all of these same principles and concerns apply regardless of whether an electioneering communication fits within the specific contours of the cross-referenced 11 C.F.R. § 114.15.

Further, where a law "threatens to inhibit . . . free speech," it must meet a "more stringent vagueness test" than just the "fair notice" that due process requires of all laws. *Buckley*, 426 U.S. 1, 40-41, 79 (1976); *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2724 (2010). This is because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful

- 6 -

zone . . . than if the boundaries of the forbidden areas were clearly marked," and precious speech thus is suppressed. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (internal quotations omitted); *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). Absent the guidance contained in the FEC's regulation, speakers would be subject to a statutory provision under which some, but not all, sources of general treasury funds would need to be disclosed. Unless 11 C.F.R. § 104.20(c)(9) is applied broadly to cover all types of electioneering communications, these same vagueness concerns would apply to the large quantity of speech that did not fall within the parameters of the cross-referenced 11 C.F.R. § 114.15, causing many corporations and labor unions to stand silent rather than risk compliance with a vague law.

Such a bifurcated disclosure regime for different types of electioneering communications is easily avoidable. Reading the Regulation broadly to apply to all electioneering communications – as the FEC and regulated community now have done for several years – will avoid significant constitutional issues. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. Trades Council*, 485 U.S. 568, 575 (1988); *AFL-CIO v. FEC*, 333 F.3d 168, 175-79 (D.C. Cir. 2003) (constitutional avoidance may apply at either step of the inquiry in *Chevron*); *Diouf v. Napolitano*, 634 F.3d 1081, 1086 n.7 (9th Cir. 2011) (the doctrine is a "cardinal principle" of construction). Such reading also would be consistent with the FEC's own obligation to "tailor its policy to avoid unnecessarily burdening the First Amendment rights." *AFL-CIO*, 333 F.3d at 178.

### III.     Under No Circumstances Should the Challenged Regulation Be Vacated.

For the reasons discussed above and in prior submissions, Van Hollen's challenge to the Regulation must fail. But even if, contrary to CFIF's expectations, the Court found merit to the challenge, the most that should occur is a remand to the agency.

"Remand without vacatur is common in this circuit," *In re Core Comm's, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring), and such procedure "is often warranted once a rule has gone into effect and, as such, there is no apparent way to restore the status quo," *Int'l Swaps and Derivatives Ass'n v. CFTC*, 887 F. Supp. 2d 259, 284 (D.D.C. 2012). This "established administrative practice," *Sugar Cane Growers Co-Op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (quotation omitted), is "normal" when there are deficiencies in the record – a significant component of Van Hollen's allegations here, *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 218 (D.D.C. 2012). Under the umbrella of these guiding principles, the question on whether to vacate an existing regulation turns on two criteria: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)"; and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

As to the first element, "[t]here is a fine line between agency reasoning that is 'so crippled as to be unlawful' and action that is potentially lawful but insufficiently or inappropriately explained." *Radio-Television News Directors Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999) (citing *Checkosky v. SEC*, 23 F.3d 452, 464 (D.C.Cir.1994) (opinion of Silberman, J.)). In "the former circumstance, the court's practice is to vacate the agency's order, while in the later the court frequently remands for further explanation (including discussion of relevant factors and precedents) while withholding judgment on the lawfulness of the agency's proposed action." *Id.* Here, the Court of Appeals ruling explicitly acknowledges that the Regulation may be justified or, at the very least, justifiable. *See, e.g.*, *CFIF*, 694 F.3d at 111 ("[w]e do not agree with the District Court that the words 'contributors' and 'contributed' in 2 U.S.C. § 434(f)(2)(F) cannot be construed to include a 'purpose' requirement."). Nothing in

the Court of Appeals opinion precludes the possibility that the FEC will be able to remedy any perceived deficiencies in the rulemaking. *See, e.g.*, *N. Air Cargo v. USPS*, 674 F.3d 852, 861 (D.C. Cir. 2012) (vacatur not warranted where agency is likely able to "advance reasonable interpretations of the provisions at issue"); *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 950 (D.C. Cir. 2004) (rejecting vacatur where the agency "may be able to explain" its reasoning). Thus, the first factor cuts strongly against vacatur.[5]

Vacating the existing regulation also would be disruptive. The disclosure statute requires corporations and labor unions making electioneering communications to disclose contributors who gave as early as "the first day of the preceding calendar year" from the election to which the electioneering communications relate. 2 U.S.C. § 434(f)(2)(F) (emphasis added). But for the regulation now-in-place, countless prospective donors who wanted to make unearmarked donations to corporations like CFIF or labor unions like the AFL-CIO – but who valued their ability to do so anonymously – would cease giving to any entity that might conceivably make electioneering communications in the future. In other words, if the regulation is vacated, many of these scarce financial resources would stop flowing into multi-purpose organizations like CFIF. This type of "disruptive" hardship weighs in favor of preserving the existing rule, *Allied-Signal*, 988 F.2d at 151, particularly since CFIF and others have to budget for their projects and programs well in advance. Conversely, Van Hollen would not be disrupted if the regulation were left in place during the remand. As a congressional candidate, Van Hollen would only begin receiving information about spending on electioneering communications and funding

---

[5] Van Hollen also argues (at 7) that remand to the FEC again would be pointless. But there is no guarantee the agency would deadlock in its efforts to adopt a revised rule. For example, the "administration is vetting two candidates and aims to nominate them when the Senate returns from its Memorial Day recess," and it would only take one appointee voting a different way than his or her predecessor to effect a significant change in the outcome of the rulemaking process. Jonathan Salant, *FEC Expired Terms Prompt Calls for Obama to Keep Promise*, Bloomberg (Apr. 29, 2013), available at http://www.bloomberg.com/news/2013-04-30/fec-expired-terms-prompt-calls-for-obama-to-keep-promise.html.

sources shortly before the next election in which he will be a candidate, which is over a year away.  *See* Md. State Bd. of Elec., *2014 Gubernatorial Election*, available at http://www.elections.state.md.us/elections/2014/ (last visited May 10, 2013) (noting that the primary is on June 24, 2014).

Reinstating the old regulation, or simply reverting back to the statute itself, also would cause profound constitutional problems.  The 2003 regulation was issued before *WRTL II* and *Citizens United*, and the FEC has already concluded that the prior version of the rule did not appropriately respect First Amendment rights.  A statute-only disclosure regime would leave in place a vague law without any clarifying guidance.  Unless the Court intends to narrowly construe 2 U.S.C. § 434(f)(2)(F) to avoid vague and unconstitutional applications to corporations and labor unions, this remedy would swap minor rulemaking deficiencies for broad constitutional violations.[6]

## CONCLUSION

For the foregoing reasons, and also for the reasons discussed in the earlier legal memoranda filed by CFIF and its codefendants, the Court should uphold 11 C.F.R. § 104.20(c)(9) as a reasonable interpretation of 2 U.S.C. § 434(f)(2)(F) under *Chevron* Step Two.  The Court also should find that the Regulation is neither arbitrary nor capricious under the Administrative Procedure Act.

---

[6]   Van Hollen relies on *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009), to argue that vacatur is the appropriate remedy here.  *See* VH Supp. Br. at 7.  But this reliance is woefully misplaced, as the two primary criteria relied upon in *Comcast* either are absent in this case or actually support CFIF's position.  First, *Comcast* found that the FCC's conduct was "particularly egregious" because the agency had ignored a prior court order to consider specific data.  579 F.3d at 9.  Here, no court has ever remanded this matter to the FEC, much less "expressly instructed" the agency to consider particular data or arguments.  *Id.*  Second, the *Comcast* court's decision to vacate the existing rule hinged on whether allowing the regulation to remain in effect "would continue to burden speech protected by the First Amendment." *Id.* at 9.  Because vacating the Regulation here would have a speech-suppressing effect that inhibits "the right of the public to receive suitable access to . . . political . . . and other ideas and experiences through the medium of broadcasting," *id.*, *Comcast*'s analysis actually supports CFIF's position.

        Respectfully submitted,

        <u>   /s/ Thomas W. Kirby         </u>
        Jan Witold Baran (D.C. Bar No. 233486)
        Thomas W. Kirby (D.C. Bar No. 915231)
        Caleb P. Burns (D.C. Bar No. 474923)
        Andrew G. Woodson (D.C. Bar No. 494062)

        WILEY REIN LLP
        1776 K St., NW
        Washington, D.C. 20006
        202.719.7000

May 13, 2013        *Counsel for Center for Individual Freedom*