## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ————————————————— | ) | |
| CHRISTOPHER VAN HOLLEN, Jr., | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Civil Action No. 11-0766 (ABJ) |
|  | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
|  | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

### MEMORANDUM OPINION

This case originated in 2011 when plaintiff Chris Van Hollen, Jr. – a member of the U.S. House of Representatives from the 8th Congressional District of the State of Maryland – filed a complaint challenging the authority of the Federal Election Commission to promulgate 11 C.F.R. § 104.20(c)(9), which narrowed the disclosure requirements set forth in the Bipartisan Campaign Reform Act ("BCRA"), 52 U.S.C. § 30104(f)(d)(E)–(F) (2012),[1] for corporations and labor organizations that fund electioneering communications. Compl. ¶¶ 1, 9 [Dkt. # 1]. Applying the framework set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Court found that the Commission had exceeded its authority, particularly because the problem it was trying to remedy was not – even as the agency characterized its task – to interpret an ambiguity in the statute, but rather, to address a problem not contemplated by the statute that was ostensibly created by the Supreme Court's decisions in *FEC v. Wisconsin Right to Life, Inc.* ("*WRTL II*"), 551 U.S. 449 (2007), and *Citizens United v. FEC*, 588 U.S. 310 (2010). The Court

---

[1]    At the time this case was filed, the BCRA was codified in Title 2 of the United States Code, at 2 U.S.C. § 434. It has since been transferred to Title 52, at 52 U.S.C. § 30104. Accordingly, the Court cites to the statute in this opinion as it now appears in Title 52 of the United States Code.

struck down 11 C.F.R. § 104.20(c)(9) at the first level of the *Chevron* analysis, and it did not then proceed to the second level of the *Chevron* test.[2]  *See Van Hollen v. FEC*, 851 F. Supp. 2d 69, 89 (D.D.C.), *rev'd sub nom. Ctr. for Individual Freedom v. Van Hollen*, 694 F.3d 108 (D.C. Cir. 2012).

The FEC did not appeal the decision. But the intervenor-defendants, the Center for Individual Freedom ("CFIF") and the Hispanic Leadership Fund ("HLF") did, and the United States Court of Appeals for the District of Columbia Circuit held that the case should not have been decided at the first *Chevron* step.  The Circuit Court found the BCRA's disclosure provisions to be ambiguous, "especially when viewed in the light of the Supreme Court's decisions" in *Citizens United* and *WRTL II*, and it remanded the case for consideration of the regulation at *Chevron* step two.  *Van Hollen*, 694 F.3d at 110, 112.

The Court now concludes that the promulgation of 11 C.F.R. § 104.20(c)(9) was arbitrary, capricious, and contrary to law and that the regulation is an unreasonable interpretation of the BCRA for several reasons.  First, the Commission initiated the rulemaking process for the stated purpose of responding to the decision in *WRTL II*, but nothing the Supreme Court did in that case provides a basis for narrowing the disclosure rules enacted by Congress.  *WRTL II* dealt solely with the question of whether the statutory ban on corporate and labor organization funding of electioneering communications could withstand an as-applied constitutional challenge.  And in answering that question, the Court did not find any need to address the BCRA's disclosure requirements.

---

2       *Chevron* instructs the reviewing court to consider first "whether Congress has directly spoken to the precise question at issue," and if so, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  467 U.S. at 842–43.

Second, there is little or nothing in the administrative record that would support the Commission's decision to introduce a limitation into the broad disclosure rules in the BCRA. Neither the petition for rulemaking nor the original notice of proposed rulemaking proposed altering the disclosure requirements for corporations and labor unions. None of the commenters asked the agency to amend the disclosure rules to include a purpose requirement, and the Commission did not incorporate the purpose requirement in the new rule until after the notice and comment period and the hearing had been concluded. The only post-hearing comment received in response to the newly incorporated language strongly opposed its inclusion.

Finally, the regulation's purpose requirement is inconsistent with the statutory language and purpose of the BCRA. Congress passed the disclosure provisions of the BCRA to promote transparency and to ensure that members of the public would be aware of who was trying to influence their votes just before an election. The added purpose requirement in section 104.20(c)(9) thwarts that objective by creating an easily exploited loophole that allows the true sponsors of advertisements to hide behind dubious and misleading names. Based on these considerations, the Court will vacate 11 C.F.R. § 104.20(c)(9), and it will grant plaintiff's motion for summary judgment.

## BACKGROUND

Over the course of seven years, the Supreme Court of the United States weakened, and eventually invalidated entirely, the prohibition on the use of corporate and union treasury funds to finance electioneering communications. *See Citizens United*, 558 U.S. at 365; *WRTL II*, 551 U.S. at 470–76; *McConnell v. FEC*, 540 U.S. 93, 93 (2003), *overruled by Citizens United*, 558 U.S. at 310. In the midst of this changing legal environment, the Commission began a rulemaking process and solicited public comment "generally regarding the effect of the

[*WRTL II*] decision on the Commission's rules governing corporate and labor organization funding of electioneering communications, the definition of 'electioneering communication,' and the rules governing reporting of electioneering communications."[3]   Electioneering Communications, 72 Fed. Reg. 50261, 50262 (proposed Aug. 31, 2007).  As part of that process, the Commission offered two alternative ways to implement the *WRTL II* decision:  "The first alternative would incorporate the new exemption into the rules prohibiting the use of corporate and labor organization funds for electioneering communications in 11 [C.F.R.] part 114.  The

---

3       Section 30104(f)(2) of the BCRA requires the following disclosures:

> (E)     If the disbursements were paid out of a segregated bank account which consists of funds contributed . . .  directly to this account for electioneering communications, the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to that account . . . . [; or]

> (F)     If the disbursements were paid out of funds not described in subparagraph (E), the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.

52 U.S.C. § 30104(f)(2)(E)–(F).

Section 104.207(c)(7)–(8) of FEC's implementing regulations generally tracks the language of section 30104(f)(2)(E)–(F), except that it substitutes the words "donor" and "donated" for "contributor" and "contributed."  It calls for the following disclosures:

> (7)(i)   If the disbursements were paid exclusively from a segregated bank account . . . , the name and address of each donor who donated an amount aggregating $1,000 or more to the segregated bank account, aggregating since the first day of the preceding calendar year; or . . . .

> (8)      If the disbursements were not paid exclusively from a segregated bank account described in paragraph (c)(7) of this section, . . . the name and address of each donor who donated an amount aggregating $1,000 or more to the person making the disbursement, aggregating since the first day of the preceding calendar year.

11 C.F.R. § 104.20(c)(7)(i), (c)(8) (2014).

second alternative would incorporate the new exemption into the definition of 'electioneering communication' in 11 [C.F.R.] § 100.29." *Id.* Under the first alternative, corporations and labor organizations making the sorts of electioneering communications deemed permissible in *WRTL II* would be permitted to use general treasury funds for that purpose, but they would be subject to the same reporting requirements as other entities. *Id.* As part of that alternative, the agency also proposed changes to the rules that would enable those organizations to establish segregated bank accounts for the funding of electioneering communications as certain individuals were already permitted to do. *Id.* Adopting Alternative II would have exempted the *WRTL II* ads from the definition of electioneering communication in 11 C.F.R. § 100.29 entirely, thereby eliminating both the disclosure and financing restrictions for those ads. *Id.* at 50263.

In December 2007, the agency adopted a variant of the first alternative. It promulgated 11 C.F.R. § 104.20(c)(9), which included the following language:

> If the disbursements were made by a corporation or labor organization pursuant to 11 [C.F.R.] § 114.15, the name and address of each person who made a donation aggregating $1,000 or more to the corporation or labor organization, aggregating since the first day of the precedent calendar year, *which was made for the purpose of furthering electioneering communications*.

11 C.F.R. § 104.20(c)(9) (emphasis added).

The Commission provided several explanations for adding this new "purpose" or "intent" requirement to the corporate and labor organization disclosure regulation. First, it noted that those entities' "general treasury funds are often largely comprised of funds received from investors," donors, customers, or members "who may not necessarily support the organization's electioneering communications." Electioneering Communications, Final Rule, 72 Fed. Reg. 72899, 72911 (Dec. 26, 2007). And second, it stated that compliance with the disclosure rules as previously written would impose a heavy burden on corporations and labor organizations:

"[W]itnesses at the Commission's hearing testified that the effort necessary to identify those persons who provided funds totaling $1,000 or more . . . would be very costly and require an inordinate amount of effort." *Id.* The Commission then concluded that "the policy underlying the disclosure provisions of BCRA [was] properly met by requiring corporations and labor organizations to disclose and report only those persons who made donations for the purpose of funding [electioneering communications]." *Id.*

Plaintiff Chris Van Hollen – concerned that "corporations have exploited the enormous loophole [the new regulation] created," Compl. ¶ 29 – filed this case against the FEC under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. He argued that the agency exceeded its statutory authority in promulgating that regulation and that the regulation is also arbitrary, capricious, and contrary to law under the APA. Two months after plaintiff filed his complaint, CFIF and HLF filed motions to intervene as defendants [Dkt. # 14 & 15], and the Court granted those motions pursuant to Federal Rule of Civil Procedure 24(a). Aug. 1, 2011 Minute Entry. Plaintiff, the Commission, and CFIF then filed cross-motions for summary judgment, Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") [Dkt. # 20]; Def.'s Cross-Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 25]; CFIF's Cross-Mot. for Summ. J. [Dkt. # 36], and HLF filed a motion to dismiss for lack of jurisdiction. HLF's Mot. to Dismiss [Dkt. # 30].

On March 30, 2012, the Court entered an order granting plaintiff's motion for summary judgment and denying the other three motions. Order [Dkt. # 47]. After determining that plaintiff had standing to bring his APA challenge, the Court conducted a *Chevron* analysis and struck down 11 C.F.R. § 104.20(c)(9) as inconsistent with text of the statute. The Commission did not appeal the Court's order, but intervenor-defendants CFIF and HLF did. *Van Hollen*, 694 F.3d at 110. On September 18, 2012, the U.S. Court of Appeals for the District of Columbia

Circuit concluded that since the BCRA was ambiguous, the case should not have been decided at the first step of the *Chevron* test.  *Id.* at 112.

The D.C. Circuit remanded the case with instructions to the District Court to refer the matter first to the Commission to ascertain whether the agency intended to engage in further rulemaking to clarify the regulatory regime.  The judgment further provided:  "[i]f the FEC elects instead to defend the current regulation, then the District Court should allow the parties to present arguments on Appellee's claims that the regulation cannot survive review under *Chevron* step two or [*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 42–43 (1983)], and then decide these issues in the first instance." *Id.*

On September 20, 2012, the Court referred the matter to the Commission and directed it to advise the Court on or before October 12, 2012, whether it intended to pursue a new rulemaking or defend the regulation.   Order Referring Matter to Def. FEC for Further Consideration [Dkt. # 66].  In a status report filed on October 4, 2012, the Commission stated that it did not intend to pursue a rulemaking and that it would continue to defend 11 C.F.R. § 104.20(c)(9) as written before the Court.  FEC Status Report [Dkt. # 67].  But the following day, intervenor-defendant CFIF advised the Court that it had petitioned the FEC to engage in the rulemaking that the agency had just informed the Court that it did not intend to undertake.  CFIF Status Report [Dkt. # 68].  The matter was stayed pending the FEC's consideration of CFIF's petition, and on March 12, 2013, the stay was lifted in light of the agency's decision to deny the petition and forego further rulemaking.  *See* Oct. 18, 2012 Minute Order Staying Case; Mar. 12, 2013 Minute Order Lifting Stay.  The Court permitted the parties to supplement their original memoranda with additional arguments on the *Chevron* step two issue, and it heard oral argument.

## ANALYSIS

### I.   The standard to be applied at *Chevron* step two

This Court is bound by the Circuit's determination that section 30104(f)(2)(E)–(F) is ambiguous, and therefore, it must now address the question of whether the implementing regulation, 11 C.F.R. § 104.20(c)(9), is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  At the second step of the *Chevron* analysis, the reviewing court must give "considerable weight" to an agency's interpretation of a statutory scheme it has been "entrusted to administer;" the "court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.  As the D.C. Circuit put it in *Serono Laboratories, Inc. v. Shalala*, "under *Chevron*, courts are bound to uphold an agency interpretation [so] long as it is reasonable – regardless [of] whether there may be other reasonable, or even more reasonable, views."   158 F.3d 1313, 1321 (D.C. Cir 1998).

Here, the Court of Appeals specifically directed this Court to determine whether the regulation could survive review under the test prescribed in the *State Farm* opinion. *Van Hollen*, 694 F.3d at 112.  In *State Farm*, the Supreme Court reiterated that under the arbitrary and capricious standard, "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute."   463 U.S. at 42.  The Supreme Court went on to explain the process in greater detail:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."   In reviewing that explanation, we must "consider whether the decision was based on a

> consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43 (citations omitted). This, then, is the framework that must govern the Court's decision. But as plaintiff points out, that analysis cannot be divorced from the context of the particular statutory scheme involved.

Plaintiff Van Hollen cites *Shays v. FEC ("Shays II")*, 414 F.3d 76 (D.C. Cir. 2005), and *Shays v. FEC* ("*Shays III*"), 528 F.3d 914 (D.C. Cir. 2008), to the Court. Pl.'s Supplemental Briefing on Remanded Issues ("Pl.'s Supp.") at 1–2 [Dkt. # 87]. He asserts that a reviewing court's task is to determine whether agency regulations are reasonable "in light of the language, legislative history, and policies of the statute," *id.* at 2, quoting *Shays v. FEC*, 337 F. Supp. 2d 28, 78 (D.D.C. 2004), and he calls upon the Court to follow the approach "exemplified in *Shays*" and to reject the regulations here on the grounds that they frustrate the policy behind the BCRA. *Id.* at 1–2, citing *Shays III*, 528 F.3d at 919.

The first *Shays* opinion cited is not helpful because it does not concern a *Chevron* step two exercise. In *Shays II*, the court addressed the standing question at length, and then it affirmed the District Court's invalidation of a set of FEC rules as too lax. *See* 414 F.3d at 83–96. The first two rules failed at the threshold *Chevron* inquiry, as the court found that they contravened the unambiguously expressed intent of Congress, and the Circuit Court upheld the District Court's invalidation of the other three rules on APA grounds, noting that it did not need to reach the second *Chevron* question of whether the rules were reasonable because the agency had failed to advance *any* justification for them. *Id.* at 96–97.

But in *Shays III*, the Court of Appeals did directly address the second step of the *Chevron* analysis when it approved the District Court's "thorough" rejection of a set of FEC rules based on the finding that they were "either contrary to BCRA's purpose or arbitrary and capricious." 528 F.3d at 919.  The Court stated:  "[i]n applying *Chevron*'s second step and the APA, we must reject administrative constructions of [a] statute . . . that frustrate the policy that Congress sought to implement."  *Id.* (alterations in original) (internal quotation marks omitted).

So, under the precedent that this Court is bound to follow, the challenged rule must also be tested against the policy that BCRA was intended to advance.

**II.      The challenged regulation is not supported by the agency's explanation for the regulation.**

The starting point of the second step of the *Chevron* analysis must be the stated reason behind the regulation, which is illuminated by both the Notice of Proposed Rulemaking ("NPRM") and the Explanation and Justification that accompanied the announcement of the final rule.  The rulemaking was supposed to be about one narrow subject:  what to do to implement the Supreme Court's decision in *WRTL II*.  *See* 72 Fed. Reg. at 50261 ("These proposed rules would implement the Supreme Court's decision in *FEC v. Wisconsin Right to Life, Inc.*, which held that the prohibition on the use of corporate and labor organization funds for electioneering communications is unconstitutional as applied to certain types of electioneering communications."); *see also id.* at 50262 ("The Commission is initiating this rulemaking to implement the Supreme Court's decision in *WRTL II*. . . .  The Commission is seeking public comment on two proposed alternative ways to implement the *WRTL II* decision in the rules governing electioneering communications.").  To assess the reasonableness of the regulations, then, one must first ascertain what the Supreme Court decided in that case that required implementation.

*WRTL II* dealt with the constitutionality of section 203 of the BCRA, 2 U.S.C. § 441(b)(2), as applied to particular advertisements that the Wisconsin advocacy organization planned to broadcast.  551 U.S. at 449.  At that time, section 203 made it a crime for a corporation or labor union to use its general treasury funds to pay for any "electioneering communication," 2 U.S.C. § 441b(b)(2), that is, a broadcast, cable, or satellite communication that refers to a candidate for federal office and is aired within a prescribed time period before an election.  52 U.S.C. § 30104(f)(3)(A).

*WRTL II* was not the first time the Supreme Court addressed section 203:  the opinion followed *McConnell*, in which the Court considered a series of facial challenges to multiple provisions of the statute.  540 U.S. at 114.  As part of that exercise, the *McConnell* Court found the regulation of corporate and labor union expenditures in section 203 to be constitutional on its face.  *Id.* at 203–09.  The plaintiffs claimed that section 203 was overbroad and that it violated the First Amendment because it covered not only campaign speech, or "express advocacy," but also more general "issue advocacy" that might mention a candidate for federal office.  *Id.* at 205–07.  The Court disagreed and found that the compelling governmental interests that justified the imposition of restrictions on express campaign speech would also apply to advertisements that are the "functional equivalent" of express campaign speech.  *Id.* at 204–06.  Thus, it concluded that even if one assumed that section 203 would "inhibit some constitutionally protected corporate and union speech," plaintiffs had not met their heavy burden of establishing that the provision was overbroad and that it could never be constitutionally enforced.  *Id.* at 207; *see also WRTL II*, 551 U.S. at 457 ("The [*McConnell*] Court concluded that there was no overbreadth concern to the extent the speech in question was the 'functional equivalent' of express campaign

speech."). The *McConnell* opinion did not further define "functional equivalent" or undertake to resolve any future as-applied challenges to the law.

It was *WRTL II* that directly presented an as-applied challenge to section 203. The non-profit issue advocacy corporation sought to broadcast radio advertisements that clearly identified a particular Senator running for re-election during the period when "electioneering communications" would be illegal under section 203. 551 U.S. at 458–61. The Supreme Court reviewed its decision in *McConnell* and explained that resolving an as-applied challenge required it to determine at the outset "whether the speech at issue is the 'functional equivalent' of speech expressly advocating the election or defeat of a candidate for federal office, or instead a 'genuine issue a[d].'" *Id.* at 457 (alteration in original), quoting *McConnell*, 540 U.S. at 206. The Court observed that *McConnell* did not adopt any test to be used as the standard for future as-applied challenges, and so, it found it necessary to do so. *Id.* at 464.

The Court determined that in order to safeguard First Amendment rights, it was necessary that the standard be an objective one, "focusing on the substance of the communication rather than amorphous considerations of intent and effect." *Id.* at 469.

> It must entail minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation. And it must eschew the open-ended rough-and-tumble of factors, which invites complex argument in a trial court and a virtually inevitable appeal. In short, it must give the benefit of any doubt to protecting rather than stifling speech.
>
> In light of these considerations, a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.

*Id.* (citations and internal quotation marks omitted).

This then is the sole holding of *WRTL II*:  that the section 203 prohibition against the use of a corporation's or labor organization's general funds for electioneering communications can only be applied to express campaign ads or to those issue ads that can only be reasonably interpreted as a plea to vote for or against a particular candidate.

Applying the new test, the majority concluded that the particular ads at issue were not the functional equivalent of express campaign speech, and that since the interests that would justify restricting corporate campaign speech or its functional equivalent do not support restrictions on issue advocacy, section 203 was unconstitutional as applied to WRTL's ads.  *Id.* at 457.[4]

Notably, the opinion in *WRTL II* said absolutely nothing about the reporting requirements that attach when an individual or a group disburses funds to pay for express campaign ads or those issue ads that fall within the definition of electioneering communications.  The plaintiff had specifically disavowed any challenge to the reporting provisions, noting that the ads it sought to run would be subject to the transparency that was the goal of the BCRA.  *See In the matter of Electioneering Communications: Notice 2007-16* ("Rulemaking Hr'g") (Oct. 17, 2007), Administrative Record ("AR") 622–23 [Dkt. # 17-5] (quoting WRTL's brief:  "Because WRTL does not challenge the disclaimer in the disclosure requirements there will be no ads done under misleading names.   There will continue to be full disclosure of all electioneering communications both as to disclaimer and public reports.   The whole system will be transparent.").  This raises the question:  how did a Supreme Court opinion lifting the ban on

---

[4]     The Court was sharply divided on this point.   Justice Souter, in an opinion joined by Justices Stevens, Ginsburg, and Breyer, wrote:  "it is beyond all reasonable debate that the ads are constitutionally subject to regulation under *McConnell*."  *Id.* at 525 (Souter, J., dissenting).

WRTL's ads prompt the agency to revise the reporting requirements?  After all, the Supreme

Court had already squarely addressed those reporting requirements in *McConnell*.[5]

After the *WRTL II* decision was handed down, a petition for rulemaking was filed. The

petition – filed by the James Madison Center for Free Speech, which was represented by the

same counsel who had represented WRTL – did not call for a change in the disclosure

requirements either.  *Petition for Rulemaking: Protecting "Genuine Issue Ads" from the*

*"Electioneering Communication" Prohibition & Repealing 11 C.F.R. § 100.22(b)*, James

Madison Ctr. for Free Speech, AR 96 [Dkt. # 17-2].  Instead, the organization urged the agency

to undertake a rulemaking to make two changes to the FEC's regulations in the wake of *WRTL*

*II*:  1) to recognize the protection accorded to genuine issue ads in *WRTL II* by promulgating a

rule limiting the ban on corporate spending on "electioneering communications" to ads that meet

the *WRTL II* definition; and 2) to repeal 11 C.F.R. § 100.22(b), the Commission's definition of

"expressly advocating."  *Id.*, AR 98–103.

In response to that petition, the agency published a NPRM and requested comments on

proposed rules that "would implement the Supreme Court's decision in *FEC v. Wisconsin Right*

*to Life, Inc.*"  72 Fed. Reg. at 50261.  Acknowledging that "[t]he plaintiff in [*WRTL II*] . . . did

---

5      The *McConnell* plaintiffs had complained that the requirements should not extend to both
express and issue advocacy, but the Supreme Court unequivocally rejected that contention,
quoting the District Court opinion at length and noting its approval:

> We agree with the District Court that the important state interests that
> prompted the *Buckley* Court to uphold FECA's disclosure requirements –
> providing the electorate with information, deterring actual corruption and
> avoiding any appearance thereof, and gathering the data necessary to
> enforce more substantive electioneering restrictions – apply in full to
> BCRA.   Accordingly, *Buckley* amply supports application of FECA
> § 304's disclosure requirements to the entire range of "electioneering
> communications."

540 U.S. at 196 (footnote omitted).

not contest . . . the reporting requirement in section [30104](f)(1)" and therefore that the case did not directly impact the BCRA's reporting requirements, *id.* at 50262, the agency nonetheless set out two alternative approaches for how it could revise the then-established disclosure requirements to apply to the newly allowed *WRTL II* ads.

Under the first alternative, the agency observed that "corporations and labor organizations that make [*WRTL II*] electioneering communications . . . totaling over $10,000 in a calendar year must file reports like other entities that make electioneering communications." *Id.* at 50271. It proposed amending subsection 104.20(c)(7), which deals with the use of segregated bank accounts to fund electioneering communications, to include separate subparts covering non-*WRTL II* and *WRTL II* ads so that corporations and labor unions would be authorized to create such accounts to fund the permissible ads and would report contributions to the accounts accordingly. *Id.* The FEC also recognized that under Alternative I, corporations and unions would be permitted to expend general treasury funds for *WRTL II* ads. *Id.* In contemplating that circumstance, it posed a series of questions about how the agency should administer the disclosure requirements established by section 104.20(c)(8) in that context:

> Under the proposed regulations, how would a corporation or labor organization report an electioneering communication funded with general treasury funds? If the corporation or labor organization does not pay for the electioneering communication from an account described in proposed sections 104.20(c)(7)(ii) and 114.14(d)(2)(i), would the corporation or labor organization be required to report "the name and address of each donor who donated an amount aggregating $1,000 or more" to the corporation or labor organization during the relevant reporting period, as required by [52 U.S.C. § 30104(f)(2)(F)] and 11 [C.F.R. §] 104.20(c)(8)? If so, how would a corporation or labor organization determine which receipts qualify as "donations"? Should the Commission limit the "donation" reporting requirement to funds that are donated for the express purpose of making electioneering communications?

*Id.*  Although the agency posed this question, the first alternative set out in the Notice did not include any sort of limiting language.

Alternative 2 embodied a simpler approach.  Under that option, the agency proposed that "a communication that qualifies for [the *WRTL II*] exemption in proposed section 100.29(c)(6) would be exempted from the definition of 'electioneering communication.'"  *Id.* at 50272.  In other words, all *WRTL II* communications would be exempt from the "regulations imposing reporting requirements on persons making 'electioneering communications,'" while "the reporting requirements applicable to all communications that continue to meet the definition of 'electioneering communication' would remain unchanged."  *Id.*  Thus, neither of the alternatives proposed in the FEC's notice incorporated the specific limiting language that is the subject of this litigation.

The Commission received twenty-seven written comments on the proposed rules, and it held a two day hearing at which fifteen witnesses testified.  72 Fed. Reg. at 72900.  After the hearing and before it promulgated the final rule, the Commission added the language that is at issue in this case – "made for the purpose of furthering electioneering communications" – for the first time.  *See* Memorandum on Draft Final Rule on Electioneering Communication to the Commission (Nov. 16, 2007), AR 1006 (setting forth its proposed draft B of the regulation).  The agency received only one comment in response to the newly proposed language, which strongly opposed the proposal.  Letter from the Campaign Legal Center to the Federal Election Commission (Nov. 19, 2007), AR 1024–25.[6]

---

6       Another commenter recommended that the Commission adopt Draft A.  AR 1018–19.

This review of the procedural history tends to diminish the validity of the regulation under the second level of the *Chevron* analysis because it demonstrates that the Commission's action was unmoored from the stated basis for embarking on a rulemaking in the first place.[7]

Before *WRTL II*, the *McConnell* Court upheld the disclosure provisions on their face, with the understanding that they applied to individuals, to those corporations and unions using segregated bank accounts, and to "groups" that had many individual donors.  The rules also applied to some corporations, *see FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986), even if that group was small.

*WRTL II* left the reporting provisions untouched.

And even after *WRTL II*, when the restrictions on corporate and labor union spending were struck down entirely in *Citizens United*, and the Supreme Court was well aware that the statutory reporting requirements would now apply to a large number of ads funded by those organizations, it again left the reporting requirements untouched.  558 U.S. at 368 (alterations in original) (citations omitted) ("[Citizens United] contends that the governmental interest in providing information to the electorate does not justify requiring disclaimers for any commercial advertisements, including the ones at issue here.  We disagree. . . .  The disclaimers required by

---

7       Indeed, multiple witnesses at the rulemaking hearing specifically cautioned that it would be inappropriate for the Commission to take up a change to the disclosure rules when the sole purpose of the rulemaking was supposed to be to conform the existing regulations to the *WRTL II* opinion.  *See, e.g.*, Rulemaking Hr'g, AR 511 (testimony of Mark Elias) (imploring the agency to address the Supreme Court ruling on electioneering communications and do no more:  "[y]ou are not faced with questions about disclosure"); *id.* 517 (testimony of Allison Hayward) (joining Elias and "counseling restraint"); *id.* 647–49 (testimony of Donald Simon) (arguing that the Commission was engaging in a "bait and switch" because "[t]he plaintiff in WRTL did not challenge the [s]ection 201 disclosure requirements and repeatedly reassured the Supreme Court that if it did permit corporations to make some electioneering communications there would continue to be full disclosure . . . .  But now having won the [s]ection 203 argument on that basis many urge the Commission to reach out and eviscerate the disclosure requirement"); *id.* at 807–08 (testimony of Brian Svoboda) (urging the Commission to proceed narrowly and do little more than *WRTL II* required and noting that *WRTL II* did not address disclosure).

section 311 'provid[e] the electorate with information' and 'insure that the voters are fully informed' about the person or group who is speaking.").

Therefore, the Court finds that it was unreasonable for the FEC to alter the statutory reporting requirements on the stated grounds that it was implementing the Supreme Court's decision in *WRTL II*. There was nothing about implementing the new definition of "functional equivalent of express advocacy" for purposes of enforcing section 203 that required narrowing the disclosure requirements in 52 U.S.C. § 30104(f)(2).

### III. The record does not reflect that the FEC examined the relevant data and articulated a rational connection between the facts found and the choice it made.

In addition to considering the regulation in light of its stated purpose, the Court must also review the record to determine whether the agency fully explained how its choice was predicated upon data it accumulated during the rulemaking process. Here, the parties did not deal with the record before the agency in any detail in their briefs. So the Court found it necessary to review the record in its entirety in order to undertake the analysis described in *State Farm*. And it found that there is a very poor fit between the rule that was promulgated and both the question and the evidence that were before the agency at the time.

As an initial point, the Court notes that it was not until after the notice and comment period that the Commission announced that it had decided to depart from the proposed rules set forth in the NPRM and to do something entirely different – to limit corporate and labor union disclosure requirements to cover only the names and addresses of donors who intended to fund an electioneering communication. 72 Fed. Reg. at 72911 ("As discussed in detail below, after consideration of the comments, the Commission has decided to depart from the rules proposed in the NPRM . . . ."). Although the mere fact that changes were made to a proposed rule after the notice and comment period does not itself invalidate the rule or the process, *see Air Transport*

18

*Ass'n of Am. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224 (D.C. Cir. 1984), the chronology here has an impact upon this portion of the *State Farm* analysis.  As the record stands, none of the comments received during the NPRM stage or at the Commission's hearing addressed the language that the Commission eventually adopted, and the one post-hearing comment that did address the proposed course of action vehemently opposed it.  The record is therefore largely devoid of evidence that supports the specific language that the Commission used to curtail the disclosure requirements in the case of corporations and labor organizations.

The record also lacks evidence that supports the Commission's decision to alter the disclosure regulations in the first place.  In the Explanation and Justification that accompanied the promulgation of the final rule, the Commission stated that the disclosure regulation governing corporations and labor organizations that paid for electioneering campaigns would be tailored so that those entities need "disclose only the identities of those persons who made a donation aggregating $1,000 or more *specifically for the purpose* of furthering [electioneering communications] made by that" entity.  72 Fed. Reg. at 72911 (emphasis added).  It offered the following explanation in support of its decision:

> A corporation's general treasury funds are often largely comprised of funds received from investors such as shareholders who have acquired stock in the corporation and customers who have purchased the corporation's products or services, or in the case of a non-profit corporation, donations from persons who support the corporation's mission.  These investors, customers, and donors do not necessarily support the corporation's electioneering communications.  Likewise, the general treasury funds of labor organizations and incorporated membership organizations are composed of member dues obtained from individuals and other members who may not necessarily support the organization's electioneering communications.

*Id.*  The agency also noted – without further specific citations to the record or testimony – that "witnesses at the Commission's hearing testified that the effort necessary to identify those

persons who provided funds totaling $1,000 or more to a corporation or labor organization would be very costly and require an inordinate amount of effort." *Id.* Based on those considerations, the agency then summarily concluded that "the policy underlying the disclosure provisions of BCRA [was] properly met by requiring corporations and labor organizations to disclose and report only those persons who made donations for the purpose of funding [electioneering communications]." *Id.*

Plaintiff does not dispute the agency's representation that at the time *WRTL II* was decided, it was anticipated that there would be a significant increase in the number of advertisements sponsored by corporations and labor unions. *See* 551 U.S. at 535–36 (Souter, J., dissenting). But the written comments submitted to the agency and the testimony at the hearing did not supply grounds for a narrowing of the reporting requirements. Although some commenters raised concerns about the burdens that the disclosure rules might impose, those concerns were generally presented in the context of urging the agency to define electioneering communications clearly and narrowly, so that neither the prohibition nor the reporting requirements would apply to genuine issue advertisements or commercial speech. No commenters provided data to quantify the burden that this change in the law might impose on corporations or labor unions, and no written submissions actually asked the Commission to limit the disclosure rules to contributions made for the purpose of funding electioneering communications.

Four of the commenters did not discuss the question of whether the reporting rules should be changed in their comments at all. *See* Comments of the James Madison Center for Free Speech, AR 96–103 (the organization that petitioned for the rulemaking); Comments of the American Cancer Society Cancer Action Network, Inc., AR 222–27; Comments of the Thomas

Jefferson Center for the Protection of Free Expression and Comments of the Media Institute, AR 249–62.   And although there were several commenters that did mention disclosure, they generally mentioned it in the context of advancing their position that their issue ads should not be subject to *any* regulation.   They favored the approach embodied in Alternative 2 – establishing an exclusion to the definition of electioneering communications for the type of speech protected by *WRTL II* – and observed that excluding constitutionally protected communications from the definition of electioneering communications would also mean that the reporting requirements would not apply to them.   *See, e.g.*, Comments of National Association of Realtors, AR 376–82; *see also* Comments of Citizens United, AR 298–323.[8]

For example, the American Association of Advertising Agencies, the American Advertising Federation, and the Association of National Advertisers sought clarification that their commercial and business advertisements were fully shielded by the Constitution and not subject to either the prohibitions or the reporting requirements in the BCRA.   *See* Comments of the American Association of Advertising Agencies, the American Advertising Federation, and the Association of National Advertisers, AR 231–41.   They favored a broad safe harbor that would clearly distinguish commercial speech from prohibited communications and noted: "There is no legal rationale for subjecting to the electioneering communication reporting regime ads that are protected under the *WRTL II* decision.   Further, such an obligation would impose

---

8       Citizens United also mentioned disclosure in passing in its comments in favor of the adoption of Alternative 2 instead of Alternative 1. The organization was concerned that advertisements for its books and documentary films could include references to candidates for federal elective office.   It took the position that the FEC was obligated by *WRTL II* to address general advertising for businesses, products, and services, and that it should do so by exempting business advertising from the definition of electioneering communications.   In that context, it noted:  "Also, from a practical standpoint, we believe the disclosure requirements of Alternative 1 would be extremely difficult to implement because ads for products and services are often financed by investment capital and sales revenues, not reportable contributions."   Comments of Citizens United, AR 309.

significant burdens on advertisers and would chill the full exercise of their First Amendment rights." *Id.* 239.  The advertisers pointed out that "the legal underpinnings for reporting articulated in *Buckley* are wholly absent for ads protected by the *WRTL II* decision[,]" and concluded, "[a] reporting and disclosure regime is inconsistent with the zone of safety created by the Supreme Court for advertisements that can reasonably be interpreted as concerning something other than an election campaign." *Id.* 240.

The Free Speech Coalition, Inc. and the Free Speech and Education Fund, Inc. echoed those concerns, and they called for the promulgation of a narrow definition of "express advocacy and its functional equivalent" that would in turn limit the applicability of the reporting and disclosure requirements.  Comments of the Free Speech Coalition, Inc. and the Free Speech & Education Fund, Inc., AR 325–35.  "[I]f the funding limitations placed upon a broadcast of a genuine issue ad or any other broadcast communication is found to be unconstitutional, then the reporting and disclosure requirement that would otherwise be attached to the ad because it is the functional equivalent of express advocacy cannot be justified by the *Buckley* standard . . . ." *Id.* 330.  The two free speech organizations warned that disclosure and reporting requirements posed the same dangers and should be subject to the same strict scrutiny as absolute prohibitions if they imposed any burden on constitutionally protected speech.  *Id.* 329; *see also* Comments of Independent Sector, AR 365 (advocating Alternative 2 – excluding issue ads from the definition of electioneering communications – over Alternative 1 because "issue advocacy is a fundamental right and purpose of nonprofit organizations" and a "distinction between the funding of ads, which the Supreme Court struck down, and the disclosure of funding for that right cannot be maintained. . . .  Aside from the daunting complexity involved in following FEC procedures, donor disclosure requirements present significant privacy concerns that are not outweighed by

the government interest in disclosure. . . .   We are also concerned about the chilling effect of proposed Alternative One on advocacy rights"); Comments of OMB Watch, AR 384–88 (calling for a more specific general rule exempting issue advocacy and grassroots lobbying from the statutory prohibitions and objecting to the imposition of any reporting requirements on broadcasts that should be exempt).[9]

And similarly, the American Taxpayers Alliance and Americans for Limited Government also warned that compelled disclosure could infringe upon or chill the exercise of First Amendment rights and rejected the notion that the Commission could regulate or impose reporting requirements on issue ads that fell short of express advocacy or its functional equivalent.   Comments of the American Taxpayers Alliance and Comments of Americans for Limited Government, AR 416–29.

In sum, the commenters who expressed concerns about the burdens or the constitutionality of the reporting requirements were primarily advancing the view that certain advertising should fall outside of the scope of the regulatory regime altogether.   None of them called for or even discussed revising or narrowing of the reporting requirements for corporations and labor unions sponsoring genuine electioneering communications:  their aim was to shrink the pool of advertisements to which those requirements would apply.

Meanwhile, on the other end of the spectrum, there were approximately a dozen commenters who urged the Commission to keep the disclosure requirements intact.   *See* Comments of S.B. Hornik, AR 167; Comments of Professors Richard L. Hasen of School of Law: Loyola University Chicago and Professor Richard Briffault of Columbia Law School, AR

---

9       In light of the language in *Citizens United* and *McConnell,* the Court is not persuaded that there is much force to the constitutional objections raised to reporting requirements as opposed to the funding prohibitions.  *See Citizens United*, 558 U.S. at 366–70; *McConnell,* 540 U.S. at 196; *Van Hollen*, 851 F. Supp. 2d at 88–89.

184–88; Comments of Washington State Public Disclosure Commission, AR 190–92; Comments of Professor Allison Hayward of George Mason University Law School, AR 243–47; Comments of Democratic Senatorial Campaign Committee and Democratic Congressional Campaign Committee, AR 264–69; Comments of Common Cause, Public Citizen, and U.S. Public Interest Research Group ("PIRG"), AR 346–60; Comments of Senators McCain, Feingold, and Snowe and Representative Shays, AR 369–74; Comments of Public Campaign, AR 390–91; Comments of the Campaign Legal Center, Democracy 21, Brennan Center for Justice, Common Cause, League of Women Voters, and U.S. PIRG, AR 393–414; Comments of Campaign Legal Center and Robert F. Bauer, AR 431–33; Comments of Alliance for Justice, AR 435–51; Comments of American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"), American Federation of State, County, and Municipal Employees ("AFSCME"), National Education Association ("NEA"), and Service Employees International Union ("SEIU"), AR 453–75.[10]

The Center for Competitive Politics expressed strong views against revising the disclosure rules:

> To our knowledge, no plaintiff has challenged *McConnell*'s interpretation of BCRA's reporting requirements for electioneering communications. Because the Commission has no new or additional basis for believing that electioneering communications run within the temporal windows cannot be subject to reporting, the Commission's rulemaking in response to *WRTL II* must address the application of BCRA § 203 to its regulations and not application of other parts of BCRA. This means the Commission has guidance from the Court only to amend 11 CFR Part 114.

---

[10]     The comments made by Alliance for Justice as well as those submitted by American Federation of Labor and Congress of Industrial Organizations, American Federation of State, County, and Municipal Employees, National Education Association, and Service Employees International Union also contained an alternative position on what the agency should do in the wake of *WRTL II* if the Commission should ultimately decide that the disclosure rules should be changed. *See* Comments of Alliance for Justice, AR 444; Comments for American Federation of Labor and Congress of Industrial Organizations, *et al.*, AR 457.

Comments of Center for Competitive Politics, AR 339.

Similarly, Common Cause, Public Citizen, and U.S. PIRG admonished the Commission

that *WRTL II* did not open the door to altering that portion of the statute:

> The Commission should retain the reporting and disclosure requirements
> for electioneering communications that are express advocacy for a number
> of compelling reasons.  First, the plaintiffs in both *WRTL* and the other
> major as-applied challenge to BCRA Section 203's funding prohibition
> (*Christian Civic League of Maine v. FEC*) never contested BCRA's
> reporting and disclosure requirements for electioneering communications.
> Indeed, they repeatedly told the courts that they were ready and willing to
> comply with the disclosure rules if permitted to fund the ads they wished
> to run.
>
> Second, neither the controlling opinion nor concurring opinions in *WRTL*
> mentioned the reporting and disclosure requirements of BCRA Section
> 201.   They certainly did not call into question the legality of the
> provisions.  The FEC would therefore be entering uncharted waters.

Comments of Common Cause, *et al.*, AR 351 (footnote omitted).  That view was seconded by

the Congressional sponsors of Title II of the BCRA, Senator John McCain, Senator Russell D.

Feingold, Senator Olympia Snowe, and Representative Christopher Shays, who insisted that the

Supreme Court's holding finding some funding restrictions to be unconstitutional did not extend

to the reporting requirements:

> The reporting requirements were not at issue in [*WRTL II*].  The Court did
> not analyze their constitutionality, and if it had, an entirely different legal
> framework would have been implicated.  The Commission should not
> undertake such an analysis on its own, especially since the Court in
> *McConnell* upheld the reporting requirement against a facial challenge. . . .
>
> One of the main purposes of Title II of BCRA was to make sure that the
> public was informed of the identity of persons making expenditures on
> electioneering communications.  The legislative history of BCRA and the
> record in *McConnell* are replete with examples of ads run by organizations
> with benign sounding names and of unknown origin.   The reporting
> requirements of Section 201 were a significant reform in and of
> themselves, completely independent of the prohibition contained in
> Section 203.  Those disclosure provisions apply not only to corporations

and unions but to individuals and unincorporated associations who fund electioneering communications.  And the severability clause in section 401 of BCRA was meant to underscore congressional intent that even if Section 203 were declared unconstitutional, other sections of the bill, including Section 201, should survive.  The Commission should not now effectively throw out Section 201 based on an as-applied challenge to Section 203 that specifically and explicitly disclaimed any challenge to Section 201.

Comments of Senator McCain, *et al.*, AR 371.

Other commenters underscored the salutary purposes of disclosure and took the position that reporting requirements are much less burdensome than restrictions on expenditures. *See* Comments of Public Campaign, AR 390–91 ("Disclosure enhances transparency and can provide citizens with the information to determine how to vote or respond to calls for grassroots lobbying. . . .  I urge the Commission to retain the extant disclosure requirements for all ads that meet the definition of 'electioneering communication.'").

After the written comments were submitted, there was a hearing to consider the NPRM. The hearing to consider the NPRM was held on October 17 and 18, 2007, and it consisted of a series of panels. The witnesses and the Commissioners considered many issues other than the possible narrowing of the disclosure rules, and those discussions that do not bear on the issue presented in this case are not summarized here.

 The first panel included James Bopp, who represented Wisconsin Right to Life in *WRTL II,* on behalf of the organization that filed the petition for rulemaking:  The James Madison Center for Free Speech.  He was joined by Marc Elias of Perkins Coie, representing the Democratic Senatorial Campaign Committee, and former FEC staff member and George Mason Law School faculty member, Allison Hayward. AR 503–632. While there was some discussion of disclosure issues during this panel, the bulk of the discussion was directed towards other issues, such as which of a series of sample ads should be considered to be the "functional

equivalent" of express advocacy, and whether the proposed rules would have the effect of regulating grassroots lobbying.  It is true that Professor Hayward commented that if a corporation or labor union did not utilize a segregated account, the regulatory reporting requirements would require it to "open up [its] books," which could impose a "real burden."  AR 517.  But she did not offer further specifics or quantification.  When prompted to make a prediction, Professor Hayward stated that she anticipated that the Supreme Court might find disclosure requirements for *WRTL II* communications to be unconstitutional if presented with the right case, AR 592–93, but her central point was that *WRTL II* dealt only with the ban on corporate spending, and not disclosure, and therefore, the Commission should not tread into that area at all.  AR 517–18.

Elias similarly "implored" the Commission to do what was necessary under *WRTL II* and no more; "you are not faced with questions about disclosure."  AR 511; 537.  Elias also cautioned against attempting to predict how the Supreme Court would treat the disclosure of *WRTL II* communications.  AR 594.

Hayward's general comments about the burdens of disclosure included her observation that the "contributors" to be disclosed under the statute would not include an organization's commercial customers, those who pay for its services, or members who pay membership dues.  AR 611.  Elias agreed.  AR 612; 616 ("Are there 'contributors' to Ford?").  So this panel did not supply evidence that compliance would be difficult for commercial enterprises or labor unions that did not elect to establish the segregated bank account.

At least one of the Commissioners did express concerns about how the rule would affect non-profit organizations since they are not generally required to identify their contributors, and the delineation between dues and "donations" paid to them might be unclear.  AR 616–19.  But

much of the record consists of the Commissioners themselves thinking out loud about those issues – there was little data placed before them. And there was no testimony offered that suggested that the availability of the segregated bank account option would not alleviate any burdens or privacy concerns associated with imposing the disclosure requirements on a non-profit or any other organization.

Finally, as the Commission wrestled with the larger question of how it should administer the statutory disclosure requirements in the case of organizations that Congress did not anticipate would be funding electioneering communications in the first place, Elias urged the Commission to be guided by the approach that the BCRA is "a disclosure statute." AR 599. He cautioned the Commission to address only section 203 issues, not issues related to section 201 disclosures. AR 599–600. Even James Bopp, who was the most vocal member of the panel on behalf of grassroots advocacy organizations and who warned against adopting an approach that would chill their lobbying and issue advocacy, conceded that no change to the disclosure requirements was required by the *WRTL II* decision. AR 626. Instead, Bopp's position was limited to advocating for Alternative 2, which would exclude *WRTL II* communications from the definition of electioneering communications all together. AR 601–04.

The second panel on October 17, 2007 included Jan Baran, representing the Chamber of Commerce; Larry Gold on behalf of the AFL-CIO; and Don Simon for Democracy 21, a non-profit campaign finance reform organization. AR 632–720. Much of the discussion covered other issues, such as what the definitions of express advocacy and electioneering communications should be, and how to provide clear guidance about what would be permissible after *WRTL II*. *See, e.g.,* AR 665–720. With respect to any changes to the disclosure provisions, Baran simply urged the FEC to create a safe harbor for the funding of issue ads that would be

sure to include all permissible speech, which would in turn have the effect of also eliminating reporting requirements for permissible speech and grassroots lobbying.  AR 636–39.

Gold emphasized that the line of prohibition in the statute defined the line of disclosure, and he pressed for an approach along the lines of Alternative 2 that would narrowly define "electioneering communication" rather than a new regulation addressing the prohibition or the related disclosure rules directly.  AR 641.  In the event the agency took a different approach, Gold observed that the Commission was faced with a situation that had not been contemplated by Congress:  "unions and corporations would never be in a position to have to report electioneering communications because they were simply banned from doing so."  *Id*.  Gold also testified that the words "contribute" or "donate" connote a voluntary transfer without consideration, so under the terms of the statute, "such income [as] receipts, dues, investment income, damages awards and other commercial income and the like ought not to be subject to disclosure."  AR 645.  He explained that taking a broader approach would impose "a tremendous burden on unions in particular.  The obligation to report income at the $1,000 level would be remarkable in comparison to a regulatory requirement . . . which requires unions to disclose all receipts at the $5,000 threshold."  AR 646 (referring to the $5,000 threshold for disclosure under the long-standing Labor Management Report and Disclosure Act).

Simon urged the FEC to leave the disclosure requirement for electioneering communications untouched.

> The [*WRTL II*] court said nothing about disclosure and the analysis used to evaluate the "as applied" constitutionality of Section 203 cannot logically be extended to invalidate the disclosure required by Section 201.  The standard of review is different.   Strict scrutiny versus intermediate scrutiny.  The nature of the burden is different – a ban on spending versus a disclosure of spending that, as the court previously said, "does not prevent anyone from speaking."   . . .  Yet, notwithstanding these differences on every level of the analysis and notwithstanding the court's

> own silence on the matter in [*WRTL II*], and notwithstanding the court's eight to one majority ruling in *McConnell* that the disclosure provision is facially constitutional, you are being asked to make a determination that Section 201 is unconstitutional. Surely the fact that Justices Scalia and Kennedy, as well as Chief Justice Rehnquist in *McConnell*, agreed that Section 201 was constitutional while at the same time voting to strike down Section 203, indicates that they think the analysis of the two provisions is completely different and there is nothing in [*WRTL II*] that indicates that they or any other member of the court has changed their mind on this question.

AR 649–651. Simon was asked whether the FEC could choose its first alternative and adopt language that would exempt business income and membership dues from disclosure. AR 654–55. He opined that the agency could exempt business income, and he expressed some uncertainty about whether the agency could address union dues or whether that required a legislative fix. He acknowledged that membership dues paid to non-profit organizations might raise a different set of questions, but he warned against doing anything that would undermine the reporting requirements, and he directed the agency's attention back to *McConnell*, where the Supreme Court had talked about the importance of donor disclosure in an era of advertisements sponsored by vague "false fronts." AR 656–57. And he emphasized that Congress had already addressed the burdens that might arise out of the disclosure obligation by building in the $1000 reporting amount and creating the option of a segregated bank account. AR 657–58.

The Commissioners turned back to the union representative to ask if there were some way to exempt membership dues while still exposing those hiding behind vague monikers. The witness did not express a need for further regulation in the union context since he opined that dues would fall outside of the disclosure provisions as they were already written. "[T]he main point is that the statute talks in terms of 'contributing contributions' and you have interpreted it to mean 'donating donations.' Union dues are neither. Plainly they are neither." AR 659–60.

But Gold did caution that an organization should not be required to reveal its members simply because it had engaged in a single electioneering communication:

> It seems to me that if somebody gives funds at the dues level – pays dues – that is not a donation, that is not money contributed. If that individual voluntarily gives more, that is truly a donative act and then you are beginning to count perhaps towards the $1,000. But you do clearly have the authority to make these distinctions and you ought to do so. And the availability of the option that you're suggesting in one of the alternatives – a separate fund, even a union or corporation having a segregated fund, and just dealing with that – that doesn't really address this issue completely.

AR 660–61.

The Chairman of the Commission observed that when *WRTL II* identified a new group of communications that could not be prohibited, it necessarily drew a broader group of entities into the regulatory regime, and then the panel went on to discuss with how it should define the class of communications that were protected. AR 665–721.

The third panel on October 17, 2007 consisted of Jessica Robinson of the American Federation of State, County, and Municipal Employees and Paul Ryan from the Campaign Legal Center. AR 721–790. Robinson's remarks were directed to the need for a broad, clearly delineated safe harbor for permissible issue advocacy. She recommended that the Commission adopt Alternative 2, which would limit disclosure obligations by limiting the set of communications to which they would pertain. AR 721–26. She did say, though, that if the agency adopted Alternative 1, instead, it should simplify the disclosure requirements. She feared that the regulatory requirement to disclose "donations" could be applied to dues and therefore difficult to enforce and she concluded, "[t]he easiest way to address these issues is to require reporting only for those people who earmark funds to be used for WRTL II type communications and other funds should be reported just as a donation of the labor union." AR 727.

Ryan pointed out that while there were several commenters who proposed exempting *WRTL II* ads from the BCRA disclosure requirements, there was a large group of commenters, who came from groups with varying perspectives on campaign finance disclosure, who would all agree "that the plaintiff in *WRTL* did not challenge the disclosure requirements, the *WRTL* court did not address the constitutionality of the disclosure requirements, and the *McConnell* court by a large majority specifically upheld the constitutionality of these disclosure requirements."  AR 730–31.  For those reasons, and because there are different constitutional tests to be applied to funding restrictions and disclosure rules, there are broader governmental interests served by disclosure,  and the burdens imposed by disclosure are less than those imposed by restrictions on expenditures, he urged the agency not to utilize the rulemaking to alter the BCRA disclosure requirements.  AR 729–32.

The panel then talked a great deal about the scope of any safe harbor and where the Supreme Court had drawn the line on permissible expenditures for issue ads, before it turned again to the disclosure issue. One Commissioner asked whether there would be any union members whose dues would exceed $1,000 per year, and the answer was yes, although no numbers were provided.  AR 766–67.  The Commissioner also posed questions about how to exempt legitimate dues from disclosure requirements without creating a loophole whereby an anonymous advocacy organization could simply structure itself to charge exorbitant "dues" and thereby shield the names of a limited set of individual donors.  Robinson responded, "I suppose one thing you would look at is donative intent . . . .  Union dues, they are not donations because they are required for union membership.  So one of the ways you would look at it is you would look at the intent of the members of [the group].  Are they doing it so the organization can pay for electioneering communications?"  AR 768–69.  The specter of probing a contributor's intent

prompted this comment by the Vice Chairman:  "It's one of those things that we would have to get into discovery for and that would be a bad thing."  AR 769.  Robinson agreed, *id.,* and the panel resumed its discussion about the content of *WRTL II* ads.

On October 18, 2007, the Commission heard from Brian Svoboda on behalf of the Democratic Congressional Campaign Committee, Jeremiah Morgan of William J. Olson, P.C., representing the Free Speech Coalition and Free Speech Defense and Education Fund, and Michael Trister for the Alliance for Justice.  AR 797–899.  Morgan took a strong stance against imposing disclosure requirements on entities sponsoring issue ads, and he argued that neither of the alternatives in the Notice would comport with the First Amendment.  AR 798–805.  Svoboda encouraged the Commission to proceed narrowly and to do little more than what *WRTL II* required, particularly in the disclosure arena, which was not addressed in the opinion at all and might require a different legal standard and method of legal review.  AR 805–09.  He maintained that this approach would reflect "fidelity to what it was that Congress passed," AR 806, but in his remarks, Trister countered that the existing reporting requirements were not written for corporations or labor unions, so it would be impossible for the Commission to divine how Congress would have decided the question.  Under those circumstances, he counseled the agency to adopt Alternative 2, excluding *WRTL II* communications from the definition of electioneering communications, and to leave the question of what reporting requirements should apply to the funding of this new particular category of speech up to the legislature.  AR 812–16.

After the panelists discussed the safe harbor issue in depth, a Commissioner asked:

> The comment that was most persuasive to me on this point was the one the labor unions filed, because it seems to me you would not even get very useful information out of making a labor union disclose the names of all of its members, anybody who has paid dues in the last year . . . .  Now is there some way that we could preserve the disclosure piece of it, because I think it's still on the books and we kind of have an obligation to do that,

33

> and yet, define donation perhaps in some way to exclude union dues . . . and yet not open the door to . . . those sort of organizations that are always described as shady or shadowy because we do not know who the donors are behind them?   That's the sort of disclosure that I think Congress actually has historically been concerned about.  Is there some way to catch one and not the other?

AR 833–34.

Svoboda posited that Congress provided for the segregated account as one possible option for organizations that wanted to limit disclosure by disclosing only those who donated to the segregated account.   AR 834–37.   Trister suggested that the agency could call for the information that 501(c) organizations are already required to supply to the IRS.   But he expressed the view that there should be a distinction between a general support grant, which an organization can use for any purpose, and an earmarked or special project grant, and he noted that general support grants, even if reportable to the IRS, should not be included within the FEC definition of donation.   "If they gave it whenever they gave it and said, 'Here's $1,000 and I want you to run an ad,' then they ought to report that.   But if they give them $1,000 and say, 'here's $1,000.  I like your organization.  Keep up the good work,' which is essentially a general support grant, then it is unfair and it [is] misleading to the public to suggest that person was connected to the ad in some way, that they paid for the ad."   AR 839–40.   Trister also noted that Congress had distinguished between earmarked and non-earmarked funds in other reporting contexts.   AR 840.

Svoboda generally agreed with Trister as to unions, but he thought that an intent-based distinction would be problematic in the case of those non-profit organizations created for the primary purpose of running electioneering communications.   He cautioned that such an approach would create an enormous hole in the statutory requirement, leaving both the public, and a candidate who might wish to respond to an attack, in the dark about who had sponsored an

advertisement at a critical time close to an actual election.  AR 842–44.  In response to a question by a Commissioner concerned about potential threats to those who might criticize an incumbent officeholder, Svoboda further explained that the identity of the speaker, and not simply the content of the speech, could play an important role in determining the nature of the response. AR 850–52.  Trister took the position that Svoboda's concerns were overstated, because such organizations would likely be required to disclose under the regulations for registered political committees anyway.  AR 845.

The panel was then occupied by an extended legal discussion on the question of whether the justifications for campaign finance regulation set forth in the Supreme Court's opinion in *Buckley v. Valeo* would apply to *WRTL II* ads and what Chief Justice Roberts meant on page 2672 of the *WRTL II* opinion when he questioned whether issue ads that are not the functional equivalent of express advocacy raise the sort of corruption concern identified in *Buckley* as reason for campaign finance regulation.  And Commissioner von Sakovsky asked, if *WRTL II* ads were not electoral activities, how did the FEC have any authority to call for disclosure of their sponsors at all?  AR 853–56.  Since the positions expressed by both the Commissioners and the witnesses during this and similar portions of the hearing were legal conclusions, they shed light on the agency's thought processes and decision making but in the end, they do not provide "evidence" against which the decision can be tested.

The final panel consisted of Stephen Hoersting of the Center for Competitive Politics; John Sullivan of the Service Employees International Union; Heidi Abegg, on behalf of the American Taxpayers Alliance and Americans for Limited Government, and Michael Boos of Citizens United.  AR 900; 902.  Abegg urged the Commissioners to think about those 501(c)(4) organizations that may express unpopular opinions and generate strong adverse reactions from

both the government and the public.  She took the position that disclosure requirements would raise privacy concerns and pose a risk of harassment and reprisals.  She spoke of a longstanding tradition of anonymous public speech, and said that there would be no compelling governmental interest that would support disclosure regulations in the case of communications that are not express advocacy or its functional equivalent.  Ultimately, Abegg urged the adoption of Alternative 2, which would have the effect of eliminating disclosure requirements for *WRTL II* communications.  AR 902–08.

Boos of Citizens United also noted that Alternative 1 did not solve the problems related to those communications because it would leave the "burdensome" disclosure scheme that applies to electioneering communications intact.  But Boos failed to elaborate on how disclosure was burdensome.  AR 910.  He took the position that the FEC should adopt Alternative 2 instead since it would exempt the ads in question – not only the *WRTL II* grassroots ads, but also Citizens United's advertisements promoting the books and documentary films it produces – from the regulatory scheme altogether.  Finally, he called for a broader safe harbor in Alternative 2. AR 908–14.

Stephen Hoersting agreed with the notion that "it would be absurd to have organizations Congress never intended to run ECs all of a sudden have to start reporting their electioneering communications," but he cautioned: "it would be untenable for the Commission to invoke its administrative authority to stay application of Section 201, a facially valid provision, without some organization asserting the application of 201 violates the rights of speech and association. It would be unseemly for that question to be litigated in the posture of an agency defending its administrative prerogatives . . . with no factual background of a speaker who is actually chilled." AR 915.  *See also* AR 927–28.  He concluded:  "The Commission should therefore hold its nose

and apply Section 201 to issue advocates . . . .  The word 'contributes' . . . should guide the Commission in crafting disclosure requirements even if disclosure comes down harder on nonprofit organizations whose ads are funded by contributors than it would for for-profit corporations."  AR 916.[11]  Finally, Hoersting underscored the importance of the need for a clear, narrow definition of express advocacy.  AR 917–19.

The union witness explained that the SEIU, AFL, NEA, and AFSCME were all very active in the area of issue advocacy, spending considerable resources on federal and state legislative activities and spending "a tremendous amount of our members' voluntary contributions on political activities."  AR 920.  He argued that *WRTL II* required the agency to revise its regulations concerning the definition of electioneering communications since the Supreme Court had redefined the boundaries of the Commission's authority, and he emphasized the important distinction between donations and dues.

> Members pay dues to unions not to finance electioneering communications, but to finance and support the full range of activities that the union engages in, from collective bargaining representation, to servicing members, to engaging in advocacy both with their employers and with state and local officials around the country.  And it would be, if not counterproductive, at least serving no particular purpose to report or disclose the names of people who did in fact not contribute to the financing of a particular electioneering communication.

AR 923–24.

There was then considerable discussion by the panel about the extent of the safe harbor provisions in the regulations under consideration and the manner in which the agency could and should implement the *WRTL II* imperative to define the functional equivalent of express advocacy.  AR 925–65.  In response to a question from one of the Commissioners returning to

---

11   Later, Abegg disagreed.  AR 952–53 ("I am for 'the tie goes to the speaker' and not require another nonprofit to spend a lot of money bringing another lawsuit to challenge the disclosure provisions.").

the disclosure issue, Stephen Hoersting suggested that the Commission could probably draw an inference from Congress's rejection of amendments to the Honest Leadership Open Government Act that would have required the disclosure of donors to grassroots lobbying organizations that Congress did not intend that the FECA disclosure rules would apply to grassroots issue advertisements. AR 964–65.  Boos, from Citizens United, stressed the fact that if the agency were to define electioneering communication to exempt certain ads, then those ads would be free of any the disclosure and reporting requirements as well.  AR 967.

At the close of the hearing, the Vice Chairman asked Abegg to provide more information in support of her claim that disclosure could pose some threat to potential donors.  AR 968.  The witness reiterated that disclosure requirements might chill political speech, but she presented the Commission with no specifics:

> I have particular examples, but I can't share them.  Some of them are businessmen who are active in one political party but there is an issue that is important to them so they want [to] give to effect change on that issue and they are afraid if they do so they will face harassment or reprisals from those in the other organizations with which they were associated.

AR 969–70.  Abegg went on:

> Some of them just don't want their names known. They don't want any attention.  They just want to do it anonymously and go about their way.

AR 970.  She maintained that "[i]t is a very real concern" that could stop the flow of donations, and Hoersting echoed that sentiment.  He indicated that he had been involved in conversations where "people stopped their activities because they heard about this disclosure aspect," but his testimony on that point was similarly vague.  AR 971.

> Chairman Lenard:  Could you just elaborate on exactly concretely what their concern is?

> Mr. Hoersting: Yes. Well, I am not sure that I could, actually. I just know when they heard disclosure they were not longer interested in pursuing that issue that had a nexus to candidates.

AR 971. Sullivan from SEIU reminded the Commission of the need to protect the names of union members from potential reprisals in the workplace. AR 973–74. And then finally, with respect to the disclosure issue, the Citizens United witness raised the question of the organization's sales revenue and asked how, if the agency adopted Alternative 1, one would differentiate between such revenue and reportable "contributions" that would be used to fund advertisements. AR 974–75. At that point, the second day of hearings came to an end.

A month later, on November 16, 2007, the General Counsel to the Commission transmitted a Memorandum to the Commission which set forth two proposed draft final rules for the implementation of a *WRTL II* exemption. AR 1001–12. Draft A simply created an exemption from the definition of "electioneering communication." AR 1002–04. But Draft B included changes to the electioneering communications reporting requirements in 11 CFR §104.20, adding the language at issue in this case. AR 1006. The agency received only one letter responding to the change in the reporting requirements, and in it, J. Gerald Hebert and Paul S. Ryan of the Campaign Legal Center expressed their strong objection. AR 1024–26 ("We believe it would be a mistake of historic proportions for the Commission to go beyond the text of the controlling opinion in *WRTL.*").[12] The final rule was approved by the Commission on November 20, 2007.

Based upon this review of the entire record and the hearing transcript, the Court cannot conclude that the FEC "examine[d] the relevant data and articulate[d] a satisfactory explanation

---

12     The Commission also received a letter strongly objecting to proposed language in the draft Explanation and Justification which would have differentiated between for-profit corporations and qualified non-profit corporations when applying the new limitation to the reporting requirements. AR 1127–28. This language did not appear in the final rule.

for its action including a 'rational connection between the facts found and the choice made.'" *See State Farm*, 463 U.S. at 43, quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).  It is hard to put one's finger upon any data that prompted the particular rule in question, or the specific material in the transcript that supports the agency's statement in the Explanation and Justification that "witnesses at the Commission's hearing testified that the effort necessary to identify those persons who provided funds totaling $1,000 or more to a corporation or labor organization would be very costly and require an inordinate amount of effort."  72 Fed. Reg. at 72911.  There was no testimony about how many organizations now covered by the regulatory regime would be affected by the burdens involved with compliance, what those burdens would actually entail, and what the costs would be.

The witnesses appeared to generally agree that neither the statute nor the existing regulations defining "contributors" as "donors" would call for the disclosure of the names of a for-profit corporation's commercial customers and investors, or names of all labor union members, since none of those individuals could fairly be characterized as "donors."  Thus, the concerns that were expressed related largely to non-profit advocacy groups.  In the Explanation and Justification that accompanied the final rule, the agency stated that a non-profit corporation's coffers would include "donations from persons who support the corporation's mission," but that those "donors do not necessarily support the corporation's electioneering communications."  72 Fed. Reg. at 72911.  But no testimony indicated how many non-profit organizations, if any, collected contributions or dues or that would exceed the $1000 statutory threshold, how many individuals made donations or paid dues in those amounts, or how difficult it would be to keep track of them.  No evidence was adduced that would suggest that individuals contributing more than $1000 to a non-profit would be likely to disagree with the messages to be conveyed by that

organization in its electioneering communications.  And nothing explained why the segregated bank account was not a suitable solution for any of the problems that were identified.  So the Court cannot find the regulation to be reasonable under the *State Farm* formulation.

### IV.    The regulation contravenes the language and the purpose of the statute.

It is true that at the second step of the *Chevron* analysis, the reviewing court is required to accord appropriate weight to an agency's interpretation of a statutory scheme that falls within its bailiwick.  467 U.S. at 844.  But an agency's interpretation of an ambiguous statutory provision must still be reasonable "in light of the language, legislative history, and policies of the statute." *Shays v. FEC,* 337 F. Supp. 2d 28, 78 (D.D.C. 2004), aff'd 414 F.3d 76 (D.C. Cir. 2005) ("*Shays I*"), quoting *Republican National Committee v. FEC,* 76 F.3d 400, 406 (D.C. Cir. 1996). Moreover, in *Shays III,* the Court of Appeals declared:  "[i]n applying *Chevron's* second step and the APA, we must reject administrative constructions of a statute that frustrate the policy that Congress sought to implement." 528 F.3d at 918 (internal quotations and edits omitted).  In light of those precedents, the FEC's decision to take it upon itself to "limit" the statutory disclosure requirements cannot be sustained, and for those reasons, in addition to those set forth above, the Court does not find section 104.20(c)(9) to be a reasonable interpretation of the BCRA.

First, looking at the language of the statute, section 30104(f)(1) imposes its disclosure requirements on *"[e]very* person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year."  52 U.S.C. § 30104(f)(1).  The BCRA defines "person" to include corporations and labor unions, 52 U.S.C. § 30101(11), and as the FEC acknowledged in its pleadings before this Court, even before *WRTL II,* the disclosure rules applied to some corporations, in particular, the non-profit corporations described in *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S.

238 (1986).  *See* Def.'s Mem. [Dkt. # 24] at 6.  And section 30104(f)(2) requires disclosure of "the names and addresses of *all* contributors who contributed an aggregate amount of $1,000 or more," 52 U.S.C. § 30104(f)(2)(E)–(F) (emphasis added), with no limitation other than the threshold amount.

It is true that the Court of Appeals has already stated that the words "contributors" and "contributed" can, on their face, be construed to include a purpose requirement.  *Ctr. for Individual Freedom v. Van Hollen*, 694 F.3d at 111.  But an interpretation that narrows the application of the reporting provision would be inconsistent with the policies underlying the statute.  There can be no dispute that the concept of disclosure and transparency is fundamental to the BCRA.  As the Court set out in some detail in its prior opinion, the legislative history of the BCRA makes it clear that the purpose behind the disclosure requirements was to enable voters to be informed about who was trying to influence their decisions.  147 Cong. Rec. S3022-05, S3034 (Mar. 28, 2001) (statement by Sen. Jeffords) (noting that Congress intended to "shine[] sunlight on the undisclosed expenditures for sham issue advertisements"); 147 Cong. Rec. S3233-06, S3238 (April 2, 2001) (statement of Sen. Feinstein) ("The attacks come and no one knows who is actually paying for them.  I believe this is unethical.  I believe it is unjust.  I believe it is unreasonable and it must end.").  As the Supreme Court has explained, the disclosure provisions were intended to prevent independent groups from running advertisements "'while hiding behind dubious and misleading names'" so that "citizens [could] 'make informed choices in the political marketplace.'"  *Citizens United*, 558 U.S. at 367, quoting *McConnell*, 540 U.S. at 197.

Therefore, it was contrary to the policy goal that Congress intended to implement for the Commission to add limiting language to its regulations when the aim of that language was – as

the FEC put it – "to ensure that disclosure of the newly-permitted electioneering communications would be narrowly tailored . . . ." Def.'s Mem. at 10. Congress did not call for narrow tailoring; it called for just the opposite.

And the new rule serves to frustrate the aim of the statute because the introduction of a subjective test to the reporting regime creates an exception that has the potential to swallow the rule entirely. A donor can avoid reporting altogether by transmitting funds but remaining silent about their intended use.

Moreover, the decision to reduce disclosure and transparency was not justified or necessitated by the reasons the agency identified when the final rule was promulgated. The Commission posited that the donative purpose limitation was needed because the general treasury of a corporation or labor organization is likely to contain funds derived from individuals who do not necessarily support the entity's electioneering communications, and that therefore, disclosing the identity of those payors would not advance the goals underlying the reporting requirements. 72 Fed. Reg. at 72911. But the same rationale applies equally to partnerships, unincorporated entities, and any other "persons," and Congress determined that they would all be bound by the disclosure requirements anyway. *See also Citizens United,* 558 U.S. at 351 ("All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech."). And, prior to *WRTL II,* the disclosure provisions already applied to some corporations – the *MCFL* organizations – which, like other non-profits, pursue a broad range of educational and advocacy activities beyond the mere funding of electioneering communications. Furthermore, the agency's statement that it would be too burdensome to require organizations to identify all "persons who provided funds," *see* 72 Fed. Reg. at 72911, is inconsistent not only with the statute, but with the agency's own regulations, because that is not

who had to be identified under the existing regime in the first place.   FEC regulations implementing the BCRA reporting provisions require the disclosure of "the name and address of each *donor* who *donated* an amount aggregating $1,000 or more," 11 CFR §104.20(c)(8) (emphasis added), not "persons who provided funds."   The Commission failed to articulate why a for-profit corporation's customers and investors, or a labor union's members – all of whom transfer funds in return for some consideration in the form of goods or services or an ownership interest – would not be fully protected by the regulation's limiting reporting requirements to "donors," or why further elaboration on that term – rather than the interposition of an intent limitation that could eviscerate the reporting rules – would not alleviate any lingering confusion. In other words, the FEC had already clarified the ambiguous statutory term "contributors" in a manner that largely cured the potential problems it identified.   And Congress had already prescribed a remedy for those organizations that found the identification of all individual donors to be too burdensome:  the segregated bank account. *See 5*2 U.S.C. § 30104(f)(2)(E).[13]

Since nothing about the *WRTL II* decision altered the operation of those regulations, it was unreasonable to add an intent requirement that limited disclosure obligations for the supposed purpose of implementing the changes brought about by *WRTL II*.   Indeed, the Commission explicitly acknowledged in the Explanation and Justification for the rule that *WRTL II* did not authorize it to eliminate the reporting requirements.  *See* 72 Fed. Reg. at 72901 ("Thus, because *McConnell* has upheld the definition of ECs, as well as the reporting and disclaimer requirements, as facially valid, and because *WRTL II* did not address these provisions, the

---

13    The fact that these accounts may be used to receive contributions from individual donors only does not make them an unsuitable vehicle for eliminating the burdens of organizational disclosure; it was the cost and effort that might be involved in reporting individual donations that was what troubled the agency.

Commission has no mandate to revise the underlying definition of 'electioneering communication' or remove the reporting and disclaimer requirements.")

Finally, the regulation cannot be supported on the grounds that the Commission fairly balanced the need for disclosure against sensitive First Amendment and privacy concerns. *See* Def.'s Mem. at 33–36; CIF Supplemental Mem. [Dkt. # 93] at 5–7. This was not a justification advanced in the Explanation and Justification, and more important, those arguments have been foreclosed by the Supreme Court. In *Citizens United,* the Court clearly found that the disclosure requirements in the BCRA – even those that apply to ads that are not express advocacy or its functional equivalent – do not impinge upon constitutional rights, *see Citizens United,* 558 U.S. at 367–69. *See also Independence Institute v. FEC,* Civ. Action No. 14-1500 (CKK), 2014 WL 4959403 (D.D.C. Oct. 6, 2014); Def.'s Opp. at 7 (noting that in *McConnell,* the Supreme Court "upheld the electioneering communication disclosure requirements, noting that they did not suppress speech and that important state interests support the requirements"). Moreover, the record evidence on the need to address privacy concerns was extremely thin; the fact that some contributors "just don't want their names known" does not provide grounds to override a clear Congressional choice in favor of transparency. AR 970.

**CONCLUSION**

For the reasons above, the Court finds that 11 C.F.R. § 104.20(c)(9) is unreasonable and therefore fails under the second step of the *Chevron* test, and that it is arbitrary, capricious, and contrary to law in violation of the APA.  As a result, the Court will enter judgment in favor of plaintiff, and it will vacate 11 C.F.R. § 104.20(c)(9).  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  November 25, 2014